UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
NANCY HALL,

Plaintiff,

24-CV-2817 (VF)

-against-

**ORDER**

SONNY VATAJ,

Defendant.
----------------------------------------------------------------X
**VALERIE FIGUEREDO, United States Magistrate Judge:**

The transcripts from the bench trial are attached hereto. Exhibit A is the transcript from June, 2, 2026, and Exhibit B is the transcript from June 3, 2026.

**SO ORDERED.**

DATED: New York, New York
July 8, 2026

VALERIE FIGUEREDO
United States Magistrate Judge

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

NANCY HALL,

Plaintiff,

v.

24 Civ. 2817 (VF)

SONNY VATAJ,

Trial

Defendant.

------------------------------x

New York, N.Y.
June 2, 2026
11:15 a.m.

Before:

HON. VALERIE FIGUEREDO,

U.S. Magistrate Judge

APPEARANCES

THE LINDEN LAW GROUP, PC
Attorneys for Plaintiff
BY: JEFFREY BENJAMIN

PATRICK J. BLISS
Attorney for Defendant

(Case called)

MR. BENJAMIN: Good morning, your Honor. Jeff Benjamin from the Linden Law Group in Manhattan.

THE COURT: Good morning, Mr. Benjamin.

MR. BENJAMIN: Good morning.

MR. BLISS: Good morning, your Honor. Patrick Bliss, 399 Knollwood Road, White Plains, New York.

THE COURT: Good morning, Mr. Bliss.

So it sounds like no one is planning on giving an opening statement. So we can start with plaintiff's first witness.

MR. BENJAMIN: Your Honor, yes. One quick housekeeping matter, plaintiff's exhibits, anyway, are a little bit off. I don't know what the Court wants me to do about this. I emailed the Court last night. We can keep it as is just for numbering purposes, or I can take a moment to re-number them if your Honor wants. I'm withdrawing certain exhibits. There is no need for a couple of them in our final preparation.

THE COURT: I would introduce the exhibits with whatever witness is going to introduce them, one at a time. So then the ones that you don't plan to introduce, you don't have to introduce, and then there won't be any numbering issues because I will number them as they get admitted.

MR. BENJAMIN: Exactly. Okay.

MR. BLISS: I have a totally different set of numbers, so you are going to go identifying each document, that's fine with me, Judge.

THE COURT: Okay.

MR. BENJAMIN: One more final thing. Counsel and I conferred, and there are certain exhibits that we both consent to, if you want to hear what those are? I think you should know --

THE COURT: You mean stipulated exhibits?

MR. BLISS: Basically, yes.

THE COURT: And they are different than the stipulated facts you sent last night? They are actual exhibits?

MR. BLISS: They are actual exhibits.

THE COURT: We can do those at the end. If you need them for the first witness, we can do them at the beginning.

MR. BENJAMIN: I just want to know from counsel if there is one that we can stipulate to admit, as opposed to going through entire identification, authentication. Much of these are duplicative. His exhibits are almost duplicative of mine, so I can consent to those. So when he introduces them, we don't need to go through the admission process. But I haven't heard from counsel yet on what he can admit to mine. So when I'm about to call the witness, I just need to know what the process is going to be if we can just consent to their admission.

THE COURT: Let's hypothetically take an example. You're going to call the plaintiff up to testify. You have an exhibit you want admitted. Before laying the foundation if you've shown it to defense counsel, and he has no objection to its admission, we can just admit it. If he objects, then I'll have you lay the foundation.

MR. BENJAMIN: Sure, sounds good. Thank you.

Plaintiff calls the plaintiff. Can I hand up the trial binder?

THE COURT: Are these exhibits?

MR. BENJAMIN: Yes, these are the plaintiff's exhibits, yes.

THE COURT: Okay. Whenever you're ready.

NANCY HALL,

called as a witness by the Plaintiff,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BENJAMIN:

Q. Good morning, Ms. Hall.

A. Good morning.

Q. Let's start by telling the Court what your educational background is.

A. Well, I was a high school dropout. I got my GED and then I eventually got myself admitted into Fordham University. I didn't complete my bachelor's. I only completed about three

years of credits.
Q. What is your work experience?
A. Predominantly administrative assistant work. I'm also a full-charge bookkeeper, so I have a lot of experience with bookkeeping as well.
Do you want me to run my resume down?
Q. Did you own a business at some point in the past?
A. I did.
Q. What was the name of that business?
A. Dash Car Service.
Q. And what was the nature of that business?
A. It was a medical transportation provider for dialysis patients.
Q. What were your daily duties or operations in that business?
A. I would basically go out and solicit business with some of the dialysis centers. I would also handle all of the billing as far as getting payment. That was the most important part of my business to me. And you know I also oversaw payroll. I had a payroll service. But, you know, basically I did HR, general administration tasks that you would do in any business.
Q. Okay. And when did you run that business from, when to when, what days?
A. I started in 2013. And I closed it in 2022, in the beginning of 2022, about nine years.
Q. Okay. Prior to 2018, did you have any experience in

investing in real estate whatsoever?
A. No.
Q. Okay.
A. I had a real estate license, but I never used it. I did maybe one transaction doing a rental right before my business took off. But once I got really busy with running the business, I realized I wasn't going to be a realtor.
Q. Okay. Prior to 2018, have you ever had any experience with private money loans, regular loans?
A. No. I mean, the only thing I did was maybe a car loan. I took a small loan with the SBA when I first started my business but, you know, they basically handle all the paperwork. They did a lot of handholding for new businesses, $15,000 just as a startup.
Q. Are you familiar with the term, "hard money loans" when it comes to real estate investments?
A. I'm familiar with it now.
Q. Prior to 2018, had you had any experience with extending hard money loans in real estate?
A. No.
Q. What do you understand hard money loans to be today?
A. The way that it works, now that I've educated myself on it, basically, it's an asset-based loan. Pretty much they don't loan you the money based upon your creditworthiness. They basically, solely base the loan upon the asset. The way they

structure it is usually -- depending on the deal it could be a 70/30 or 80/20 loan-to-value ratio, where they put up the 70 or 80 percent, and the borrower puts up the other 20 or 30 percent toward the asset. And once the asset is purchased -- it's usually for distressed properties. It's not for regular properties. The property has to be in distress. And the loan -- the lender basically is responsible for putting out money for these construction loans to actually develop the property.

But the lender is very strict about the way they give out those draws. You have to do the construction first and the lender comes and inspects the property to make sure that the value, you know, was added to the property. And then if they agree that the value was added, then they give you the first money draw for the construction. And they do that process about two or three times throughout the project. And, you know, then you complete the project. And you are supposed to flip it into a conventional mortgage. Because hard money loans are not really designed to -- for you to buy a property and hold the mortgage for 30 years. It's really a short-term loan where basically you buy this distressed property, you improve the property, and then flip it to a conventional mortgage.

Q. Okay. How did you first meet the defendant, Sonny Vataj?

A. Around 2013 when I was just starting to plan on opening up my business, I lived in Morris Park in the Bronx. I attended

association meetings there. I went to speak to him. I had a business plan that I put together. And I picked the particular location in mind that I wanted to have my business at. And the president of the association said that they wouldn't approve that location. It wasn't the right location for a car service. And he recommended that I meet with Sonny, who was a local broker in the area. He said that he would be able to help me find a proper location that the association would approve.

And so I met with Sonny. I think I paid him either 10 or $15,000. He explained to me that he would be able to help me obtain all of the necessary approvals because it was a trifecta of people that I had to get approval in order to open a car service. It's a very complicated process.

He was very friendly with people in the community. I had to get approved from the police department, I think it was the chief of police. I had to get approval from the community board, which the Morris Park Association president was also a member of. And I also had to get approval from somebody at city council. I think his name was Jimmy Vacca. And he knew all these people. So basically he told me that if I paid him the amount that we agreed upon, he would help me get the three letters to get the approval. And he would also help me pick the location to house the car service.

Q. And where was that location?

A. 1534 Stillwell Avenue in the Bronx.

Q. Did you remain there throughout your business?
A. No, I stayed there for five years, roughly five years, give or take. And then about 2018, I went to Sonny. He was -- he owned, like, a mini mall. And that was where his office was at on Allerton Avenue. And one of the tenants had moved out, and he wanted to take over that space. He didn't want to re-rent it to a tenant, so he was doing an expansion of his operations. And he was building all of these tiny offices in that space. And when I went over there to look at it -- for the first five years of my business I had been working out of this dirty warehouse. So when I saw that he had this open space, I said to him, hey, you know, can I move over here? I'd prefer to be over here in this nice office. Can I have one of the small back offices in the back? And he agreed to it. And, you know, basically --
Q. What was he in the business of doing back then?
A. He was a real estate broker. He had two or three offices throughout the Bronx. Actually, he opened one in Westchester as well. He was a real estate broker. He was very prominent. He had anywhere from 100 to 150 agents depending on how many offices he had. He was a very well-known person in the community.
Q. What kind of proximity were you in your office when you moved there to his office or his area?
A. We both had offices in the back. Basically, I was on one

side of the building, and he was on the other side of the building. And there was a back entrance. And, you know, most of the realtors in his office, they would dress up. They would wear suits. And me and my staff would dress down. We would come in in sweatpants or jeans. I didn't work there all the time. I worked from home sometimes, remotely. But my staff would come in. And they would come in through a back door entrance through the alley. It was very clean, but basically we would use that entrance, predominantly.
Q. Back then in 2018, how frequently did you interact with him on a business basis?
A. Once I moved into his office, I probably interacted with him at least once or twice a week, but it was always in passing. It was very rushed. Sonny was very busy. And you had to catch him on the go. And sometimes I'd walk with him or get in his car and take a quick ride with him to the store or wherever it was he was going just to have a conversation.
Q. At some point was there a proposal between you to do business together?
A. Yes. I approached him. My business was doing very well, and I had saved quite a bit of money. And I was getting ready to start looking at buying a house. I had also set aside some funds to invest in some sort of investment property. I knew that he was extremely successful, not only as a broker, but he also owned a multitude of investment properties as well.

Sometimes I would go to different events with him and he would speak at conventions and give speeches about his first big deal was a property on Williamsbridge Road that was right up the street from me, and there was a TD Bank. When I first moved into the apartment up the street from that property, it was a hole in the ground. And he basically obtained that property. It was obviously a distressed property. He built it from the ground up and put the anchor tenant in there. It went through several years of changes of banks because I guess TD Bank had different names at the time. But that was one of the different properties that he had.
Q. What was the proposal between the two of you?
A. I approached him and told him that I wanted to get into some sort of mixed-use properties, similar to the types of properties that he already owned. I wanted to create passive income for myself. You know, I had saved up enough money to purchase a house and also get some sort of real estate investment. I admired a lot of the properties that he had, and I wanted to be in a similar position. So I went to him and, you know, basically told him we should set something up and, you know, I would put some money up to invest in that type of property.
Q. And what was his response?
A. He was okay with it. You know --
Q. What was the date that you talked to him about that?

A. It had to be June of 2018 more or less, maybe May. I mean, we had a quick conversation, and it eventually happened. But, yeah, it was somewhere around that spring, early -- late spring, early summer of 2018.

Q. When you discussed the proposal of doing a real estate investment together at that time, what did you expect your roles to be, you and him separately?

MR. BLISS: Objection, your Honor.

THE COURT: Grounds?

MR. BLISS: What she expected?

THE COURT: If you want to rephrase it to just what she understood.

Q. What did you discuss with him about what your varying roles would be in this venture together?

A. Well, he was definitely going to be in charge of vetting any investment properties. I clearly had no experience in working with distressed properties or even working with any type of properties. I had never owned a property in my life. In fact, I was just thinking about buying my first house. I hadn't even done that when we started the LLC. So I wasn't in the position to do that. He basically told me, like, he had to make sure it was the right deal. You know, he wanted to make sure that it was in a prominent location, that it was going to be a good deal. He always had this saying of "buy low, sell high." He didn't want to have something that wasn't

profitable. He had so many successful investment properties. He certainly didn't want to pick one up with me, according to that discussion. So my understanding was that basically he was going to be vetting the properties, vetting the entire project and overseeing me because I clearly had no experience in that. My entire resume was basically bookkeeping and, you know, administration.

Q. So when you say "vetting the property," what did you mean by that when you expected him to do that then?

A. I expected him to look for properties that made sense as far as the numbers were concerned. You know, I couldn't even really say what I expected because I didn't even have enough knowledge in the industry to say what I expected specifically. But he was the one that took command and basically said we have to make sure that it's a property that makes sense, that the numbers make sense. He stressed that to me. Because he said, you know, we don't want to get into a deal that's not a good deal.

Q. And what about you? What was your role to be in this partnership?

A. We didn't really discuss my role. I mean, I put up money. But I did expect him to either match my money or contribute more money. Obviously, $200,000 wasn't going to go very far in the real estate market in the Bronx. That was basically me just putting the money there and setting it aside specifically

for that.
Q. Did he ever put money in himself?
A. No.
MR. BLISS: Objection. I'm a little lost as to what we are putting money into, whether there was a project in place. We kind of jumped from what the purpose of going into a project together would be. And now we're talking about people putting money up.
THE COURT: Overruled. If you want to continue asking her about the potential for the joint venture. But vis-a-vis that question, if she is able to answer.
Q. When you say -- when you testified before that he was to vet the property, he was vetting or verifying the property, what did you know that to be at that time? What was he going to do?
A. I assumed that he was -- either he was going to search for the properties himself, or he was going to have some of his agents do it. He had a bevy of agents at his disposal which obviously, whatever property we would take, if they were involved in the transaction, they would take a commission. So I expected that he was going to be putting proposals together as far as these type of investment properties, investment opportunities as far as those properties were concerned. Because I clearly didn't have any experience.
Now, I did take it upon myself to look for properties.

I was very excited. I was excited that he was willing to go into something like this with me, and I just wanted to get it going. So I took it upon myself to also look at properties, do research. I traveled down to Baltimore to look at some properties. My daughter lived down there. And I figured there might be an opportunity down there. I knew that I was looking to buy a house in New Jersey, so I also looked at New Jersey as well. And obviously, there were also opportunities in the Bronx because our offices were in the Bronx.

Q. Okay. So going back to the research portion of the venture that you testified to just now, other than, as you said, running the numbers, what was your understanding of how Sonny was going to identify a good property for the two of you?

A. I presume he would be doing some sort of due diligence, looking at what -- I guess what the price of the property was versus what sort of work was needed on the project. In particular, if it was a distressed property, obviously he would have to assess how much was going to be, you know, put into the property, maybe put forth some sort of construction budget.

You know, he would also be contributing as far as helping with the financing of the project. Because I wasn't even sure if I would be able to finance a project so big by myself. So I expected him to put money in as well. And also put forth his name, his credit. We both had excellent credit. We both had good cash flow. You know, it was supposed to be a

partnership.
Q. You mentioned the word "distressed property." What did you mean when you said "distressed property"?
A. Well, distressed property is something that you can't get a conventional mortgage for. You have to purchase it with a hard money lender. Conventional banks don't purchase distressed properties. So that type of property would need a significant amount of work to bring it to the valuation that we were looking for, for the deal to be profitable.
Q. Was there a point in time where you sought to formalize your relationship with Mr. Vataj by agreement or a corporation or something else?
A. Yes, we formed an LLC.
Q. Who formed the LLC?
A. He had his lawyer form it.
Q. And who was his lawyer.
A. Walter Ciacii.
Q. Did you reach out to Walter Ciacii?
A. No.
Q. And what did Walter Ciacii do initially?
A. He basically did the formation. You know, me and Sonny had a brief discussion before he did the formation because we had to decide on the name. He let me pick the name because typically he had another rule which was that any property that he bought he would name the LLC the address of the property.

But because this particular LLC did not have an address, because we hadn't picked the property yet, he let me pick the name. And basically I ran it past him, but he wasn't too concerned about that. And then he had Walter form the LLC.

MR. BENJAMIN: Okay. If you could take a look at what's been marked for identification as Exhibit 1 in the binder.

For the record, I'm handing counsel my Exhibit 1. Any objection?

MR. BLISS: No.

MR. BENJAMIN: Your Honor, move to admit.

THE COURT: I just want to make sure I'm looking at the right document. It starts with Blumberg Excelsior Corporate Services Inc.

MR. BENJAMIN: Right.

THE COURT: Those were the documents you previously gave as informational documents of Cache?

MR. BENJAMIN: Correct.

THE COURT: And no objection?

MR. BLISS: No objection.

THE COURT: Plaintiff's Exhibit 1 is admitted.

(Plaintiff's Exhibit 1 received in evidence)

Q. Ms. Hall, if you could flip to the sixth page of the exhibit. At the top you'll see a statement of organization?

A. Yes, I'm on that page.

Q. Do you see in Paragraph 2, that it lists the members of the LLC; correct?
A. Yes.
Q. That's both of you, that lists both of you there?
A. Yes.
Q. At the time that Mr. Ciacii -- strike that.
Did Mr. Ciacii send you the corporation documents you see here?
A. No, he gave the black book to Sonny, Mr. Vataj.
Q. Did you ever have any correspondence from Mr. Ciacii on the corporation documents?
A. No. The only correspondence that I got from him was one email the day that he went to open the bank account, basically saying that, you know, this was a draft of the operating agreement. And that -- and I replied back to the email and basically said, you know, we should meet and discuss this.
Q. Okay. That was as to the operating agreement. But at any point in time, did you retain Mr. Ciacii to do this work?
A. Oh, I'm sorry. I guess I'm confusing the operating agreement with the statement of organization. They look similar to me.
No, I did not retain Mr. Ciacii for this. These were Sonny's friends. It was his lawyer. He did all the talking with them, predominantly.
Q. Are you aware whether Sonny formally retained Mr. Ciacii

for the corporation documents or operating agreement?
A. He asked me to cut a check from the LLC at some point, and I did that. But that was the extent of it.
Q. Did you ever see a contract between two of them or the LLC for work, for lawyer work?
A. No.
Q. Okay. If you could take a look at what's been marked Exhibit Number 2, for identification.
MR. BENJAMIN: For the record, I showed counsel Exhibit Number 2. Any objection?
MR. BLISS: No objection, your Honor.
THE COURT: And this is a draft of the operating agreement?
MR. BENJAMIN: Yes, your Honor.
MR. BLISS: And an email.
THE COURT: Plaintiff's Exhibit 2 is admitted.
(Plaintiff's Exhibit 2 received in evidence)
Q. Ms. Hall, take a look please at the first page. Can you describe what's in the first page to the court?
A. It's an email from Peter Della Mura who was Walter Ciacii's partner. Basically, he is saying that attached is a simple agreement for our review and can we meet tomorrow. And then I replied back and basically said, yes. Let's meet tomorrow. We have an appointment with Chase to open up the bank account for Cache, and let's do the meeting before.

Q. Did that meeting ever happen?
A. No.
Q. Why didn't that meeting go forward?
A. After we opened up the bank account, Sonny claimed that he had to do something else and didn't have time to meet.
Q. Was it rescheduled?
A. No.
Q. Who wrote -- strike that.
The second page of the agreement, which at the bottom says "1 of 14." Do you see that?
A. Uh-hum.
Q. Who wrote this agreement, to your knowledge?
A. Well, I'm not sure because there is Peter Della Mura and Walter Ciacii. It appears that Peter wrote it because he is the one that sent the email but I don't know for sure because, again, I didn't speak to them about writing the agreement. But it was one of the two.
Q. The meeting you testified to just now was not rescheduled at any time; correct?
A. No.
Q. Did you have a discussion with Sonny as to the contents or the possibility of an operating agreement between you?
A. Not as far as the contents of the operating agreement. This was just a boilerplate operating agreement that they threw together based upon whatever they thought it was going to be.

Q. Did you have a discussion with respect to an operating agreement in general, to put something in writing?
A. I told Sonny that I did want an operating agreement. I was concerned that if something happened to one of us, that there could be an issue. Particularly because I had already put $200,000 into the bank account. And, you know, I had children. He had children. I didn't want to be in a position where if one of us, you know, passed away tomorrow, the $200,000 would be in limbo.
Q. And what was his response to the conversation of putting this in writing and in an operating agreement?
A. He just blew it off as if it never happened.
Q. To your understanding, no operating agreement was ever signed by either side; is that true?
A. No.
Q. Okay. You testified earlier to what the roles were between you in this joint venture, in this partnership for real estate?
A. Correct.
Q. What about ownership and split of money. What was your understanding as to how you were going to split money and the ownership of the LLC?
A. We hadn't really decided that yet. Basically, it was a boilerplate agreement that these people had put together. But given the fact that I had put $200,000 in, and he hadn't put anything in, I wasn't sure that I was willing to commit to

50/50. I wanted to see how things played out. I didn't really pressure him as far as that was concerned because I didn't know how this played out. I was more concerned about finding the asset because I felt like then we would somewhat finalize things.
Q. Was there ever a discussion of a different split, other than 50/50 with Sonny?
A. Well, not in terms of the operating agreement. There was a discussion in terms of the tax returns because down the line we formed an LLC in 2018 and a year later the tax returns had to be filed. So I approached him at one point and said, hey, I would like to do an 80/20 split on the K1s for the tax returns because we have to file the tax returns. We can't just not file them because we don't have the asset yet. So are you okay with that? And he said yes.
Q. And you mentioned that you had deposited 200,000. In relation to date on the email, the first page of that Exhibit Number 2 -- do you see the date of June 7, 2018?
A. Correct.
Q. That was the email and the talk of the operating agreement; correct?
A. Correct.
Q. In relation to that date, when did you deposit money into the Cache account?
A. I either transferred it that day or maybe a day or two

later. I'd have to see the bank statement to confirm the exact date, but I believe I transferred it over two transfers. It was 100,000, and it was another 100,000.
Q. Initially, at that initial point in time, was it your understanding that Sonny was going to deposit money at that time with you, at the same time?
A. At some point, yes.
MR. BENJAMIN: Okay. Flip to, if you would, please, what's been marked as Exhibit Number 3 for identification.
I'm handing counsel a copy.
MR. BLISS: No objection.
THE COURT: These are the bank statements from Chase?
MR. BENJAMIN: This is the initial bank statements from Chase, right.
THE COURT: Plaintiff's Exhibit 3 is admitted.
MR. BENJAMIN: Thank you.
(Plaintiff's Exhibit 3 received in evidence)
Q. Tell us what Exhibit 3 is, please.
A. It's the bank statement for Cache Realty Group. It shows the two transfers that I did. And it also shows a deposit of $30,000.
Q. Those two transfers of 100,000 and the second one for 100,000 on June 8 and June 13, respectively, that was from your account?
A. That's correct.

Q. What was the 30,000 for?
A. I had given Sonny $30,000. I wanted to basically motivate him to let him know, you know, to take this seriously as far as looking for these investment opportunities. And, you know, Sonny was the type of person that was motivated with money. So, you know, he had, on the fly, he had agreed to give me the office space in the back. He was already doing the construction. It wasn't that he constructed an office for me *per se*. The walls were down. Everything was open. Once he agreed to rent me the office space in the back, I asked him could I put some specific data lines and electric lines in certain places in the office before they closed the walls back up. And so he allowed me to do that without a problem. And because of that and just the whole gestalt of the situation, I wanted to give him $30,000 to motivate him to get moving with looking for an investment opportunity. It was, again, something I was very excited about.
Q. And were you aware what he did with that $30,000?
A. He took the $30,000 and deposited it into Exit or into his personal account. I don't remember which. I want to say it was Exit. And then he wrote a check back to Cache for $30,000. So in essence it was basically a transfer from me to him and back to Cache.
Q. And that's the fourth page of the exhibit; correct?
A. Yes. And the check written from Exit Realty. So he took

the 30,000 I gave him, and he then wrote the check right back out back to Cache.

Q. Do you recognize your handwriting in the "pay to the order of" section?

A. In which section?

Q. The "paid to the order of" section of the check, that last page of the exhibit? Do you recognize the handwriting on there?

A. I don't see a "paid to the order of" page. I'm not sure. Maybe it's missing --

Q. Take a look at the signature on that page then. Withdraw the question.

A. Oh, yes, I do see that. Yes, that's Sonny's signature.

Q. You recognize Sonny's signature?

A. Yes. It was on the front of the check. And it's also on the back of the check.

Q. Okay. About how many times did you view his signature while you were there?

A. A couple of times. I was pretty familiar with it.

Q. We can set that aside for now.

Okay. Once you deposited the money into the Cache account, tell the Court what the process was for finding a property? What did Sonny do at that point in terms of searching for a property?

A. He sent me a couple of listings via email. He also had a

couple of his agents submit listings to me. I also, you know, was reaching out to different people. I had a realtor at the time who was searching for a house for me. So I also mentioned to him that I might be looking for some commercial real estate. And, you know, we exchanged a couple emails back and forth. To be honest, I sent most of the listings to him, but there were a couple from him and his agents but not many.

Q. So you were looking for listings as well?

A. Correct.

Q. Were you vetting or verifying any of those properties?

A. I mean, I really didn't have the experience to vet or verify. I visited some of the properties. I traveled to some of the properties. I would talk to the realtors about the properties. But I really didn't have the level of experience to, quote, vet the projects. I was nowhere near as experienced as Mr. Vataj.

MR. BENJAMIN: Flip to Exhibit Number 4 for identification.

I'm showing counsel a copy. No objection?

MR. BLISS: No objection.

MR. BENJAMIN: Your Honor, no objection to Number Four.

THE COURT: Number Four is the 9/29 email regarding Hopewell Junction?

MR. BENJAMIN: Yes, your Honor.

THE COURT: Plaintiff's Exhibit 4 is admitted.

(Plaintiff's Exhibit 4 received in evidence)

Q. If you could tell the Court, Ms. Hall, what is that email regarding?

A. Sonny, in passing, had mentioned to me that one of his investment properties, which was I don't know, it had maybe 50 or 60 apartments up in Hopewell Junction that him and his brother owned it. And, you know, would that be something that I was interested in as far as an investment opportunity. He didn't get into a lot of detail. I wasn't really sure what his thought process was in terms of how he was going to structure it, if he was trying to sell the whole property to me by myself or was he trying to sell it to Cache and maybe just sell his brother's portion of the property so that he could get out of the deal? So I made a list of questions that I had in regards to the property, and I sent Sonny an email about it.

Q. One of those questions in this exhibit says, are you and your brother 50/50? Did you see that?

A. Yes.

Q. Why were you asking that at that time?

A. I was just curious to know, like, again, what was the structure of the deal? What were we looking at? Was he trying to sell 100 percent of the property? Was he trying to sell a portion of the property and then we were going to own the whole property together under Cache? I didn't really understand what

his thought process was on it. He didn't really give me enough information to understand that. So I just put together a list of questions that I thought would be intelligent questions to ask in regards to the project.

Q. That was September of 2018. Do you see that? That was the date of that email; correct?

A. Yes.

Q. Between June of 2018 and September of 2018, what, if anything, did Sonny show you in terms of potential acquisition?

A. He didn't show me anything. I'm not sure of the timing of when his agent, Otis sent me an email regarding a particular project that Sonny did mention to me. But outside of that, he hadn't sent me anything.

MR. BENJAMIN: Okay. Thank you. With that please take a look at Exhibit Number 5. I'm showing counsel this as well. It's two pages.

Your Honor, could we admit?

THE COURT: No objection? The Cache offer to purchase of 2019, that's the document?

MR. BENJAMIN: Yes, your Honor.

THE COURT: So Plaintiff's Exhibit 5 is admitted.

(Plaintiff's Exhibit 5 received in evidence)

Q. Okay. Can you describe what the two pages of Exhibit 5 are to the Court?

A. Basically, it was an email from Otis Gore, who was one of

Sonny's top realtors. It was to both me and Sonny, and it was basically an offer to purchase a property. And Sonny briefly told me about the property. It was located, I believe on Westchester Avenue. He told me basically it had a laundromat on the ground floor and had some apartment rentals on the upper floors. And he was considering that as an opportunity for us, but he wasn't sure about the location. He had concerns because it was on Westchester Avenue. And Westchester Avenue wasn't as prominent as some of the other properties he owned. A lot of his properties were located on these main streets like Allerton Avenue, Morris Park Avenue, Williamsbridge Road. And this particular property was on Westchester Avenue. It was a known avenue, but it wasn't as prominent as some of these other properties that he had been involved in.

Q. So this was an example of him actually sending you a potential investment; correct?

A. Correct.

Q. Okay. So understanding your testimony, this might not have been typical. Why didn't this deal go through?

A. He didn't follow up with it. He started basically shooting it down and coming up with reasons why it potentially wasn't a good deal, even though he had Otis draft this offer to purchase.

Q. You did discuss this with Sonny himself; correct?

A. Yes, absolutely.

Q. Okay.
A. Otis just sent the email. He was just like a middle person just presenting the paperwork because he would have been the realtor. You know, if we purchased it, he would have made a commission. So he was highly motivated to get this out and make something happen but everything was discussed directly with Sonny.
Q. Okay. The purchase price that's listed here is second page of the offer. It is 1.150 million, right, 1.15 --
A. 1.035.
Q. Sorry?
A. 1.35. No, I'm sorry. No, you're right. I'm sorry. I'm reading less the deposit. It's the balance at closing. Correct, it's 1.150.
Q. Ms. Hall, for a purchase of that, the two of you would have needed more than 200,000 in the bank; correct?
A. Probably.
Q. Where would -- if hypothetically if this were to go through, where would the other money have come from to purchase this property?
MR. BLISS: Objection, Judge. It's a hypothetical.
THE COURT: Do you want to rephrase.
Q. If it was a viable property -- strike that.
Were the two of you considering a property that was -- that would have been in the range of 1.15 million?

A. Yeah, we were considering properties even higher than that multimillion.
Q. Where would the extra money come from if one of those went through?
A. From him, from me, from financing.
Q. So was it your understanding of the agreement that you might have had both either put more or --
A. Absolutely.
Q. -- into the investment?
A. Yes.
Q. Okay.
A. I just wanted to set my money aside and get it into the account because I knew -- you know, I'm just that way. I'm a bookkeeper. I like to put things where they belong. So I had that money set aside for that in particular. I didn't want it sitting in other accounts where I could potentially dip into it.
Q. Other than this offer in October, was there any other offer coming from Sonny or one of his agents that came to you?
A. No. I mean, like I said, in the very beginning he sent me a couple emails. There may have been a few scattered emails here and there, but there was nothing very serious that materialized. Basically his reasoning behind that was that no good deals had come up.
Q. So after October 2019 -- I'm sorry.

A. October 2018.
Q. 2018, after that offer, did any deals come up whatsoever?
A. No.
Q. In the period between June 2018 through November 2018, was there any discussion of doing something other than acquiring a property?
A. Between June of 2018 to November of 2018?
Q. Yes.
A. No.
Q. At some point in time, did you discuss with Sonny not acquiring a property but extending a loan?
A. No, not in that time period.
Q. Okay. So at what time period did you discuss doing a loan?
A. In the spring of 2019 we were passing each other in the office, and he mentioned that an opportunity had presented itself where one of his agents, Faton, had an uncle who was a developer. And they had a property in Tennessee. The property had three buildings, and it had an anchor tenant which was FedEx. And he mentioned, potentially, flying down there to look at the property. And he basically said that he thought it would be a good thing for us to do because no actual real estate deals with an asset had materialized. And instead of having the money just sitting in the bank account for the LLC, we could be making some interest on the money.
Q. What did you understand the connection to be between Faton

and Sonny prior to the conversation with Sonny?
A. He made it appear like he was very familiar with it. He also made it appear that he was very familiar with his uncle. He used the word "developer." All of Sonny's friends were in real estate just like him. They were all very prominent, as far as their real estate buildings. One of his very close friends owned the building that I actually lived in for 23 years. And he owned a multitude of buildings in the area. And him and his brothers also owned a multitude of buildings up and down Eastchester Road, Morris Park Avenue. They were in construction. So when he used the word "developer," I took it to be one of these people that we -- that I saw him around, that I was familiar with being around him.
Q. You mentioned his uncle. Who was his uncle?
A. Destan.
Q. Do you know what his role was in this Tennessee property?
A. Destan and Faton owned the LLC that Sonny ultimately deployed the money to.
Q. What was your understanding of how Sonny negotiated the terms of this loan that he brought to you?
A. He told me that basically it would be 8 percent interest, either eight to ten percent, and you know it would be a six-month turnaround time. So it would be really quick to get a flip on the money and that he was going to make sure that it had a personal guarantee. The way he framed it was that this

personal guarantee was so valuable, this interest rate was so great that I didn't have to worry. In other words, I had nothing to worry about in regards to the money because of the personal guarantee, that was going to make the deal ironclad. And he would make sure the money would be returned.

MR. BENJAMIN: Your Honor, I'm going to skip to 7, I'm going to hand counsel both 7 and 8 for his review. Your Honor, 7 and 8 I believe there's no objection?

MR. BLISS: No objection.

THE COURT: 7 is the personal agreement, and 8 is the promissory note?

MR. BENJAMIN: Yes, your Honor.

THE COURT: Exhibits 7 and 8 are admitted.

(Plaintiff's Exhibits 7, 8 received in evidence)

Q. Ms. Hall, what was your money supposed to be used for when you agreed to send it to the LLC in Tennessee?

A. He actually described it as a hard money loan. He basically said that, you know, the money was being deployed as a hard money loan and that is why we would be getting such a high interest rate. So it would be used for construction.

Q. Do you know what kind of construction this would have been?

A. He didn't specify. I mean, he made it seem like it was just a bridge loan for them to ultimately refinance and that was the reason they would be able to turn the repayment around so quick. In other words, whatever they were doing down there

that they were refinancing, the majority of it was completed. And therefore this was just wrapping up some loose ends to the project in order for them to complete the refinance with the traditional lender.

Q. What did Sonny do to vet this particular loan, at least to come to you and say this is a good investment?

A. He didn't specify to me what he did. I mean, as I know now, as I've learned now, he didn't do anything.

MR. BLISS: Objection, your Honor.

THE COURT: If you want to ask her what she knew then, that would work.

Q. Okay. At some point the money in the Cache account was sent to the borrowers in Tennessee; correct?

A. Yes.

Q. Or the LLC I should say?

A. Correct.

Q. Were you given anything from Sonny to support the quality of this investment or the terms of this investment?

A. Outside of the personal guarantee, no.

Q. And the personal guarantee is Exhibit Number 7. Could you look at that.

A. Yes, that's correct.

Q. Okay. And if you look at Number Eight in conjunction with Number Seven, what was that document?

A. That was basically the note saying how they would repay the

loan, what the interest rate was and what the terms of the arrangement were. It basically said that he was, you know, supposed to deploy the first amount and then before he deployed the second amount he was supposed to do some sort of verification that the work had actually been done for the first hundred thousand.

Q. Okay. We're going to get there.

But these two documents, do you see the date of these documents? Who gave you these documents?

A. Sonny did.

Q. When?

A. Well, he showed me them, and then he ultimately signed them, you know, with the gentleman that he deployed the money to.

Q. Was that on or around May 7, 2019, for the personal guarantee?

A. Well, he showed me them a little bit before.

Q. Okay. So to your knowledge these were executed on the dates that were listed there, May 7th and May 9th?

A. That's correct. I wasn't there for the execution of them.

Q. Thank you.

When you saw these and when you had the conversation with Sonny, what did he represent these documents to be?

A. He made it seem like it was ironclad, like this was an easy choice to make. The money was just sitting in the bank, not

getting any interest, that he didn't have any concern, that he knew these people, that they were experienced. Again, he used the word "developer," which now that I have more knowledge, I could see that could be used very cavalierly. And basically he said that this would be an easy flip for us to make a little bit of money on the side until we found the type of investment opportunity that Cache was formed for.

Q. Did you know the relationship between Sonny and Faton and Destan when you got these documents? When you got Seven and Eight?

A. Yeah, he told me the relationship between them. He told me -- well, I knew that Faton worked in his office. I wasn't really familiar with Faton. You know, he had tons of agents running around. I may have seen Faton in passing, but he wasn't very friendly, and I wasn't very friendly. You know, everybody was busy doing their own thing. There were one or two agents that I was particularly friendly with in his office, and Faton wasn't one of them. He had also told me basically that he knew his uncle, that was the bigger issue. He knew his uncle. He was a developer in Tennessee. And they had this project, and it was a great opportunity for us to make some interest on the money versus letting it sit in the bank account.

Q. So what -- strike that.

How was the money transferred to the LLC in Tennessee?

A. The first hundred thousand was written by check by Sonny and then the second one was a wire transfer where he went to the bank to make the transfer.

Q. Okay. With that said, I'm going to direct your attention to Exhibits 9 and 10 for identification. And I'm handing counsel copies of both.

MR. BENJAMIN: No objection to these exhibits, your Honor.

THE COURT: Plaintiff's Exhibit 9 is the bank statement, that's admitted.

And Plaintiff's Exhibit 10 is the second bank statement, and that's also admitted.

(Plaintiff's Exhibits 9, 10 received in evidence)

MR. BENJAMIN: Thank you.

Q. So Ms. Hall, please tell us first what Number Nine is, as you testified earlier?

A. So Number Nine is the bank statement showing when the first $100,000 check was written by Sonny. And it looks like it was cashed on what was written on May 13th, and it was cashed on May 13th.

Q. And it appears to be cashed by somebody named Destan Seferaj?

A. Yes. Destan was the uncle who he said was a real estate developer.

Q. If it was written on the 13th, and it was cashed on the

13th, was it your understanding that Destan was in New York?
A. I didn't know where Destan was. My understanding was that he was in Tennessee. The project was down in Tennessee. The only person that I knew to be in New York was Faton. He had to have been in New York at some point because he signed the agreement with Sonny.
Q. But you were aware that Sonny was writing this check; correct?
A. Yes. He called me.
What happened was first he mentioned the opportunity to me. And he mentioned that we were going to fly down to Tennessee and then he didn't follow up for a couple weeks. And suddenly one day he called me out of the blue and basically said, you know, did you think about what we talked about? And I said yes. And he said, what do you want to do? And I said, are you sure it's a good deal? He said, yeah, it's a good deal. The money is sitting there anyway. It's an easy flip. You're going to make interest on the money and so on and so forth. And basically it's a no brainer. You're not using the money or deploying the money into any project right now. We have the personal guarantee. There is nothing to really worry about. He said he was familiar with these people. It seemed like he had worked with them before. I had no reason to question him deploying the funds to these people because everybody around him, you know, was a serious real estate

developer or real estate investor. He himself was a serious real estate developer and investor.
Q. So if the term of the loan was six months, you testified earlier it was six months, you expected payment in November of 2019; is that true?
A. That's correct.
Q. Okay. Same questions as to Exhibit Number 10. Do you see Number 10 in evidence? What was that payment for?
A. So this is the second bank statement from -- it's dated in July, and it's when he did the second transfer to Pendleton Court Apartments for the $88,500.
Q. And when you say "he did," you mean Sonny?
A. I mean Mr. Vataj.
Q. Okay. Take a look at the fifth page of that exhibit. It actually says page 3 of 4 at the bottom.
A. Yes.
Q. Do you recognize the signature there?
A. Yes, it's Mr. Vataj's signature.
Q. Okay. And the date purports to be July 3 of 2019?
A. That's correct.
Q. Okay. So the first payment in Exhibit 9 was made May 13th in Exhibit 9?
A. Correct.
Q. And the second payment was made July 2; correct?
A. That's correct.

Q. Do you know how starting with the first payment, how that money was used?

A. No.

Q. Did you have a discussion with Sonny of how the first payment was used by them in Tennessee?

A. No. He never explained to me what they did with it. Again, it was supposed to be a construction loan, so I presumed that it was construction. But he never discussed it with me. He never showed me evidence of them doing construction.

Q. Right. So from May, did you ever see any receipts for anything?

A. No.

Q. Did you see any permits for anything?

A. No.

Q. Did you see any tax receipts or tax payments for that property?

A. No.

And tax payments weren't the purpose of the money. So, no, I did not see that.

Q. Was there ever a discussion that payments -- your money would be going towards tax for the property, taxes for the property?

A. No.

He described it as a hard money loan. I didn't even realize that they actually had a hard money lender already in

place. Again, I wasn't sophisticated back then to understand what that means. But his exact words were we were basically the hard money lender.

Q. Were you aware of any other liens on that property?

A. No. He did use the word "refinance." So I had to assume that there was some sort of mortgage on the property which obviously they would have a lien. But I'm not aware that there was already a hard money lender in place.

Q. Did you ever later come to be aware that there was another hard money lender on the property?

A. Yes. Through my own research I basically looked up the deed. I looked up when they purchased the property. They actually purchased it in January of 2018. And they purchased it with Mercury Capital which is a hard money lender. They specialize in distressed assets and pretty much they purchased it for 1.65 million.

So, again, assuming how hard money lenders work, I would presume that the borrowers, Destan and Faton, would have had to have put up between 20 and 30 percent of their own funds in order to obtain the asset which would have been between 5 and $600,000. So they probably owed about a million fifty on the note.

Q. And you learned that from where? Where did you learn that?

A. I went to public records, and I pulled the deed of purchase. And I also went to the public records for the

auction. I saw that when the property was ultimately auctioned off, it actually went to auction six times, which I was never made aware of. I actually just found that out two or three weeks ago. I pulled up the substitute trustee deed from a company called DebtCo which basically Mercury Capital hired to go to the final auction to buy the property back. And they purchased it back at a million fifty which told me that's probably more or less what Faton and Destan owed on the note. And subsequently DebtCo flipped it back to Mercury Capital a month later after the auction, back to Mercury Capital for 1.75 million.

And what that told me was that basically they hadn't done any construction on the property. They clearly could not even get to the first construction draw with Mercury Capital, which was very problematic. If they purchased the property in January of 2018 that would mean that they were holding onto the property for about 18 months before they came to Sonny for this money and had not gotten to the first construction draw. And that's very serious.

These people were in serious financial distress. They were incompetent basically. You know, they didn't know what they were doing there. I mean, you don't take a hard money loan on a project like this and not do the construction. The minute that you close on that property, you need to get right to work. You need to be pulling permits. They should have

been pulling HVAC permits, you know, plumbing permits, construction permits to basically do the entire project. And according to Mr. Faton's deposition, he said that the property had an after-repair value of --

MR. BLISS: Objection. At this point.

THE COURT: Yes, sustained. If we could ask a question.

MR. BENJAMIN: Sure.

Q. What was Sonny telling you at those points about the value of the property?

A. He didn't tell me anything about the value of the property. That was never discussed.

Again, at that time I was not a sophisticated real estate investor, as the defense would like to claim. So I was just concerned with us getting something and getting something going. He was really the deciding factor in terms of, you know, what the property would be purchased at, what the valuation was before and after. I didn't have any experience with any of that. He had experience with construction. He had experience with distressed properties. He owned a multitude of investment properties. I had zero experience with any of this. I was relying on his experience, basically.

Q. Were you aware of the period of time when your money went down to the LLC in Tennessee in July of 2019, from that date, do you know when that property went to foreclosure auction that

you mentioned?
A. I'm not sure. But if I had to guess, they probably would --

MR. BLISS: Objection, Judge, as to the guess.

THE COURT: Sustained.

Q. Do you have anything that either in this case or that was given to you to show what period of time lapsed between giving them the money and the property going to foreclosure?
A. Well, I know they weren't paying their taxes back in 2018 and 2019 --

MR. BLISS: Objection, Judge. That's not responsive to the question.

MR. BENJAMIN: She answered.

THE COURT: You don't have a document that would refresh her recollection about the foreclosure date?

MR. BENJAMIN: We're going to get there later, but I don't want to take it out of order at the moment. I'll withdraw. That's fine. We'll just move on.

THE COURT: Okay.

Q. When did you learn about foreclosure and ultimately the six auctions that you discovered?
A. I didn't know about the six auctions until about three weeks ago. But I learned about the foreclosure in February of 2022.
Q. And what brought you to understand the foreclosure was

happening?

A. Me and Sonny had an argument prior to that about me questioning him about what when was going on with the money, and he got very upset with me. I had asked him to schedule a call with me and my bookkeeper. She is more familiar with certain things, and I wanted her to be on the line to ask questions. And within three to five minutes in the conversation, he got furious. He basically said, like, what's going on here? Maybe the next time I talk to you, I need to talk to you with my lawyer, and he hung up on us. Of course I was mortified. I was completely embarrassed. I wasn't expecting that. Up until then, he never spoke to me like that. He was always very callous and just, you know, kind of fluffing you off, but he never spoke to me in that way saying that he needed to speak with an attorney.

So I called him back, and I was like what is going on with you? Why did you just act like that? He was like, oh, you are always questioning me. I don't want you questioning me, this and that. It was a brief conversation. I wrapped it up. But at that point I was very concerned.

And then shortly thereafter he sent me a text and basically said that I needed to move from the office. Prior to that I had asked him if I could downsize my office and move to one of the smaller offices because it was during COVID. Everybody was working from home. I really didn't need as much

office space. And initially he had agreed to that. But then once he flew into this rage with me, he sent me a text telling me that I had to move the office. So I agreed. And then shortly --

Q. And that was January of what year?

A. It was January of 2022. January or February of 2022, somewhere in that range.

And then shortly thereafter, he suddenly called me up one day after I had moved out of the office. And he said I'm here with Walter -- or I want to say Walter because Walter was the one that was involved in this. And he said we lost the property. And I went into shock. I had absolutely no idea that the property was in foreclosure. I didn't even know that the property was up for auction.

You know, over the prior summer, he had mentioned to me in passing, like, maybe we could buy the property back at auction at some point. But he didn't specify that the property was actually up for auction and that they were actually in foreclosure. That was never clarified to me whatsoever. If I knew that, you know, I would have immediately took action.

I had no idea what was going on. Basically him and Walter were pretty much -- I want to say Sonny was creating an information monopoly between him and Walter. Any time that I spoke to Walter, which was very briefly, I didn't really have much of a relationship with Walter. Even though he was next

door, he was friends with Sonny. They owned the strip mall together at one point. This was a very incestuous relationship. It wasn't like I could pick up the phone and call him up and ask him all of these questions. On top of that, I relied on Sonny's expertise and experience. You know, he was my business partner, or at least I thought he was my business partner. I assumed he was telling me exactly what was going on. I never dreamed that I was in the position of just completely having the rug pulled out from under me one day.

So he calls me up with Walter. He tells me he lost the property. And then he starts this high-pressure conversation in regards to me having to make a decision because apparently they had seized one of the bank accounts of Faton's son, I believe. I want to say it was Faton's son. I'm not really sure. The bank account had about $25,000 in it, but according to Sonny, we wouldn't be able to seize that much because it wasn't Faton's account. And so he was trying to basically get me to make a decision on creating some sort of settlement with them where I would take that money and take a $600 payment per month to pay down the judgment.

Q. We'll get there.

But when you learned -- when you were told that you lost the property, where did you think at that time your money actually went when it was sent there, back in July of 2019?

MR. BLISS: Objection. It calls for speculation.

THE COURT: If you can rephrase the question. I don't think I even understood the question.

Q. When you learned -- that you just testified that you learned you lost the property, where did you understand your money to have gone?

MR. BLISS: Same objection.

THE COURT: Can I ask a background question. I may have missed it in the testimony. It would be helpful to know what she understood at the very beginning, so May of 2019 when the first transfer goes out, what she understood that money to be going towards?

MR. BENJAMIN: Sure.

THE WITNESS: You want me to answer the question?

THE COURT: Well, he should ask you the question.

I just don't know that we've established what she thought the money was being used for.

Q. In May of 2019 when you did agree with Sonny to send that first installment down there --

A. I thought it was being used for construction to finish the project so that they could refinance and repay me my money.

Q. Did you ever come to learn that it was actually used for construction?

A. No, they did not use it for construction. There were no improvements done to the property, which is why they ultimately lost the property.

MR. BLISS: Objection, Judge. What's the basis for that conclusion?

THE COURT: And how did she know it was not used for construction?

THE WITNESS: I looked up the permits that they pulled on the property. There were no major construction permits.

MR. BLISS: Same objection, Judge. Permits don't always equate to work being done or construction taking place.

MR. BENJAMIN: But the absence of permits do. And she's just testified to what she checked in the public record and what she learned. She can testify to what she's observed. I think that's what she's doing.

MR. BLISS: It's hearsay, observance, number one.

Number two, lots of construction takes place without permits. So I don't think you can conclude --

THE COURT: Yes, I sustained it. Given her lack of expertise in whatever the construction at issue may be, I'm not sure she can say just from the lack of permits that there was no construction done.

Q. Where did you think the second installment was going to be used? How did you think the second installment was going to be used?

A. I thought it was also going to be deployed for construction.

Q. Did you get any indication after the fact, after that

payment was made that it was actually used for construction?
A. No.
Q. As you sit here today, you don't know precisely whether either of those payments were put to?
A. I know it wasn't put to construction because the property was relisted.
MR. BLISS: Objection, Judge.
THE COURT: Sustained.
Q. Flip to, please, Exhibit Number 11 for identification. It's a three-page exhibit.
There's no objection to 11.
THE COURT: It's the 2018 bank letter?
MR. BENJAMIN: Yes, your Honor.
THE COURT: Admitted.
(Plaintiff's Exhibit 11 received in evidence)
Q. Ms. Hall, can you tell the Judge what this email and document is for?
A. I was working with a realtor in New Jersey for my house. And I also told him that I was, you know, looking for a potential commercial property, mixed use. And he wanted proof of funds. So I went to Sonny and I asked him could he provide me with that so the realtor would take us seriously and start looking for listings of the type of properties that Cache was looking for.
Q. And the last page of that exhibit, if you could look at the

last page of the exhibit, which looks to be a TD Bank letter. What did that letter mean to you?
A. Sonny owned TD Bank. That was his anchor tenant, and he also owned an account at TD Bank. And basically that was his proof of funds showing that he had $600,000 in the bank at the time when I asked him for the proof of funds.
Q. And when you saw that, what did you think when you knew he had that in the bank?
A. I felt good. He had already deployed my money, but I felt good. I knew he was solvent. I knew he had all of these investment properties. I knew he was a successful real estate broker. It reassured me that basically I was doing business with somebody that knew what they were doing and was in a position to do what he said he was going to do.
Q. Were you aware whether Sonny had control over this 186 for Williamsbridge Road LLC?
A. Yes, he had control over a number of LLCs. He had a shelf full of them.
Q. It was your understanding that when you saw this proof of funds letter, this money was available to Sonny?
A. Yes.
Q. And what was done with this letter -- strike that.
What was your understanding of how this letter was used?
A. It was used for proof of funds to realtors who would help

us look for the type of properties that we formed Cache for.
Q. You gave this to your New Jersey realtor?
A. Yes.
Q. Okay. Was there a discussion at the date of this letter in October 2019 of Sonny actually contributing money at that time?
A. Yeah. I mean, there was always a discussion about that right from the beginning. It wasn't just from 2019. It was right from the very beginning he was supposed to contribute money and also help finance the loan.
Q. Was there a loan in particular that you had discussed having gotten this proof of funds letter?
MR. BLISS: Objection, Judge. I think the testimony was that they were seeking out properties, not making loans.
MR. BENJAMIN: Well, I think --
Q. When you testified just recently to the loan, who was supposed to apply for a loan?
A. I'm sorry. I'm confused.
Q. You just testified to go out to get a loan?
A. A loan for a property.
Q. A loan to acquire a property?
A. Correct, that was the original intention of Cache. It was never my intention to loan the money.
MR. BENJAMIN: Right.
We're going to skip Number 12 and move on to Number 13. I'm handing counsel a copy of what's been marked as 13.

Any objection?

MR. BLISS: No.

Q. If you could take a look at what's been marked as Exhibit 13 in evidence, Ms. Hall.

A. Yes.

Q. What does that document represent?

A. I sent him an email telling him about some COVID-relief funds. And that was his response to me. He didn't really reply often to emails, but it just was his general attitude with me. It was very sarcastic, very flippant.

Q. So when he responded, "send me check, mofo." What was he referring to?

A. He was referring to the rent check for Cache.

Q. This had nothing to do with to the property acquisition?

A. No.

Q. Let's set that aside.

THE COURT: Are you moving Exhibit 13 into evidence?

MR. BENJAMIN: Yes. I'm sorry. There wasn't an objection.

THE COURT: And there wasn't an objection.

Just to confirm, I have for Exhibit 13 a form that's titled Additional Information From Your 2019 Federal Partnership Tax Return, and then a general email from Sonny.

MR. BLISS: No, I have as 13 in my exhibit book an email exchange on one page from Sonny Vataj to Nancy Hall and

then below that is an email from Nancy Hall to Sonny Vataj. This is dated April 2nd. Hers is dated March 31.

MR. BENJAMIN: The one you listed, your Honor, was my original 12 that I'm skipping. I think you just said it was a tax return.

THE COURT: Yeah, for your 12, I have the partnership tax return. And then I have a loan sheet, and 13, I have two sheets in 13, the additional information from your 2019 partnership tax return, which I can take out because I'm assuming that is not your 13.

MR. BENJAMIN: Yeah, sorry.

THE COURT: So Exhibit 13, just the two emails is admitted.

MR. BENJAMIN: Yes. Thank you.

(Plaintiff's Exhibit 13 received in evidence)

Q. At some point in time, Ms. Hall, did you come to understand that Sonny actually made efforts to recover the money that was sent down to the LLC?

A. Yes.

Q. Okay. What did he do, to your knowledge?

A. Well, initially when they first defaulted on the loan, he approached me and asked me to call Destan. He said that basically Destan didn't know that he was participant of the LLC and that he really didn't want Destan to know that because, you know, it would be frowned upon by the Albanian community if

Sonny was involved in, I guess, putting him in default of this loan.
Q. The default was in November 2019; is that correct?
A. That's correct.
Q. So did you call Destan?
A. I did.
Q. And what was your -- why did you call him?
A. Sonny asked me to call him. He directed me to call him and basically just asked him general questions about payment. Destan started making excuses. He claimed that there was some sort of issue with the architect. And that --
Q. Was there ever any payment made of your money back based on the loan and the note?
A. No.
Q. Okay. After that phone call? I mean, after that phone call?
A. No. There was a couple of phone calls, two or three.
Q. Did you discuss that phone call and the substance of your conversation with Sonny later?
A. Yeah. Sonny was probably on the line listening in.
Q. But Sonny did not participate in a phone call?
A. No. He did not want Destan to know that he basically, you know, was involved with the LLC to that degree. He wanted to act like he was some sort of representative to me and that he was the one who would be taking any action against Destan and

Faton.
Q. Did you have a discussion after that phone call can Destan with Sonny as to what Destan said?
A. Yeah, I told him what Destan said, but it didn't really mean anything to me. Sonny never indicated to me that there was ever any alarming issue other than that they defaulted on the loan, and he made it appear like it wasn't a big deal because we were collecting interest on it anyway because interest was accruing, so that wasn't a bad thing for us. We were still making interest on our money. And we had these personal guarantees that were ironclad and blah, blah, blah.
MR. BENJAMIN: Let's flip to exhibit -- your Honor, if you could just give me just a moment.
THE COURT: No worries.
MR. BENJAMIN: Your Honor, there is no objection to Number 15.
THE COURT: The affidavit and confession of judgment?
MR. BENJAMIN: Yes.
THE COURT: Plaintiff's Exhibit 15 is admitted.
(Plaintiff's Exhibit 15 received in evidence)
Q. Ms. Hall, if you could please flip --
MR. BLISS: Judge, is your labeled? Meaning, there's a number of documents in 15 that I have. I actually don't have an objection to any of them. But --
THE COURT: So I have as the first document in 15 is

the personal guarantee of payment.

MR. BLISS: Right.

THE COURT: That's six pages. Then I have a document titled, Affidavit of Confession of Judgment. Then I have a promissory note. Then I have another copy of a personal guarantee of payment.

MR. BLISS: That's what I have.

THE COURT: Okay.

MR. BLISS: And no objection to any of the documents. I think everything but the affidavit is already in evidence.

THE COURT: Okay.

MR. BENJAMIN: I'm sorry about the duplicitous. I'm only going to be asking about the affidavit of judgment which starts at the sixth page, and it's three pages.

Q. If you could please, Ms. Hall, flip to the sixth page where you see three pages of an affidavit of confession of judgment.

A. Uh-hum.

Q. Are you there?

A. Yes.

Q. When did you first see this document?

A. He probably showed it to me around the time that it was filed or shortly thereafter.

Q. And you mean Sonny?

A. Yes, Mr. Vataj.

Q. So if the date on this document at the top by the Court

stamp was May 6th and 7th of 2021, is that when you remember seeing this document?
A. Yes, more or less.
Q. And what did you -- why was he giving you this document?
A. He was basically telling me that I didn't have to worry, that we were going to seize their bank accounts and basically that would secure my money.
And at that time I believed him because I didn't understand that the people they loaned the money to were judgment proof. They didn't have any assets. They didn't have any bank accounts. In fact, they hadn't even been paying their taxes on the property down in Tennessee since 2018. And if they had money in bank accounts, why weren't they paying their taxes? Why weren't they able together the first construction draw?
Q. After he showed you this document, did you feel more secure in getting your money back?
A. Yes, I did. He kept reassuring me, like, don't worry. We are going to seize these bank accounts. We are going to get ahold of them, as if there were some bank accounts with loads of money in them because these are real estate developers.
Q. With that, take a look at what's been marked Exhibit 16 for identification.
MR. BENJAMIN: Your Honor, there was no objection to 16.

THE COURT: The entry of order of judgment?
MR. BENJAMIN: Yes.
THE COURT: Plaintiff's Exhibit 16 is admitted.
(Plaintiff's Exhibit 16 received in evidence)
Q. Ms. Hall, do you see Exhibit 16?
A. Yes. I'm looking through it now.
Q. What is that document?
A. I'm sorry. Just give me a moment to look through it, please.
It looks like this is -- it looks like they had filed the judgment with the Court to seize their bank accounts.
Q. And did Sonny show you this at any point in time?
A. Yeah. Yes, he did.
Q. And how did you feel about your money when you saw this judgment paper?
A. I felt reassured. I felt that we were going to finally get to seizing these bank accounts which had some money in it.
Q. Okay. In 2021 when you saw this affidavit of confession and ultimately this judgment, did you do anything in relation to it?
A. No, outside of calling him to ask him what was going on, you know, I was asking him when are we going to seize the bank accounts? He claimed there was a delay because of COVID and that the Courts had finally opened up and basically they got the judgment and that, you know, they were going to submit it

to the bank.
Q. If you look at Number 16 at the top, it looks like an email that was forwarded or at least sent to you. Do you see at the top?
A. I wasn't on any of these emails. Any information that I would receive, I would receive it directly from Sonny. I didn't really have a line of communication with Walter Ciacii. My email address is not on here at all.
Q. So that's the question. You didn't receive this from the lawyer?
A. No. All my information and communications basically came from Sonny.
MR. BENJAMIN: We can skip Number 17, your Honor. I'm not offering that at this time.
If you look at 18. We are skipping to 18, please. I'm handing a copy to counsel. It's a six-page document. No objection?
MR. BLISS: No.
MR. BENJAMIN: Your Honor, there is no objection to Number 18.
THE COURT: Plaintiff's Exhibit 18 is the restraining notice?
MR. BENJAMIN: Right, yes.
THE COURT: And it has a cover letter, that's the document?

MR. BENJAMIN: Yes. That's the document.

THE COURT: Plaintiff's Exhibit 18 is admitted.

(Plaintiff's Exhibit 18 received in evidence)

Q. Ms. Hall, when did you see this? Have you seen this document before?

A. I did see it before.

Q. Okay. What who gave you this document?

A. Sonny gave it to me. I called him to get an update on what was going on with the money. He said to me that they were having an issue with Chase Bank and getting Chase to actually put a -- I guess the word is "lien," on the account. Again, that a lot of these delays were due to COVID. And he decided to show me a copy of the letter to prove basically Mr. Ciacii had actually sent this letter to the bank.

Q. Okay. Did you have a conversation with anyone on the date of this letter, June 9, 2021, on the importance of this notice?

A. Yeah, Sonny. He was my line of communication. He was basically reassuring me that we were getting ready to seize their bank accounts and get to recovering some of money.

Q. And did you learn at some point in time that there was some money that was in the bank account that was being seized?

A. I didn't learn that until February of 2022.

Q. What did you learn -- you know what, let's look at Number 19. Thank you.

MR. BENJAMIN: I'm handing a copy of number 19 to

counsel. It's three pages. No objection?

MR. BLISS: No.

MR. BENJAMIN: Your Honor, there's no objection to 19.

THE COURT: Nineteen is the email and the letter?

MR. BENJAMIN: Yes.

THE COURT: Exhibit 19 is admitted.

(Plaintiff's Exhibit 19 received in evidence)

BY MR. BENJAMIN:

Q. Start with the -- do you see Number 19?

A. Yes.

Q. Thank you.

Can you describe what the first page is?

A. Sonny had called me prior to this email announcing to me that the property had been sold. And I was very upset. I started crying. I hung up on him. And --

Q. Take a moment.

A. I was in shock. And then shortly thereafter I got this email saying that he needed my thoughts on it right away. He attached this letter that Walter Ciacii had wrote.

Q. Did you receive this letter on your own, directly from the law firm?

A. No. Sonny sent it in an email to my email address.

Q. You testified in the last set of questions that was February 2022 which is the date of this letter; right?

A. That's correct.

Q. Okay. So in February of 2022, Sonny sent you this letter right away from the lawyers.

Were you able to read through this letter, real quick? If you haven't, could you --

A. I'm familiar with the letter.

Q. Okay. So after you understood what the lawyers were writing in this letter, what did you do at that time? What happened?

A. I called my bookkeeper. She was my confidant, and I told her what happened. And she said that basically the letter was like a threat to me to, you know, silence me. That, you know, where was he coming up with this $10,000 bill? Where was Walter Ciacii coming up with this $10,000 bill? Because prior to this Sonny always made it seem like he was bartering with Walter. There was never any billing between us except for the cost of the actual formation of the LLC and, you know, that was because they had to publish some sort of article that had a cost to them. But outside of that, you know, Walter had never billed anything over the four years, even for little stuff for me with Dash. He never billed me anything. We didn't have a retainer agreement with him at all and to my knowledge, knowledge neither did Sonny.

He also conveniently said basically the settlement that they were trying to make with Destan and Faton was that they would get $10,000 from the account and that $10,000 was

owed to Walter so basically I wouldn't get anything and that I should accept the payment agreement of $600 a month from them to repay the $188,000.
Q. Did you ever have a conversation with the lawyer about that, about this letter?
A. No.
Q. And with Sonny, how about Sonny?
A. He called me with Walter and was like, when he told me about the property being sold, that's when he mentioned, like, you really need to make a decision on this, and he started articulating what the letter said. Walter did not speak. He told me that he was there, but he did not speak. Sonny did all the talking.
Q. There is a spot for your signature on the bottom. Did you ever read and sign this?
A. No. Like I said, when they called me I was so upset that I just hung up. I went into shock.
Q. Okay. Thank you. We can put that aside.
Did you remember have a discussion with Sonny about what Walter was doing and the efforts to collect this money?
A. Yes. He basically told me that he was filing this confession of judgment and that ultimately he would be able to seize their bank accounts, that the game plan.
Q. Were you satisfied with that when you discussed it with him?

A. Yes, because I really didn't have any experience as far as what my options were.

I mean, I later learned that there were many more better options and that if Walter was really representing me and --

MR. BLISS: Objection, your Honor. He asked a question. She answered the question.

THE COURT: Do you want to ask her a new question.

MR. BENJAMIN: Sure.

Q. At the point in time when you received this letter and talked to Sonny, at that point did you ever request for Sonny to reimburse your money?

MR. BLISS: Objection, your Honor. She testified that she hung up when they were on the phone. She testified as to what she was told in that phone call and that she hung up.

THE COURT: If you are asking about a later time, you can frame it that way.

Q. After you hung up, did you have a discussion with Sonny as to him reimbursing you?

A. I had a discussion with him prior to even finding out about the property being auctioned off.

Q. Do you know what the date of that was?

A. Probably around December of 2021. At the time I knew that I was going to be closing my business, and I want the money returned. So I started really pressuring him. And, you know,

then subsequently all these events happened where basically he blew up on me, and suddenly I was finding out the property auctioned off of the I had to move out of his office and by the way, you owe Walter $10,000. And you should just accept $600 as a payment agreement a month.

Q. Okay. At any point in time from this letter of February 2022, did you ever learn after that as to your money, where it went?

A. I mean, I can't say where it went. I know it didn't go to construction, that I learned. The property was relisted as a distressed property by the same hard money lender, Mercury Capital, after the auction.

Q. Did you ever come to learn what the relationship was between Faton and Destan and the Pendleton LLC? Do you know the ownership situation?

A. My understanding was that they owned Pendleton LLC together, but I never saw any documentation for that but that's what I was told.

Q. You mentioned that you had researched a public record on that property. What specific information did you get from public record on the Tennessee property?

MR. BLISS: Objection, your Honor. It's all hearsay.

MR. BENJAMIN: What did she research? There was no out-of-court statement. It's just what did she observe, and what did she research.

THE COURT: Did I just ask what you are trying to show with this information?

MR. BENJAMIN: It's simply that -- what the reality was after the fact.

THE COURT: The reality of --

MR. BENJAMIN: She might not have known in the beginning -- I'm sorry?

THE COURT: The reality of what?

MR. BENJAMIN: Where her money went. And what was in the public record and was easily viewable to her even after February 2022 when the money was gone.

THE COURT: I understood her to be saying that she, at the beginning of the investment, thought that the money was going to construction on these Pendleton, these three buildings. And she's also testified that it was her understanding that it was going to construction. So what else are we trying to establish?

MR. BENJAMIN: Simply what she observed from the public record that is open to everybody. In other words, she couldn't learn anything from Mr. Vataj but she learned --

THE COURT: I'm sorry to interrupt. If you are trying to bring in what she read in some public record for the truth of what that is, that would be hearsay. You could introduce the public record itself as a business record or a public record.

MR. BENJAMIN: Okay. Thank you.

Q. To date, today, no portion of the 188,500 was ever paid back; correct?

A. No.

MR. BENJAMIN: Okay. If we could -- how are we doing on timing, your Honor? Does anybody need a break?

THE COURT: How much longer do you think you have on direct?

MR. BENJAMIN: I don't have a lot in terms of exhibits. Maybe 30 minutes at most.

THE COURT: I'll leave it to you. Do you want to power through and get her done and then take a break for a quick lunch and then do cross, or would you rather break now for a quick lunch, come back finish direct and go to cross?

MR. BENJAMIN: I could plow through and then lunch. We could break for cross if that's okay with counsel.

MR. BLISS: That's all right.

THE COURT: Okay.

MR. BENJAMIN: I don't have very much left.

If I could call your attention to Number 22, please.

MR. BLISS: No objection.

MR. BENJAMIN: Your Honor, no objection to 22, it's a nine-page.

THE COURT: Plaintiff's Exhibit 22 is the email chain between Ms. Hall and David Anthony?

MR. BLISS: No. Oh, I'm sorry it is, Judge. I'm sorry.

THE COURT: So Exhibit 22 is admitted.

(Plaintiff's Exhibit 22 received in evidence)

MR. BENJAMIN: Thank you, your Honor.

Q. Ms. Hall, who is David Anthony, to your knowledge?

A. David Anthony is an attorney in Tennessee.

Q. And what was the purpose of this email chain between you and him in and around March of 2022?

A. Well, after I had a little bit of time to decompress from the shock of finding out that the asset had been liquidated, I started calling different lawyers to see what my options were. And he asked me to forward what I had on the property, whatever information I had. And that pretty much was what the email chain was.

Q. Okay. And what did you learn your options were at the time?

A. I learned that the property had been auctioned off by a substitute trustee that was hired by Mercury Capital.

Q. Please flip to page 5 of that exhibit.

You mentioned it was auctioned. What is page 5 onwards, to your knowledge?

A. I guess it's the substitute trustee deed which was basically DebtCo. And typically what hard money lenders do is they get a substitute trustee to buy the property back at

auction.

MR. BLISS: Objection.

MR. BENJAMIN: I asked her to explain what the document was to her knowledge.

MR. BLISS: She started out by saying, "typically, what hard money lenders do" which has nothing to do with the question.

THE COURT: Well, also, I don't know that she has the expertise to talk about what hard money lenders would do.

Q. Okay. So the question was, what is this part of the document? When you saw this, what was this part of the document?

A. It's the deed that the property was auctioned off with.

Q. Was this one of the public records that you received?

A. Yes.

Q. Okay. And on the seventh page of this document, the very first sentence of that page says it was consistent with what you testified earlier there were six prior auctions?

A. That's correct.

Q. Okay. And when you saw that, what did you think what you saw there were six prior auctions on the property?

A. I was in shock. He never told me that the property was up for auction even one time, let alone six. I was furious.

Q. We can set that aside.

Let's skip to Number 25, please, if you look at Number

25.

(Discussion held off the record)

MR. BENJAMIN: Your Honor, there's no objection to Number 25. Actually, I'm not sure if 25 is broken down to a number of different pages.

THE WITNESS: It is.

MR. BENJAMIN: Is it?

Because my 25 is a 22-page document.

MR. BLISS: And my 25 is a one-page document.

MR. BENJAMIN: Your Honor, is yours a one-page document?

THE COURT: Mine is a 28-page or 25, sorry.

MR. BENJAMIN: I don't know why yours came separately.

MR. BLISS: Can you tell me what the last page is? Based upon what you showed me it looks like --

(Discussion held off the record)

BY MR. BENJAMIN:

Q. I'm going to ask you to look at Exhibit Number 25.

THE COURT: Just for the record 25, the full 25 pages is admitted?

MR. BENJAMIN: Yes.

MR. BLISS: Correct, Judge. I'll sort through mine.

MR. BENJAMIN: I'll just give you this while I ask the questions if you need it.

MR. BLISS: No, it's okay.

BY MR. BENJAMIN:
Q. What are those pages -- what do those pages represent?
A. They were listings that either I sent to Sonny -- predominantly, I sent to Sonny as potential opportunities. And there were a couple that were sent from him and a couple that were sent from his realtors.
Q. Immediately after you entered this agreement with him in June of 2018, you were exchanging listings to explore; is that correct?
A. Yes.
Q. And you were active in that process?
A. I was active in terms of looking at stuff. I didn't really have the expertise to say let's pull the trigger on this. I had never purchased a property before.
MR. BENJAMIN: Okay. Let's skip to Number 27. This should be my final exhibit. Please take a look at what's been marked Number 27. I'm handing a copy to counsel, which is a ten-page exhibit.
MR. BLISS: I got it.
MR. BENJAMIN: That I got right.
No objection?
MR. BLISS: No objection.
MR. BENJAMIN: Your Honor, admit Number 27?
THE COURT: I have ten pages as well. So it's the notice of filing of foreign judgment?

MR. BENJAMIN: Yes.

THE COURT: Plaintiff's Exhibit 27 is admitted.

(Plaintiff's Exhibit 27 received in evidence)

Q. Ms. Hall, if you could please take a look at Number 27. Do you recognize that document?

A. Yes, I do.

Q. And what is that document?

A. I believe this document was sent to me from the Tennessee lawyer that I spoke to. And basically it showed that they had filed the motion to have the foreign judgment, the judgment of confession moved down to Tennessee with the Tennessee lawyer to try and stop the auction on the day of the last auction. And I mean, this was not -- this was, you know, to me, if they were really trying to protect the asset, they would have done a lot more prior to that. They would not have waited until the day of the last auction.

MR. BLISS: Objection, your Honor.

THE COURT: Sustained.

MR. BLISS: Thank you.

Q. When you saw this document -- well, when did you see this document?

A. The Tennessee lawyer showed it to me.

Q. Do you know when? Was it the date of the stamp or another date?

A. No, it was around March when I called them.

Q. So what did you -- how did you react to this is when you first saw it?
A. I didn't really understand it at first but basically he explained to me that they had filed a judgment on the same day of the auction.
Q. Did you ever have a discussion with Sonny when you got that document?
A. No. By then we were already not in communication. We had the fight. I moved out of the office.
Q. Okay. So in conclusion here --
THE COURT: Could you just ask, when she says "they filed the judgment on the same day of the action, who is the "they"?
Q. Who filed the judgment on the same day of the auction?
A. It had to be the Tennessee lawyer that Mr. Vataj and Walter Ciacii had referenced in the letter that Sonny forwarded to me from Walter.
Q. And for your part, you never retained a Tennessee lawyer to get a judgment against the LLC, did you?
A. No. I was never even told that was something of significance to do.
Q. Okay. Just some concluding questions then.
If Sonny had not recommended this transaction to you, at least for the hard money loan in May of 2019, would you have agreed to fund it?

A. No. I didn't know these people. I wasn't familiar with what a hard money loan was. I didn't set the money aside to loan the money out. I set it aside to purchase a property.

Q. Okay. And in general, what are you asking the Court to do with this case?

A. I'm asking the Court to find him guilty of fraud. He maintained an information monopoly. He kept me from pertinent information that could have saved this project. If I had known that the property was up for auction, we could have retained the Tennessee lawyer. We could have contacted Mercury Capital, asked them to sell us the note at a discount.

MR. BLISS: Objection, Judge. The question was, "what is she asking the Court to do?"

THE COURT: Do you want to ask another question.

MR. BENJAMIN: Fine. Thank you. Your Honor, the plaintiff's case in chief is finished. We just want to reserve the right or time to call back in rebuttal, call Ms. Hall back to the stand in rebuttal if necessary after the defendant's case in chief.

THE COURT: I understand, Mr. Benjamin.

MR. BENJAMIN: Thank you.

THE COURT: There were stipulated facts last night sent to chambers. How do you want to move them into the record. Do you want me to just make it a Court Exhibit?

MR. BLISS: Whatever's your pleasure.

THE COURT: I will take the stipulated facts that were in the email and they will be deemed Court Exhibit 1.

MR. BENJAMIN: Your Honor, if I may qualify one thing. The revised versions of this stipulation went back and forth kind of quickly. And there was one oversight that I kind of want to remove with counsel's consent. There was something stated in here that was mixed up with the revisions, and I didn't see it originally. My client pointed it out to me.

In Paragraph Ten, the last paragraph -- excuse me, in Paragraph Ten, it says that -- do you have the stipulation, your Honor?

THE COURT: Yes, yes.

MR. BENJAMIN: It says that that plaintiff changed the address in his bank account to her home address without notice to defendant in approximately 2022. And she closed the LLC's bank account again without notice. We just want to strike because that's inaccurate. We just want to strike the portions that say "without notice." My client alerted me to that. I didn't see that in the final version and we made a mistake. I just want to see if with counsel's consent we can at least remove that. Because her contention is that he did know. And she did give him notice. We just want to strike that portion that says "without notice." She did these things in that plaintiff, but she didn't do them without notice.

Is that correct.

THE WITNESS: That's correct.

THE COURT: I do see a Paragraph Ten. I have it as Paragraph 9.

MR. BLISS: I was about to say that. In my version it's Paragraph 9.

MR. BENJAMIN: Okay. I apologize.

THE COURT: Mr. Bliss, any objection to striking the reference to "without notice" twice which is in this sentence?

MR. BLISS: It was in every version, Judge. But no, if he wants to strike the "without notice," that's fine.

THE COURT: Okay. But then I just want to clarify. Because Mr. Benjamin, you said it was her contention that she gave notice, but there has been no testimony today about a change of address or any notice.

MR. BENJAMIN: It wasn't part of our case in chief, your Honor. If he wants to cross-examination her, and say you didn't tell me about the LLC's closure, be my guest. But it's not important to our case in chief.

THE COURT: Otherwise the stipulated facts, as we've just modified them, are going to be admitted as Court Exhibit 1.

Anything else before we break for lunch?

MR. BENJAMIN: No, thank you, your Honor.

MR. BLISS: No, your Honor.

THE COURT: Do people need more than 30 minutes?

MR. BLISS: No, I don't think so.

THE COURT: So we can reconvene at 2:00.

(Lunch recess)

AFTERNOON SESSION

2:10 p.m.

(In open court)

THE COURT: Mr. Bliss, are you ready?

MR. BLISS: Judge, at this point I would like to make an application to the Court. As plaintiff indicated, they have rested their case in chief. I would move to dismiss the complaint at this time for a failure to make out a prima facie case on any of the causes of action. If you would like me to go through them, I will. But I just don't see the basis for any of the claims.

THE COURT: I'll reserve.

MR. BLISS: Judge, I'm going to have a few documents to use on cross-examination if you want me to have them marked now.

THE COURT: Either way, if you want to mark them as you show them to her, or if you want to mark them now, whichever you prefer.

MR. BLISS: Can I mark them in pen?

THE COURT: You mean --

MR. BLISS: Physically mark them for identification is what I'm saying.

THE COURT: Sure. Do I have the documents?

MR. BLISS: A lot of the documents were in plaintiff's submission, and then he chose not to have them entered. So I can do it either way, Judge.

THE COURT: You can markup your copy. If I have a copy, that will be the Court copy.

MR. BLISS: That's fine.

MR. BENJAMIN: You can use my binder, if you want. If it makes it easier.

MR. BLISS: I may do both, but I think using your binder may make it easier.

MR. BENJAMIN: Sure.

MR. BLISS: If you can bear with me, Judge. I'm sorry.

CROSS-EXAMINATION

BY MR. BLISS:

Q. Ms. Hall, if you can, please look at what was marked as Plaintiff's Exhibit 6. I think you have the binder in front of you. Do you recognize that document?

A. Yes, I do.

Q. And what is that?

A. It's the 2018 Cache Realty Group tax return.

Q. And you produced that as part of the pretrial discovery in this case?

A. Yes.

Q. And you prepared that return?
A. No. I have a bookkeeper who prepares the return, and then I sign the return as a self-prepared.
Q. And you review it?
A. Yeah, more or less. I trust my bookkeeper.
Q. Do you rely on the bookkeeper with the information enclosed in that return?
A. Yes.
Q. And Mr. Vataj has nothing to do with the preparation of the tax return?
A. No, he didn't have anything to do with the tax return.
Q. And this was a copy of the return that was actually filed with the federal government and annexed to it is a state income tax return that was filed?
A. Yes.
Q. Okay. So when I look into 2018 -- just to remind you -- is the year that Cache was formed?
A. That's correct.
Q. So it was in existence from early June of 2018 to December 31st of 2018?
A. That's correct.
Q. And on this tax return, if you look at line nine, it says salaries and wages other than partners?
A. Correct.
Q. And it has an amount there of $14,000?

A. That's correct.
Q. And is it Cache or is it --
A. Cache Realty Group.
Q. And I'll call it "Cache."
A. That's fine.
Q. And Cache had employees?
A. I hired my sister, one employee.
Q. And she worked out of the offices, at what location?
A. No, she worked remotely from home.
Q. And what did she do for Cache?
A. She helped me order business cards. She helped me pick out listings. I traveled to some of the listings. She might have helped me make some of the travel arrangements to go there. I went to look at some properties in Baltimore. I went out to New Jersey to look at some properties. And obviously some of the local properties that me and Sonny discussed in the Bronx, that was done through him.
Q. So you hired her basically to be your assistant?
A. Yes.
Q. And that was full-time employment?
A. Part-time.
Q. Well, how was she paid, salary, hourly?
A. Through payroll.
Q. I appreciate that. But did she have to get paid by the hour, or did she get paid a flat salary per week?

A. It was probably hourly. I don't recall, to be quite honest. I don't have the records in front of me. We just produced the tax return. It probably was hourly.
Q. And you said you have a background in bookkeeping?
A. I do.
Q. And on line 13 I see rent.
A. That's correct.
Q. Sorry?
A. That's correct.
Q. $7,200?
A. Correct.
Q. Did Cache pay rent to the landlord?
A. Cache was sharing an office with Dash. So traditionally when businesses share office space, typically on a tax return they will allocate some of the rent expense towards one of the businesses and allocate some of the rent expense towards another one of the businesses. And Dash was paying Mr. Vataj $1,500 a month in rent. So I believe -- and again this is just my recollection looking at this at a glance -- that we probably allocated half of that rent money towards Cache.
Q. That you probably allocated --
A. Well, my bookkeeper did.
Q. At your instruction?
A. Yeah.
Q. Because at this time, Cache was doing no business; correct?

A. Well, just because it wasn't doing any business doesn't mean that you can't expense things. When you set up a business, you have an office; you order business cards. You do basic things to form a business. You don't just not expense anything or not do anything. There were phone bills being paid, phone calls being made, paperwork being generated.
Q. But it had no actual work to be done?
A. Well, there was work to be done. I was under the impression when we formed Cache that we were looking for an investment property. So just because Mr. Vataj wasn't doing his job doesn't mean that I wasn't doing mine as somebody that was highly motivated to search for an investment opportunity. I wanted the money to be invested into a property. And so, you know, if he wasn't being active in terms of doing the search, I was doing my own search just for my own education to see what was out there and forwarding that information to him.
Q. But none of these line items that I've just mentioned were funds coming out of Cache LLC to pay those expenses?
A. I can't speak to that. You are asking me a question that happened five or six years ago. I would have to look at the actual records to determine that specifically.
Q. In preparation for this trial and in answering questions about these tax returns previously, you're saying, as you sit here today, you don't remember if Cache wrote checks out for business expenses?

A. No, that isn't the focal point of this trial. The focal point of this trial is Mr. Vataj's fraudulent behavior, not my bookkeeping.

Q. But the operations of Cache are the focus of this trial. And once again, I'm asking you, as the bookkeeper, as a member, and as the person that signed these tax returns, you have no recollection of a business that was open for less than four years, writing checks out for expenses?

MR. BENJAMIN: Objection. Asked and answered.

THE COURT: She didn't answer the question.

MR. BENJAMIN: I believe she said she didn't recall. And this is the third time he is asking that question.

Q. Earlier today you recall you thought a check being written out to either Mr. Ciacii or the law firm of Della Mura & Ciacii?

A. Correct, but that isn't relevant to my case.

Q. But that check, according to you, came out of Cache?

A. That's correct, at Sonny's instructions.

Q. And you're telling me, in general terms, you cannot, as you sit here, tell me whether Cache wrote rent checks, phone bill checks, checks to other companies because they were sharing services?

A. No, that's not what I'm telling you.

What I'm telling you is that two businesses operated out of the same office. And that traditionally in bookkeeping,

if there's two businesses sharing a space, it is allowed on a tax return for you to allocate some of the expenses from one of the businesses that's paying the expenses to the other business. That is traditionally what happens in bookkeeping. It's very common.
Q. So these expenses were allocations of expenses --
A. Some of them were --
Q. -- that Dash incurred?
A. Some of them were and some of them were actual checks that were cut or money that went out.
Q. Now, in preparing for today, did you review the accounts of Cache, the bank accounts? It only had one; correct?
A. That's correct.
Q. Did you review those accounts?
A. No, I didn't. I didn't think it was really relevant to my case other than the two bank statements that showed the money being put in and the money being taken out.
Q. And -- well, this would be money that was coming out, what I'm asking you about?
A. Well, when I say money coming out, I'm referring to the $188,000. That is where my concern is, that money coming out.
Q. Right. But there had been a total invested, according to your testimony, of 230,000?
A. That's correct.
Q. And currently, the account is closed and the account is

empty; correct?
A. Correct.
Q. And you closed that account?
A. That's correct.
Q. And you took whatever money was in that account and kept it?
A. Well, there wasn't a lot left after the expenses were paid out of the account. From my recollection --
Q. Are you now recalling that expenses --
A. I'm going to do my best to try to recollect. But what I don't want to do is I don't want to say that I know every single item because I don't. I can't recollect every single check. But I can say from my recollection of five years ago or however many years ago 2018 was, is that there were payroll expenses, there were workers' comp expenses, there were taxes that were paid. Walter Ciacii received his check for his services as far as the formation of the LLC.
Q. Getting back to payroll and workers' comp, that was all for the one employee, your sister?
A. That's correct.
Q. And then was there unemployment insurance?
A. Yes, there probably was.
Q. Payroll taxes?
A. Yes, it was required --
Q. And that was all for the benefit of your sister that worked

remotely from home, assisting --
A. The benefit of her -- it went to an employee. It's perfectly legal to hire an employee. Whether she is my sister or not is irrelevant. I was just sharing that information.
Q. Did she do work for Mr. Vataj?
A. No.
Q. Did you tell Mr. Vataj about this arrangement?
A. Yes.
Q. And when did you tell him that?
A. When I did it. I didn't do anything without telling Sonny.
Q. All right. On Line Number 20 it says "other deductions," $44,860?
A. I'm sorry. Hang on a second.
Q. Line 20 of that first page of the return.
A. Okay.
Q. Do you have any idea what those deductions are for the first six months that Cache existed?
A. No. I'd have to look at the details of the accounting.
Q. And you can't tell by looking at the schedules on the tax return?
A. Sure. Are the schedules here?
Q. I don't know. This is your exhibit?
MR. BENJAMIN: It's not our exhibit, your Honor, but okay.
THE COURT: Mr. Bliss, just for purposes of the

record, are you moving the exhibit --

MR. BLISS: I'm moving -- I'm sorry. I'll move it. It's marked as plaintiff's --

THE COURT: So it will be Defendant's Exhibit 1.

MR. BLISS: Thank you, your Honor.

(Defendant's Exhibit 1 received in evidence)

THE WITNESS: Okay. I'm at the schedule.

BY MR. BLISS:

Q. All right. Can you tell me what the $44,860 consisted of?

A. Would you like me to read the list off of the tax return?

Q. All right. If it's easier, I'll ask you. So there were accounting services?

A. Correct. I had a bookkeeper.

Q. And that was other than your sister?

A. Yes.

Q. And was that bookkeeper paid out of Cache?

A. Probably, yes.

Q. Probably, yes?

A. Again, you're --

Q. I'm not asking you to guess.

A. You're asking me about something that occurred in 2018. We are in 2026. If you don't have the checkbook in front of me, then I can't answer that with 100 percent certainty.

Q. We have the statement, so we'll look at that.

A. Okay.

Q. Advertising, what advertising was --
A. I ordered business cards. From what I can recall that was probably the gist of it.
Q. Okay. It says meals, $3,836?
A. Yes, I was traveling to look at properties. I was expensing my meals.
Q. And you were traveling --
A. To New Jersey and Baltimore.
Q. And one trip to Baltimore?
A. Not one trip. I took multiple trips down there. I have a daughter that lives down there.
Q. But you didn't produce any information about any properties in Baltimore?
A. Yes, I did. It's in discovery.
Q. It's in discovery. Is it in evidence?
A. It's in evidence, yeah. You want me to tell you what number it is?
Q. No, but if it's emails and listings, you didn't have to make a trip to go down there, did you?
A. Yes, I wanted to look at the properties in person.
Q. Then there is a separate line item, office expense, $7,034?
A. All right.
Q. Would that be also the sharing of Dash office expenses?
A. That probably was the rent.
Q. Well, wasn't the rent a separate line item?

A. I'm not sure I can't tell from the schedule.
Q. Looking back at the first page?
A. Okay. Maybe it wasn't.
Q. Do you have printing expense?
A. Uh-hum.
Q. Of $3,600.
A. Okay.
Q. Any idea what that was for?
A. Like I said, it was just expenses that were being expensed for the tax return. I don't understand what the relevance is.
Q. That's another expense that could have been shared with Dash?
A. Yes.
Q. So it was a Dash expense you were allocating between Dash and --
A. Yeah. When you are printing out things you have to spend money on ink, paper, a printer, all these things cost money. Having a business is not free.
Q. No, I get that.
But these are expenses that Dash was incurring and you were allocating to Cache?
A. I don't know that 100 percent. Like I said, I would have to see the checkbook to verify that.
Q. Well, you also testified to that in your deposition?
A. Uh-hum.

Q. Do you recall that?
A. Yes, I do.
MR. BENJAMIN: Objection. We have to go through the deposition that points -- if we are going to talk about statements in a deposition.
MR. BLISS: Well, she just acknowledged that she testified to that at her deposition.
THE COURT: It might be cleaner if you want to bring in a statement that might be inconsistent, for you to pull up a deposition.
MR. BLISS: I'll come back to it.
Q. Research and feasibility studies, $24,256?
A. Uh-hum. What's the question?
Q. Any ideas what that nearly $25,000 expense was for?
A. As I said, I was traveling to different places to look at different properties. There is a cost that comes with that. Travel isn't free.
Q. It's a research and feasibility study?
A. Yeah, I was trying to see what the feasibility was of these particular properties.
Q. All right. So that was an expense that you allocated to yourself?
A. Correct.
Q. You didn't pay someone to conduct a study?
A. Well, I spent money doing those things. No, I didn't pay

someone to do a study, but I spent money traveling to those places, meeting with different people. There were expenses involved in that, and I wanted those things on the tax return.
Q. And you shared this information with Mr. Vataj?
A. He got a copy of the tax return. He got a copy of the K1. Everything that I did with that business, I shared with him.
Q. Okay.
A. And by the way, I just want to add that he wouldn't have questioned it. It wasn't his money.
Q. I'm sorry?
A. He wouldn't have questioned it. It wasn't his money. He didn't put any money into the business.
Q. But you testified earlier he put 30,000 in?
A. He put $30,000 in after I gave him $30,000. Basically it was just a transfer.
Q. And he also supplied a location?
A. That he paid rent for.
Q. Did you pay rent for that or Dash?
A. Dash paid rent.
Q. Okay.
A. He didn't supply the location for free.
Q. And Dash operated a business out of that location?
A. That's correct.
Q. And it operated that business before Cache ever existed?
A. That's correct.

Q. And when Cache was formed the rent didn't go up because of that?

A. No.

Q. Okay.

A. But why shouldn't Dash's rent expense go down if it's sharing a office with another business?

Q. That you're an owner of?

A. That's correct.

Q. It's a business located in the same space that Mr. Vataj's business is located in?

A. Yes, but it is within my office. I paid rent for an office space within Mr. Vataj's office. It's not like I was walking around --

Q. So it was your personal office?

A. I paid rent for an office space in Mr. Vataj's large office. Okay. Predominantly, his office was a real estate brokerage. Okay. I paid rent in that office for my business, Dash. And when we formed Cache, Cache was operating out of my office. If he had a problem with that, he could have stayed there.

Q. Didn't Cache operate wherever you or Mr. Vataj were, if you were just checking out listings and trying to find opportunities?

A. I mean, if you want to claim that, yes. But on a tax return, you have to pick a location. So you could make that

theory, as far as what me or Mr. Vataj thought during that time period. But when you are filing a tax return, you have to specify where it is and what's going on.
Q. Okay. And on this return, it was your idea to allocate the shares of ownership, 80 percent to you, and 20 percent to Mr. Vataj?
A. That's correct. I spoke to him about it.
Q. And that as a result of that, and as reflected on this return, Cache took a loss in 2018?
A. That's correct.
Q. And you got the benefit of 80 percent of that loss on your personal tax returns?
A. That's correct, and he got the benefit of 20 percent on his personal tax return.
Q. Okay. But it was a benefit to you to be able to writeoff a loss for a company that really wasn't doing any business. It had no income coming in?
A. It didn't have any income in that moment, but there are many companies that are formed --
Q. I'm just talking about this company.
A. Well, any company in general is not generating any income right away. It takes time to form a business. When I formed Dash it didn't generate income right away. It took a year of expense before I actually started generating income.
Q. And then you generated quite a bit of income?

A. Correct. I did very well for myself.
Q. So had so much income that you were looking for ways to spread that out among other entities, including Cache?
A. Correct.
Q. Okay. And the money that you invested into Cache really came from Dash?
A. That's correct.
Q. And that's why you deposited the money in June, not for an opportunity, but it was to get it out of the bank accounts of Dash?
A. Well, wasn't any reason for me to get it out of my bank accounts for Dash. I have had no reason to do that. Nobody was auditing me or doing anything where I had to get the money out of my bank account. I chose to send it out of that bank account and allocate it.
Q. And park it in Cache's bank account?
A. That's correct.
Q. And allocate expenses to that money that was sitting in the bank account?
A. That's correct, many business owners do that.
THE COURT: Mr. Bliss, I just want to clarify to make sure the testimony is clear, the money that was put into Cache came from the Dash business account?
MR. BLISS: That's what she just testified to.
THE WITNESS: Yes. Who I was -- I had 100 percent

ownership of Dash. So, essentially, it was my money. I don't know where we are going with this but --

Q. Now, with respect to the operations of Dash -- I'm sorry, excuse me. As to Cache, you also signed the 2019 tax return; correct?

A. That's correct.

MR. BENJAMIN: Your Honor, I object. I don't know the line of questioning. We've gone through the '18 tax return. There's just no relevance to this for the purpose of this case. There is no counterclaim. There is no allegation that this is for impeachment or anything. There is no established record of impeachment. There is no relevance to this line of questioning on the tax returns.

THE COURT: Well, it sounds like they are making an argument that the reason she would have moved this money out of the Dash business account and to this Cache business account wasn't just for purposes of a potential investment but also for whatever tax credits, benefits she could get into terms of moving the income and deducting expenses.

MR. BENJAMIN: I don't know --

THE COURT: I think it's certainly relevant. So I will allow Mr. Bliss to keep going.

MR. BLISS: Thank you.

And I would just add it was also for purposes of evidencing that the plaintiff's sister was given a job that did

not require her to go to an office, and was receiving an income from Cache.

Q. I direct your attention --

A. Mr. Vataj was also receiving an income from Dash which didn't require him to do anything. He had no problem with that either. He received almost $80,000 in a 401(k) as income.

Q. From Dash?

A. From Dash, that's correct, and he had no problem with that.

Q. And that occurred when he was working for you and Dash --

A. He wasn't working for me and Dash --

Q. -- prior to the creation?

A. He never worked for me and Dash. He never worked for Dash.

Q. So he never -- you testified earlier that he helped you find a location --

A. He was paid for that. He was paid either 10 or $15,000 as a commission as a broker and as someone who helped me obtain the licenses for Dash.

Q. And you're saying that he then became an employee of Dash?

A. Not right away. What happened was in 2018, when I came to him, and I gave him the $30,000 to motivate him, I also told him that I would put him on the payroll for Dash and that I would put the money into a 401(k) for him. So he had no problem with the arrangements as far as payroll, as far as the 401(k), as far as the 80/20 split on the K1 because he was benefiting from those things.

MR. BLISS: I'm going to move to strike as nonresponsive.
Q. I just want to understand your testimony. You say he was hired by Dash.
A. He wasn't hired by Dash.
Q. Dash started paying him money because you wanted him to be motivated?
A. Yes, I did. Money motivated this man. If you didn't give him money, he wasn't just going to go around and do things for free. He was extremely busy. He had his own investment properties. He had his own projects. He was running three brokerage offices.
Q. You were seeking to motivate him by paying him money from Dash --
A. Correct.
Q. -- in connection with Cache?
A. I just gave it to him as a goodwill gesture to motivate him to take seriously what I was trying to do with the $200,000 to obtain this investment property.
Q. Beyond that, he didn't provide any services or assistance to you --
A. What services did he provide?
Q. -- or worth to you?
A. What services did he provide? It was a car service.
Q. I'm asking you?

A. No.
Q. He didn't provide other services?
A. No.
Q. He didn't build up office space for you?
A. No, he was building that office space for himself.
Q. He didn't find office space for you?
A. He found office space, the very first office space that I moved Dash Car Service into. At that time I paid him either 10 or $15,000. I don't remember because that was back in 2013. But he was paid for his services as so far as finding that office space. He didn't do things for free.
Q. And you had issues with that space?
A. I had issues like anybody would have issues --
Q. Did you fall behind in the payment of your rent?
A. No, never.

MR. BENJAMIN: Your Honor, I really think we should let the witness answer the question. There is a lot of interrupting, mainly on counsel's part. I think he should just let her answer the question.

THE COURT: I think counsel is correct. You shouldn't interrupt the witness. That being said, a lot of these questions are yes-or-no answers and do not require long elaborations. It is cross, after all. If she wants to give some of these explanations on redirect, you can certainly elicit the testimony. But the answers have to be yes or no in

response to the question asked.

Mr. Bliss.

THE WITNESS: I was never behind in the rent at Dash.

Q. Okay. And you didn't have to negotiate with anyone to get out of the lease that you had with your first landlord?

A. Absolutely not. I left that lease in good standing.

What did happen, if you allow me to explain, would you care to listen? Okay. What did happen is one of the things that he did to help me early on with Dash because I wasn't generating income for the first year, was he found a tenant for me who agreed to advance some of the rent money for being in the space. It was one of his construction buddies who owned a construction company. And they were in the space with me for five years.

But what winded up happening long term in the fifth year, they started acting up. The guy who ran the business, he was a smart aleck. First of all, he tried to, like, sexually harass me sometimes. Which I dismissed. I'm a big girl. I know how to handle myself. But on top of that, then he started doing things like throwing his supplies all around in front the warehouse to the point that me and my staff couldn't get to the bathroom. So we wound up having a fight about it. I called Sonny, and I told him. And he said he was doing the renovation of the space over there so that's when I asked him to move the office. And that's what prompted me to actually move the

office to his office. But it wasn't a situation where I wasn't paying my rent. My business is --
Q. Did you have to get out of the lease?
A. No. I left the landlord on good terms. He didn't negotiate anything with my landlord.
The only thing he negotiated was getting the initial lease with the landlord from the beginning, which he was paid to do. He didn't negotiate any breaking of the lease. I had a great relationship with my landlord. I was paying my rent on time. I was paying my bills on time.
Yes, in the first year or two I was struggling as any business was struggling. And there was one time that Mr. Vataj loaned me $5,000, and like I said, he also got these tenants to move in and advance me the rent. But it meant that it was an advance. It was a prepayment of rent. There was nothing free given to me as far as Mr. Vataj was concerned other than maybe some counseling, if I needed him to call somebody at the TLC or, you know, on the community board or whatever. He helped me with things of that nature.
But it's just preposterous and laughable to act like he was doing all these favors for me. In fact, it was the opposite. I was repaying him --
Q. I never said he did you a favor.
A. Well, that's how you are framing it, and that's how Mr. Vataj framed it in his deposition.

Q. That's not how I framed it.
A. That's how he framed it in his deposition.
Q. I framed it that he did work for you, and you paid him money?
A. I really wouldn't call it work. A phone call -- you call that work? One phone call here and there once in a while.
Q. I would call that work but --
A. Okay.
Q. Now, getting back to what was previously marked as Plaintiff's 12 for identification --
A. By the way, you didn't.
Q. I ask you to take a look at that document, please.
A. Uh-hum.
Q. It's the 2019 U.S. Return of Partnership Income for Cache; correct?
A. Uh-hum.
Q. And it indicates that it was self-prepared?
A. Correct.
Q. Okay. And that would be you?
A. Once again, I had a bookkeeper. She prepared the returns. I signed the returns as self-prepared. It was something I did with all of my businesses.
Q. And you filed it with the federal government?
A. That's correct.
Q. Okay. And once again, there is a listing of salaries,

office expenses, and related items?
A. Correct.
Q. Salaries listed that was, once again, for your sister; correct?
A. Correct.
Q. And the office expenses, you were still allocating office expenses between Dash and Cache?
A. Well, you have to remember this return was -- this is a --
Q. It's a yes-or-no question.
A. Well, I need to explain. Because it's not -- it's not just simply a yes-or-no question. Are you okay with me explaining?
Q. No. I think it is a yes-or-no question.
A. So what was the question again. Can you repeat the question.
Q. The question was, those expenses were expenses you were allocating between Cache and Dash?
A. This is for the 2019 return; correct?
Q. Correct.
A. Yeah, it was a very small amount.
Q. So the answer is yes?
A. Yes. One paycheck that fell over from the prior year that fell on a pay date in January.
Q. And once again, the LLC took a loss?
A. Uh-hum.
Q. And once again, you allocated that loss for you to get

80 percent of the benefit of that loss with Mr. Vataj getting 20 percent?
A. Correct. And I confirmed that he was okay with that. He said he was.
Q. Okay. And you were able to get the benefit of the loss for your personal taxes?
A. Correct.
Q. Okay.
THE COURT: Mr. Bliss, are you moving this exhibit into evidence?
MR. BLISS: I am.
THE COURT: Any objection?
MR. BENJAMIN: I object on the same basis of relevance, no counterclaim, and no impeachment, but you've already made a ruling on it.
THE COURT: On the relevance arguments, overruled. So this was marked Plaintiff's Exhibit 12. It is going to be admitted as Defendant's Exhibit 2.
(Defendant's Exhibit 2 received in evidence)
Q. Can I ask you to take a look at page 5 of the exhibit. I'm sorry page 6 of the exhibit.
A. Is this the 2019 tax return we were referring to?
Q. It's the K1 for 2019.
A. Okay.
Q. For yourself.

A. Uh-hum.
Q. It makes reference there to your beginning capital account.
A. Uh-hum.
Q. And it shows a number of $145,942.
A. Correct.
Q. And that your capital account had a loss for that year.
A. Okay.
Q. Okay. But you had an ending capital account of $144,701.
A. Okay.
Q. Okay. Can you tell me how at the end of 2019 you still had a capital account in Cache of $144,701?
A. I don't know. I didn't prepare these returns. I had somebody prepare them and basically I filed them. I'm presuming it had something to do with the money I put in.
Q. Correct. And that's your capital account. And it had a value of 144,000?
A. Yeah, maybe at the end of 2019.
Q. Not 200,000?
A. Well, there was expenses. Again, I didn't prepare this return. So --
Q. Now, was it the same practice exercised by you in both the preparation of the 2020 --
A. Yes.
Q. -- U.S. taxes?
A. I do all my tax returns that way. I have somebody prepare

them.
Q. The 2021 tax return?
A. All of them.
Q. And the 2022 tax return?
A. I'm not sure if the 2022 was filed because what happened when we tried to file it, the IRS would not allow us to file the 2022 because you can't be an LLC with one member. What happened was they told me to -- I called them. And basically they told me that it had to be treated as a disregarded entity. So I don't believe that return was filed. If that's the one that said 100 percent, then that's the one.
Q. If I understand you correctly, you're saying that the IRS informed you you cannot have one member in an LLC?
A. That's correct.
Q. And how did Cache have only one member in 2022?
A. Because the entity was no longer doing business as its original purpose.
Q. So you made a determination that Mr. Vataj was no longer a member of the LLC?
A. I didn't make that determination. I consulted with my attorney. I consulted with my bookkeeper. I called the IRS. And we all agreed that basically the business was not performing business. And once an LLC is no longer conducting business from what it was originally intended for, it's not a business anymore. Therefore, you have to do --

Q. Do you have a single IRS regulation to refer me to?
A. I'm sure I could get something. I wouldn't have it today.
MR. BENJAMIN: Objection.
Q. But again, it's your testimony that you sat down with your accountant, your bookkeeper --
A. And my attorney.
Q. -- and your attorney?
A. And I called the IRS.
Q. Was that Mr. Benjamin or someone else?
A. No, it was Mr. Benjamin.
Q. And made a determination that you could unilaterally remove Mr. Vataj as a member of the LLC and proceed to either wrap up the affairs of the company or attempt to file a tax return?
A. I didn't unilaterally remove anyone. You can't remove someone. What I did was I contacted the IRS and basically said, hey, this entity is not functioning as a business anymore. It is not doing what it was intended to do.
Q. All right. If I can stop you right there.
So who would -- if it didn't exist, why would they tell you you can't have obviously one member?
A. What do you mean if it didn't exist?
MR. BENJAMIN: Objection.
Q. If it wasn't functioning --
THE COURT: What's the objection?
MR. BENJAMIN: We're asking expert questions on

accountancy. We are asking questions on legal matters, legal conclusion or IRS code issues. I think this is an expert -- she doesn't qualify as an expert.

THE COURT: She can testify as to what she understood she could do based on whatever guidance she received.

So do you want to frame her question as to what her understanding is?

Q. You're saying for the entire calendar year of 2022 that Cache did zero business?

A. That's correct.

Q. And you prepared a tax return, did it get rejected?

A. Yes.

Q. So it was filed but it got rejected by the IRS?

A. That's correct.

Q. Okay. And did you produce anything in discovery indicating that rejection?

A. No. It was done through -- I'm trying to think of the software program that my bookkeeper uses to do the tax returns. It's -- what's the name of it, Turbo Tax. She uses Turbo Tax and basically she filed the return and the return was rejected. And then we had to basically call them --

Q. All right. If you did a tax return through Turbo Tax --

A. Uh-hum.

Q. -- wouldn't that be indicated on the return?

A. I mean, if she kept a copy of the rejection, I could

certainly ask her for it.
Q. No, I mean wouldn't "Turbo Tax" be indicated on the return?
A. Well, she was the one that actually did the submission and actually -- let me correct myself.
I'm not even 100 percent sure she did that submission. There were many times that I filed myself on extension. And if I recall correctly when that happened, I actually put myself on extension. And when you do extensions, sometimes Turbo Tax doesn't allow you to file the return. So it might have even been the case that I mailed it in. Again. I can't recall. This was quite some time ago. But what I do recollect is there was a rejection. They were not accepting only one member in the LLC. So I finally called them and said, hey, what do I do here? They said if the business is not functioning as an active business, then it needs to be treated as a disregarded entity. So that's what we did. I consulted with my lawyer. I consulted with my bookkeeper. I consulted with the IRS. I did my due diligence.
Q. All prior years, though, when you filed tax returns you signed the return and you filed it; correct?
A. I signed them or e-signed them. It depended on how we did it.
MR. BLISS: Your Honor, I apologize, but am I using numbers or letters?
THE COURT: We started with numbers. It was

defendants.

MR. BLISS: I think we both used numbers.

THE COURT: If you would like we could switch. I don't think it matters. I've been marking them as Defendant's Exhibit, so you are up to Defendant's Exhibit 3.

MR. BLISS: If I can, Judge, I'd ask the witness and I think I have an extra copy -- to take a look at what's been marked as Defendant's 3 for identification.

THE WITNESS: Is this the same that's in the book here?

MR. BLISS: I don't know if it's in the book or not, to be honest with you. I didn't -- I'll give the Court this one.

Q. Do you recognize that document?
A. Yeah.
Q. Yes?
A. Yes, I do.
Q. And is that the tax return that we have been discussing?
A. Yes.
Q. For Cache for calendar year 2022?
A. Yes.

THE COURT: Any objection to its admission into evidence?

MR. BENJAMIN: Yes, your Honor. Yes, my first objection is relevance which before you've already ruled on.

But there's also the client's social security number is on here.

THE COURT: We can redact the social security number.

MR. BENJAMIN: That's one objection. This was not in defendant's packet, and he is using my exhibit. If it's identical to my exhibit I don't have a disclosure objection, but I have my relevance objections.

THE COURT: So as to your standing relevance objection, for the same reasons that the 2018 and 2019 tax returns are relevant, this is also certainly a permissible line of inquiry.

Mr. Bliss, you didn't know if this was identical to whatever copy?

MR. BLISS: I don't, your Honor.

THE COURT: So I will just redact the social security number. But otherwise Defendant's Exhibit 3 is admitted.

MR. BLISS: Thank you.

(Defendant's Exhibit 3 received in evidence)

Q. Now, if I understand you, on this return, Mr. Vataj was not treated as a 20 percent owner?

A. That's correct. He didn't put any money in.

Q. But he was he was not treated as an owner of the LLC?

A. It was a disregarded entity. Nobody was treated as an owner.

Q. You issued a K1 to yourself?

A. As I said, if I recall correctly, this return was never filed. So while I produced it for discovery --
Q. Well, I thought it was rejected. I thought you testified that it was rejected?
A. Okay. Yes, then yes.
Q. So you produced it in discovery in this state --
A. That's correct.
Q. -- but you never indicated that the return had been rejected?
A. That's correct.
Q. And your testimony today --
A. Is that it was rejected.
Q. -- is that the return was rejected?
A. That's correct.
Q. And that it was rejected after you had the conversation with the IRS?
A. Well, no. It was rejected before and then I contacted the IRS to resolve the matter because I couldn't file my personal tax returns without completing this return, and I needed some sort of resolution. And due to the fact that Mr. Vataj hadn't put any money in, one of the concerns that I had was that he had this judgment, and I didn't feel that he was entitled to anything. He hadn't put any money in. He hasn't taken the loss that I had taken.
Q. He didn't have a judgment. Mr. Vataj never had a judgment

against anyone.
A. He got the judgment against Pendleton Court Apartments.
Q. Right, for the benefit of the LLC.
A. Correct.
Q. And monies being collected --
A. Correct.
Q. -- for the benefit of the LLC?
A. Correct.
Q. So that is property of the LLC, that's not Mr. Vataj's property?
A. Okay.
Q. "Okay" as in yes?
A. Yes.
Q. All right. And so the money is still being collected. Okay. And hopefully, the money continues to get collected for many years to come until the entire judgment is recovered?
A. I'll probably be dead by the time the entire judgment is recovered at the rate they are recovering.
Q. All right. But that's not a negative thing that Mr. Vataj did by getting that judgment and collecting money on behalf of the LLC, that's a positive thing?
A. Well, if you want to frame it that way, but he collected the money and never called me. I had to find out two years after the fact and sue him to find out that there was 40-something thousand dollars in the account.

Q. Before you got sued, though, and we already had testimony regarding it --
A. Before he got sued.
Q. -- you had conversations with Mr. Ciacii about the judgment --
A. Absolutely not.
Q. -- and efforts to pay?
MR. BENJAMIN: Objection.
A. Absolutely not.
Q. You didn't have a conversation regarding a letter that you received from Mr. Ciacii --
A. What letter are we talking about? Can you show me the letter.
Q. The letter garnishing --
A. Absolutely not. Walter Ciacii has not called me in years.
THE COURT: Mr. Bliss, are we talking about the exhibit that plaintiff admitted? If you can pull it up. It might be helpful to just refer to the actual letter.
THE WITNESS: To see the letter so I know what letter we are talking about because maybe we are confusing letters. What I can tell you is that Walter hasn't --
THE COURT: There is no question pending.
THE WITNESS: -- had contact with me in years.
THE COURT: I think it was a letter that talked about the collection of $600 monthly payments.

MR. BLISS: That's correct, Judge. I apologize.

MR. BENJAMIN: The question --

MR. BLISS: My exhibit list is quite dark.

MR. BENJAMIN: The question was asked of conversations with a Mr. Ciacii.

THE COURT: Again, if you want to ask a clearer, more directed question.

MR. BLISS: I will, Judge. But I believe her testimony earlier today involved a phone call and in which Mr. Ciacii was on that call --

THE WITNESS: And was completely silent.

MR. BLISS: -- regarding this issue.

MR. BENJAMIN: I object to any requests for conversations, that would be hearsay and out of court, and we don't have a witness on that. But I'm not objecting to the contents of something already in evidence, of course. You can talk about whats in that letter. That's a communication, as opposed to a conversation, that's what my point is.

THE COURT: I believe the letter you want to ask her about is Plaintiff's Exhibit 19.

THE WITNESS: It's probably dated 2022.

THE COURT: If Mr. Bliss, you want to ask her about other conversations, it might make sense just for the timeline if you want to center it around the date of this letter and other conversations before or after.

MR. BLISS: Thank you, your Honor. That's correct.
Q. So I'd ask you to take a look at what was entered into evidence as Plaintiff's Exhibit 19.
A. Uh-hum.
Q. And that was the letter from Della Mura & Ciacii to yourself and to Mr. Vataj; correct?
A. That's the way they wrote the letter, yes.
Q. All right.
A. But they never forwarded me the letter. Sonny forwarded the letter via email, as you can see.
Q. I see there is an email in which Sonny forwarded it to you.
A. Right.
Q. There is no indication, however, that this wasn't put in the mail to you?
A. Yes, it very well could have been.
Q. Right.
A. I'm not disputing that.
Q. So they did communicate it to you?
A. Yes. That was the only communication that we had.
After that I never heard from them. I never heard from Della Mura & Ciacii or Mr. Vataj until --
Q. But in that letter --
A. Until I filed my lawsuit and then a year into that --
Q. Well, if I may?
A. At the deposition --

Q. If I may, this letter talks about the work that's been done by Mr. Ciacii to recover, right, on the judgment that he obtained. It also talks about the judgment. It also talks about a garnishment. Okay. And earlier, I believe you testified that he was demanding to be paid $10,000?

A. Correct.

Q. Where does it say that in this letter?

A. Well, it said basically as a favor to Sonny, he hadn't billed us. And that the bill --

Q. Where does it say that in the letter?

MR. BENJAMIN: Your Honor, I think --

A. Yeah, if this letter does not say that, then this letter is altered.

MR. BENJAMIN: I believe there is a mischaracterization of this letter.

MR. BLISS: Judge, there is a question to the witness. I don't want counsel testifying now.

THE COURT: It is just him asking her to -- because she did say that before about the demand for the $10,000 to Mr. Ciacii. So he is asking her to identify where it is in the letter.

THE WITNESS: It was in the letter. So if it's not there now, then somebody altered this letter.

If you could give me a moment so I could actually read the letter. But I can assure you.

Q. I just want to remind you, it's your exhibit.
A. I understand that.
Q. Okay.
A. Again, I want to make sure it's the letter I'm referring to.
Q. Is it possible you may need to --
A. I only received two letters from Mr. Ciacii.
Q. Okay.
A. In my experience with him, basically. I didn't have a lot of communication with this guy. He didn't call me. I wasn't able to walk over there and talk to him.
Q. Could you get back to answering the question.
A. Yes.
Q. Thank you.
A. To date, I have not billed our time spent to collect this debt.
Q. That's not the part --
A. As a courtesy to Sonny.
MR. BENJAMIN: She is answering the question, your Honor.
THE WITNESS: I am answering the question.
THE COURT: I understand, Mr. Bliss, if that's --
MR. BLISS: That's fine.
Q. Okay. Where is the demand that you or Sonny or Cache pay him $10,000?

A. For starters, he said to date he hadn't collected this debt as a courtesy of Sonny. However, our time at the rate of $350 per hour is in excess of $10,000. We also have expended fees for court filing fees, process services, et cetera. I never got a bill from the guy before.
Q. Isn't the real content, I mean, he gave that information to you --
A. Gave what information to me?
Q. Where his billing stood. But he was also --
A. He gave it to me in four years later. I never had a retainer agreement with this guy. I didn't know he was billing us.
THE COURT: There is no question posed. Just listen to his question and answer the question posed.
THE WITNESS: Okay.
Q. But the topic of this letter is collecting monies from the debtors, the people that borrowed the money?
A. Right.
Q. Okay. And you were aware prior to this letter that a judgment had been obtained against them?
A. That's correct but what I wasn't --
Q. And efforts were being made to collect on that judgment?
A. On a sham judgment. On a sham promissory note. On a sham --
Q. A sham?

A. Yes, it was a sham.
Q. You don't think this was a real legal document?
A. I don't believe these people had the financial backing to sign a personal guarantee that was worth $188,000, and Sonny had to have known that.
Q. And you base that upon what information?
A. Well, for one, they weren't paying their taxes in 2018. They weren't paying their taxes in 2019. They had a hard money loan with a lender for 18 months --
Q. If I could stop you right there.
A. -- that they hadn't done any construction on. These people were flailing around.
Q. If I could stop you right here.

MR. BENJAMIN: She is answering the question.

MR. BLISS: It is not responsive to the question.

MR. BENJAMIN: It is exactly responsive.

THE COURT: Mr. Bliss, do you want to ask another question?

Q. I would be happy to ask another question.

You keep mentioning the words "hard money loan."
A. That's because Mercury Capital --
Q. Borrowers who are current in all their expenses and in paying all their bills, they don't need a hard money loan?
A. But these people were not paying their bills.
Q. That's my point, so they needed a hard money loan?

A. Right. But not to pay their taxes. Not to pay their taxes. Not to pay --
Q. To pay whatever debts they needed to pay to keep the project alive --
A. Absolutely not.
Q. -- until they could get the refinancing?
A. Right. But that's after you've already done probably like 75 or 80 percent of the construction. You don't hold onto a hard money loan for 18 months and then turn around and tell somebody this is a good deal. This is a guarantee that you are going to get your money back because they are going to refinance.
Q. Are you telling me --
A. There was no possibility of a refinance with a distressed property, Mr. Bliss, no possibility. They weren't even 10 percent close to completing that construction.
Q. How do you know?
A. Because I looked up the permits on the public records and when --
Q. Besides the --
A. And when it went back to Mercury Capital, they relisted the property as a C Class asset that was distressed. Again, no improvements --
Q. Once again that people that need hard money loans are not people that can walk into a bank and get a conventional loan or

get a conventional construction loan. That's why they are called hard money loans?
A. I understand that.
Q. All right.
A. It was still Mr. Vataj's responsibility to do the due diligence.
Q. Excuse me. There is no question. You answered my question.
On top of that, it's the reason why a hard money lender can charge more interest and get more interest?
MR. BENJAMIN: Your Honor, is counsel testifying?
A. They had a first position lender.
MR. BENJAMIN: Is counsel testifying, or is he asking a question?
MR. BLISS: It's a question. She just answered.
MR. BENJAMIN: It's testimony. He is trying to educate my client. That's essentially what I'm hearing, and that's totally inappropriate.
THE COURT: Mr. Bliss, can I just ask one question, Judge. I would like to confirm that in May or June 2019, whenever that first $100,000 gets put towards the loan --
MR. BLISS: Right.
THE COURT: -- did Ms. Hall know that this was for a hard money loan?
MR. BLISS: It was my understanding from her testimony

earlier that she understood that. That's why they were getting 8 percent interest.

THE WITNESS: I'm not disputing that, your Honor.

THE COURT: Then you understood in May --

THE WITNESS: I didn't understand what a hard money loan was, but I was told that it was a hard money loan which basically it was supposed to be returned in six months and that they were going to refinance and then I was going to be paid upon the refinance.

But the fact of the matter is they were nowhere near a refinance because they haven't done a construction to get a conventional loan for a refinance. They would have had to do a million or a $1.5 million worth of improvements from the hard money lender. My $200,000 wasn't going to bring them to a $4 million dollar --

Q. Excuse me. You keep referring to the hard money lender.

A. Because that was the --

Q. Cache is the hard money lender.

A. No Cache was not. Mercury Capital was the hard money lender. They had first position --

Q. That's not -- Judge, I'm going to move to strike.

A. They were first position --

MR. BLISS: I'm going to move to strike, Judge, and ask her to stop talking, basically.

THE COURT: I don't think we have anything in evidence

about Mercury Capital.

MR. BLISS: We do not.

THE WITNESS: You do. We do, would you like me to show it to you?

THE COURT: Do you want to ask another question, Mr. Bliss?

MR. BENJAMIN: It's in the exhibit, your Honor. She testified, but it's also in the exhibit.

THE COURT: Is this the foreclosure one?

MR. BENJAMIN: This was the 22, I believe.

THE WITNESS: It's in the substitute trustee document.

MR. BLISS: I believe 22.

THE COURT: 22 is the email chain.

MR. BLISS: It's emails and then a deed.

MR. BENJAMIN: Page 22 of -- excuse me, page 6 of 22.

THE COURT: All this says is Mercury Capital funding -- I guess the deed was made for the benefit of Mercury Capital Funding?

MR. BLISS: I believe it's subsequent to a foreclosure. They were the high bidder.

THE WITNESS: They bought the property at auction with a substitute trustee.

THE COURT: I don't see a link into a hard money lender.

MR. BLISS: I agree.

Q. And by the same token, this deed, contrary to the testimony we heard earlier, doesn't state that this was the sixth auction.
A. Yes, it does.
Q. Correct me, please.
A. On page 2 of 4, right at the top. "Lender elected on six prior occasions to cause the substitute trustee to adjourn and reschedule the sale by announcing the specified date, time and place."
Q. Right so the lender is -- the foreclosure, sale date be adjourned. It's not a new foreclosure?
A. It's probably because no one showed up for the bids.
Q. We'll never know. It certainly though, is not a sixth auction. The auctions never took place.
A. If no one showed up, the auction wouldn't take place.
Q. Well, we don't know what the rationale, reason, or no reason why they were adjourned, the deed just reflects that they were adjourned.
Now, at any point in time, did you notify Mr. Vataj that you had changed the address from Cache to your home address?
A. Yes, my bookkeeper notified him. She had to contact him.
Q. I'm going to ask that we not hear hearsay testimony.
A. She sent an email.
Q. Do you have that email?

A. I do.
Q. Where is it?
A. I wasn't able to produce it. I found it too late after discovery was already closed. I would be happy to produce it if the Judge would allow it.
Q. And was that email sent after you changed the address of Cache?
A. It was notifying him that I was changing the address because he asked me to move out of the office. And we were also communicating with him about his 401(k) money that needed to be deployed to him from Dash so she was communicating with him on a number of issues.
Q. Did she also let him know you would close Cache's bank account?
A. Yes.
Q. Prior to closing it, did you change the address of that bank account to your home address?
A. Yes, I changed all the addresses to my home address. Cache's office was moving. I was moving.
Q. And where you went --
A. Cache wasn't being held hostage just because Sonny had that office. If I had to move then Cache was moving with me.
Q. You had the authority to do that?
A. Yes.
Q. Based upon what?

A. I was a member of the LLC. I put in all the money in the LLC.
Q. And what was your percentage ownership of the LLC?
A. At that time that hadn't really been distinguished.
Q. Okay. So you had zero ownership in the LLC?
A. Obviously not if I'm the one that put all the money in.
Q. Well, I don't know. LLCs get money from all sorts of sources. It has nothing to do with ownership.
A. I really don't know where you are going with this question. But do you want to reask so I can try to give some sort of answer.
Q. I'm trying to understand that when Cache was formed, what was the ownership interest of Mr. Vataj and yourself?
A. That wasn't finalized. Nothing was finalized when Cache was formed. Basically Mr. Ciacii or Peter whichever one did the formation, they came up with those numbers. I never agreed to that. That was one of the reasons why I wanted to have a sit-down meeting regarding the operating agreement.
Q. Doesn't the limited liability company law --
A. I don't know limited liability company law.
MR. BENJAMIN: Objection.
THE COURT: I think if you could rephrase. I would just like to make clear because there were a few things she said that we don't have timing on.
Q. So you're saying that at the time Cache was formed to the

present time, okay, it had never been resolved?
A. No.
Q. What your ownership interest in the LLC was?
A. No. He never followed up with the meeting. We never signed the agreement.
Q. Because --
A. And then --
Q. Because it was never resolved?
A. Then --
Q. And you invested -- please let me finish my question.
And then because you deposited money into the LLC's bank account --
A. Uh-hum.
Q. -- that effectively, you were the only owner of Cache?
A. Yes, absolutely. He didn't sign an operating agreement. He didn't put any money in. And then he deployed the money and lost it.
Q. Okay. But he did put $30,000 in?
A. That I gave him.
Q. Well, you gave it to him, but you didn't give it to Cache. You gave it to him. He decided to put it back into Cache?
A. That's true. And even that was another ruse, trying to act like he was contributing to things that were happening at Cache.
Q. The money went into the account; right?

A. It did.

But he really took no loss when the loss happened because at the end of the day, that money was given to him by me.

Q. I'm only asking you about money being contributed.

And he took no money out for himself?

A. Well, he took out $188,000. For all I know he could have been getting kickbacks from these people. It was very questionable, the entire deal.

Q. We're talking about the LLC now.

A. Okay.

Q. In the four years that the bank account existed, did Mr. Vataj ever withdraw any money for himself?

A. No. There was no money in it. He took all of it. He deployed all of it within the first year.

Q. We had 230,000 invested and 188-5 invested by the LLC?

A. Right.

Q. Okay. And it was invested on notice to you, as a loan, to people that you were made aware of, okay, and loan documents that were shared with you, right, included a guarantee, a confession of judgment, a promissory note, the terms all of which you knew about, all right. And you were okay with that loan being made; correct?

A. I was okay with it with the understanding that he had properly vetted the project, vetted the borrowers, vetted the

entire deal. I relied on his experience. The man had 25 -- I'm sorry --

Q. Is that what this lawsuit is about?

A. That's absolutely what this lawsuit is about.

He had 25. The man had 25 --

Q. That he didn't exercise good business judgment?

A. Not good business judgment. He didn't even do the judgment. He didn't even do the due diligence. When we asked for the diligence that he testified he did in discovery, he produced zero.

Your Honor, zero evidence.

THE COURT: Can I ask a few questions?

MR. BLISS: Sure, you can do whatever you want.

THE COURT: I just want to confirm the $30,000 you said you gave to Mr. Vataj, that was in his personal capacity that was to him personally?

THE WITNESS: Correct. I wrote the check to him personally. That is right.

THE COURT: You testified that Mr. Vataj never withdrew money for himself from the Cache bank account?

THE WITNESS: That's correct.

THE COURT: When did you close the bank account for Cache?

THE WITNESS: Probably around March of 2022, after I spoke to the Tennessee lawyer and realized there was really

nothing I could do and all money was gone.

THE COURT: Between the 2018 period when Cache was formed and March of 2022, neither you and Mr. Vataj did not finalize an ownership interest?

THE WITNESS: That's correct.

THE COURT: You said at some point there were numbers put out. Where are those numbers?

THE WITNESS: When you say "numbers" are you referring to the 80, 20 from the tax returns?

THE COURT: That the only numbers you've ever seen, the 80/20 --

THE WITNESS: Correct. What happens is the tax return was filed a year later from the time it was formed, and I usually went on extension. I went and had a discussion with him about it and basically said, hey, you didn't put any money in. This is all my money. I want to file the return -- I had to file the return with some numbers, even though we had never signed the agreement. So I said to him, I think it would be reasonable that basically, you know, I take 80, and you take 20. And he was fine with that. We did is that way for four years or three years, however many returns there were.

THE COURT: You never filed a 2022 return tax returns?

THE WITNESS: I didn't believe I filed it because the IRS would not let me file it with one member.

THE COURT: Apologies, Mr. Bliss.

MR. BLISS: Judge, could I have a second?
Q. After you deposited the $200,000 into Cache's bank account, did you ever deposit any more money into the account?
A. No. If I did it might have been like a transfer where maybe I took some money out and put it back or vice versa.
Q. I'm sorry. I couldn't hear you.
A. If I did, it might have been a transfer. Maybe I needed to borrow it for a month from Dash so I might have taken it out and then put it back or something along those lines.
Q. So if I understood you correctly, that you might deposit money, might have deposited money from Dash?
A. Yes. It was my money. If I needed it for cash flow from Dash I might have pulled some of it out and put it back.
THE COURT: Mr. Benjamin, any objection to Exhibit 4?
MR. BENJAMIN: I'm just checking with my exhibit that was admitted. If you could give me a moment, your Honor.
MR. BLISS: If you have that one, I apologize. But I don't think you have that bank statement.
MR. BENJAMIN: No, this is new. This is an August -- my Exhibit 10 is the July 2019 statement. This is the subsequent month, which is new. It wasn't in counsel's packet. But I don't think -- I don't object to this exhibit. But it's a new one. It's new. It's not my Exhibit 10.
THE COURT: All right. So Defendant's Exhibit 4 is admitted.

MR. BENJAMIN: I'm sorry what number, your Honor?
THE COURT: Defendant's Exhibit 4.
(Defendant's Exhibit 4 received in evidence)
Q. Ms. Hall, I'm going to ask you to take a look at Defendant's Exhibit 4.
A. Okay.
Q. Can you tell me what that is?
A. It's a deposit for $30,000.
Q. I'm sorry?
A. It's a deposit for $30,000.
Q. Well, is it a bank statement?
A. Yes.
Q. Is it a bank statement for Cache Realty Group?
A. Yes, it is.
Q. Can you tell me for what month?
A. August of 2019.
Q. Okay. In August of 2019 there is a deposit of $30,000; right?
A. Uh-hum.
Q. I believe the deposit slip indicates that it was a cash deposit?
A. It could have been. Where does it indicate that?
Q. If you look at the deposit slip?
A. Okay.
Q. Is that a cash deposit?

A. Yes. It's marked cash deposit.
Q. Did you make that deposit?
A. Yes, I did.
Q. And what was that for?
A. I probably was putting back $30,000 that I had taken out.
Q. You were putting back $30,000 that you had taken out?
A. That's correct.
Q. For your own use?
A. Could you repeat what you have just said. For my own use, you said?
Q. Yes.
A. It was probably for Dash's use. I probably transferred money to Dash.
Q. Out of Cache?
A. I probably transferred money to Dash, and I probably put the money back into the account with a cash deposit.
Q. Okay. Do you have any idea what that was for?
A. I just explained what it was for.
Q. Well, bear with me, and maybe you can help me understand it.
A. Okay.
Q. Do you know what it was for other than probably because --
A. I took money out of Cache.
Q. Of Cache?
A. I probably sent it to Dash and then I was replenishing the

money that I took. I think I explained that now, three times.
Q. Okay. And you didn't pay Cache back with money from Dash, you used cash?
A. What do you mean --
Q. 30,000 in cash?
A. What do you mean I didn't pay it back from Dash? I took cash out of Dash all the time.
Q. Okay.
A. I don't know where you are going with this.
Q. So it's not unusual for you to take $30,000 in cash?
A. Not unusual at all. My business was cash flowing. I was doing 100 grand a month in my business, sometimes more. I was making a lot of money at Dash.
Q. All right. I seem to have only one copy of a bank statement. I didn't anticipate getting into this, but if I could double-check.
I'm going to show you what I'm marking as Defendant's 5 for identification. And I apologize, I don't have copies.
MR. BENJAMIN: Can I just see it?
MR. BLISS: Sure.
Again, I apologize to the Court also.
THE DEPUTY CLERK: It's one and one or you're just --
MR. BLISS: No, it's for identification, but it's a two-page document.
THE COURT: Any objection, Mr. Benjamin?

MR. BENJAMIN: Yeah, your Honor. I have never seen that before. I had seen the one before it, but that was brand new. It wasn't in counsel's packet. I don't know what it is being offered for.

MR. BLISS: It was not in my packet, Judge, that's correct. But it was produced by plaintiff during discovery, as were all the banks statements.

MR. BENJAMIN: Okay. But I haven't talked to my client about this. And we have no idea what the question is going to be. You know, this was supposed to be in his packet. Everything I offered was in my packet.

THE COURT: I understand it's frustrating, but generally if it was turned over in discovery, it would be fair play, and you wouldn't know the questions regardless. So as long as this is a document that plaintiff has turned over in discovery, he can put it in as an exhibit.

MR. BENJAMIN: Okay. Just note my objection. It wasn't disclosed by pretrial. We have to get a binder for each side.

MR. BLISS: I think that's on a direct case, Judge. I don't think it's necessarily on cross-examination because I don't know what I'm going to use on cross-examination.

Q. Do you recognize that document?

A. I do. It's the Cache bank statement.

Q. I'm sorry, I'm having a little trouble.

A. It's the Cache bank statement.
Q. For what month?
A. October.
Q. And for the record, it's the Chase account?
A. That's correct.
Q. And it shows a transfer out; correct?
A. That's correct.
Q. How much?
A. $30,000.
Q. And are you able to tell from that statement where it went?
A. Yes, it went to -- let's see here, it looks like it went to the Dash account. And I can actually explain it.
Q. And that's account number ending in what?
A. 8310.
Q. That's not a personal account of yours?
A. Maybe it is. It could be. I don't recall the statement numbers, but if it was a personal account, again, like I said, I have an explanation.
Q. And this, was there a purpose or a reason?
A. Yes, I was purchasing a house.
Q. I'm sorry?
A. I was purchasing a house.
Q. Okay.
A. I had to put down a deposit. I was short on the deposit. The money was supposed to be returning back the initial

investment of 188. And I was a little tight on my cash flow with Dash, so I didn't have my full deposit amount to close on my house.
Q. Okay.
A. So I spoke to Sonny about it and I told him I was taking the money out of that account.
Q. Out of the Cache account?
A. That's correct, and he was okay with it because he knew that the loan was supposed to come back by November and that hadn't happened.
Q. Well, besides that, I mean, he was okay with it? He told you that?
A. Yes.
Q. Or that's what you know because --
A. No, he told me that.
Q. Okay.
A. And I eventually transferred the money back to him.
Q. And during this conversation did you talk at all about your claim that he didn't contribute his fair share to the Cache bank account?
A. At that time I wasn't really alarmed with the situation because I didn't understand the severity of who he had deployed the money to. I was under the impression these people were solvent. I didn't realize that they weren't paying their taxes. I didn't realize they were on the brink of foreclosure

and hadn't utilized their first position hard money lender.
Q. But you knew they were borrowers of hard money loans?
A. The way he described the loan to me, as I explained in my testimony multiples and I'll say again for the record, was this was a hard money loan we were providing for them to refinance.
Now, again you have to understand my frame of mind during that time period. I didn't even know what a hard money lender was. He was the one who understood all this. He had multitude, years of experience dealing with hard money lenders, conventional loans. I was in the process of actually trying to buy my first home.
Q. If I can, all right --
A. Yes.
Q. It's your testimony, if I understand you, that he exercised bad judgment?
A. No. It's my testimony that I relied on his experience to do his job, to do the due diligence on the project, and he hadn't done that as we know from discovery.
Q. And said this is a good investment?
A. Correct.
Q. And given the amount of money and the interest that we could now make?
A. Uh-hum.
Q. It looks like an opportunity?
A. But he didn't look at anything to determine that.

Q. Forget about that part.
A. Of course, forget about that part. That part's irrelevant.
Q. He said it looks like a good opportunity?
A. Sorry?
Q. He said it looks like a good opportunity?
A. Why didn't he say that for himself with his own money with all the investment properties that he's purchased over the years before and after?
Q. I'm not asking you that question.
I'm asking you if that was the endgame that he said we should make this loan --
A. Yes, he did say that. He induced me to believe that this was a good investment. An in fact, it was a terrible investment.
Q. It turned out to be a bad investment?
A. That's right. But he should have done the diligence because he would have known that based upon just looking at the public records. He would see that was a terrible arrangement.
Q. And that's why we are here?
A. That's exactly why we are here.
Q. Now, what benefit did Mr. Vataj gain by making this loan and having the borrowers default on it?
A. I believe he was trying to help --
Q. I don't want to know what you believe. I want to know what benefit --

A. Many borrowers in this position look for investors like myself to recover their equity in the property when they know they are about to go into foreclosure. And these were people he knew. He knew the uncle. He knew the nephew. The nephew worked in his office. And clearly they were trying to recover their equity in the initial hard money loan with Mercury Capital because they knew they were about to foreclose. They had the property for 18 months and hadn't done a lick of construction except for minor electrical bandaids. They hadn't pulled any major permits, no HVAC, no plumbing, nothing.

Q. We covered all of this already today.

A. Well, we need to cover it again. Because you are asking me what he benefited from. He benefited from helping these people.

Q. So he personally got a benefit?

A. Yes, these were his friends. He knew them. He recommended this deal.

Q. And they were such good friends he had them sign a confession of judgment. He had them sign --

A. That was the inducement.

Q. He had them sign guarantees. And then he pursued collecting the money from them after they --

A. He pursued collecting the money after that, and he didn't collect not nearly what he sent out.

Q. That's a different subject.

A. It's not a different subject. He said he's deployed $188,000.
Q. Correct?
A. To date, he has collected 46,000. On top of that, that was just the dumbest of luck because they actually seized Faton's son's account who happened to have $25,000 in there. On top of that, Faton was a broker, so they took one of the brokerage fees. But now he is never going to collect that money that like. He's getting little drips and drabs from the sheriff right now for a couple hundred dollars a month. I'll be dead by the time I get this money back.
Q. I'm trying to understand how that equates with him getting a benefit by helping these guys out and giving them a loan?
A. He had very incestuous relationships, Mr. Bliss, in this community. These were the type of deals that he did. Okay. Even when he obtained his property -- even when he obtained his property in TD Bank, he told me that multiple people --
Q. Do you have any evidence with you here today to support that --
A. The fact that -- yes, the fact that this man had 25 years' experience and knew what he was supposed to look for. He had experience with distressed properties. He had experience with construction. He had experience with real estate deals. He had seen tons of deals come across his desk even being a broker. You know, some brokers they don't have the level of

experience that Mr. Vataj does. But he specifically has a number of investment properties that were very complex. He had a lot of experiences with distressed properties and multiple family properties commercial properties. You name it, he had it.

He had a shelf of books, your Honor, with black books across filled, one by one by one labeled with each address of each property that he owned. But for some reason --

Q. Well, do they all --

A. -- for some reason suddenly when he gets my money he decides he's going to deploy it down to Tennessee. I'm sorry. That is not a mistake. Okay. That is deliberate and calculated. And then he actively concealed from me what was going on. He had a whole information monopoly going on.

Q. You had zero communication with --

A. -- with Walter Ciacii. Okay. He lied to me. He did not tell me that this property was up for foreclosure. He never mentioned word "foreclosure." He never mentioned that it was up for auction.

What do you think I would have said, Mr. Bliss, if I found two things? You know what I would have said? Let me answer that for you. I would have told him, guess what, we need to get down there and save that property. We need to invest our own money and take over the project.

Q. And how would you have saved the property?

A. First of all, I had quite a bit of equity in the house that I had bought in 2020, that's number one.

Number two, my finances were great up until 2022 when I had asked him for the money back. But prior to that I was cash flowing $100,000 a month in my business. I was in the position to save that project. So was he, by the way. He had $600,000 sitting in the bank. He had excellent credit. So did I. I lost in opportunity cost of owning an asset with 78 apartments in it down in Tennessee. By the way, the market was booming down there during COVID. This nonsense, this narrative.

Q. If I could --

A. Wait a second.

Q. I understand you --

A. This narrative that COVID was the reason that the project went bad -- the project went bad before COVID even happened. They had defaulted on my loan in 2019 of November. COVID didn't happen until March of 2020, Mr. Bliss.

Q. You went from the investment shouldn't ever been made to he blew it we could have taken over this investment?

A. If he had articulated to me, based upon his experience, what my true options were -- even this nonsense about Walter Ciacii was representing me, that is a load of garbage.

The bottom line is Walter should be charged for legal malpractice, your Honor, legal malpractice. He did not tell me

what my true options were. What he should have done is he should have picked up the phone and called me and said, hey, you know what, you need to get a lawyer down in Tennessee because the asset is down in Tennessee. These people do not have any assets up here. You are not going to be able to recover your $188,000 and you're about to lose it in foreclosure.
Q. We are talking about when the loan was made, though. I think you said the loan should have never been made; correct?
A. Why don't you repeat the whole thing so that I understand the context of what you're asking me, Mr. Bliss.
Q. Well, the context is, is it your position that the loan should have never been made and that Mr. Vataj should never have even told you about this opportunity?
A. It is my position that Mr. Vataj had 20 plus years' experience in the industry, not just with being a realty broker but also an investor and with hard money loans doing construction. And it is my position he should have done the proper due diligence, and he did not do that. And that is where fraud lives. Guess what, when you tell a partner that you did something, and it was a good deal, and in fact you didn't do it, that is fraud, Mr. Bliss.
Q. Is it? Because once again, did he get a nickel out of this project?
A. I don't know what type of kickbacks he might have gotten

from these people.
Q. I see.
A. Like I said, they were his friends. As far I'm concerned, they were trying to recover their equity. They were scrambling around for 18 months. They knew this property was about to go into foreclosure. They weren't paying their taxes. He should have known --
MR. BLISS: Move to strike as nonresponsive, Judge.
THE COURT: Do you want to ask her a question. Perhaps we could move it along.
Q. But you do know that he didn't take a nickel --
A. I don't know that. I didn't get to see -- I didn't get to subpoena all his bank accounts.
Let me point something out that I don't know. When he collected that $46,000 with the lawyer that he was colluding with, they never once called me. And they claim it's sitting in an escrow account. They claimed that a year after they collected it, and I filed a lawsuit. So I didn't find out for two years that $46,000 was sitting in an escrow account which was my money. You think Walter Ciacii called me up or Mr. Vataj called me up? No. You know why because Walter moved to have that money released from Exit Realty. And, you know, where that money probably went? Right back to Sonny's pockets. And he had no intentions of calling me and telling me about that $46,000. The only reason I ever found out about is

because I filed a lawsuit. And then they had to disclose it at the first deposition, which, by the way, Walter was also colluding with him showing up like he didn't know that he had a conflict of interest, and that he was going to represent Mr. Vataj as his attorney at the first deposition. And that caused another delay. We had to turn around and wait. Walter with had to have a back door meeting with my lawyer, tell him about the 46,000. They were trying to get me to settle for that. I'm not going to settle for 46,000 when I lost 188. That is unacceptable.

Q. At any point in time after November of 2019, did you ask Mr. Ciacii or Mr. Della Mura what's going on?

A. No, I did not have this relationship with Mr. Ciacii, this narrative you are coming up with --

Q. It's just a question whether you had a relationship with them or not?

A. No, I didn't. I was getting updates from Sonny.

Q. So you were --

A. When I did speak to Walter it was with Sonny on the phone basically controlling the conversation. It was a very high-pressure conversation that was rushed through. There was no place for me to basically ask more in-depth questions. He didn't provide an opportunity for that. Him and Walter were colluding in all of this. Walter wrote me two letters in four years. None of them, not one of them said that that property

was in foreclosure. You don't think that was important information for the person whose money on the line? Not one of them said that this property that I had my $188,000 in was up for auction, not once. But suddenly you want to tell me this man communicated with me. It's laughable.
Q. Do you have any evidence that Mr. Vataj and/or Mr. Ciacii knew that the property was in foreclosure?
A. They had a responsibility to know. They claim in this letter that they were charging $10,000 for that they were representing me. That they were representing the interest. LLC and that to date they were doing all these things to try and collect on my money.
Q. I'm trying to ask you to answer my question.
A. Yes. Go ahead and ask it again, Mr. Bliss.
Q. Do you have any evidence that indicates that either Mr. Vataj or Mr. Ciacii knew the property was in foreclosure?
A. How could they not know it was in foreclosure?
Q. Well, you didn't know?
A. It wasn't my responsibility to know. I'm not a lawyer, Mr. Bliss. I'm not a experienced investor. I didn't even know that was a possibility. Sonny mentioned it in passings like it was something that could happen in the future, and it was something we would be aware of when it happened. But then when it did happen -- it was probably actively happening while he was dropping these hints, but he didn't disclose to me.

Q. So the answer is no.
A. I wasn't some sophisticated investor that understood how all of this works.
Q. So I if I understand you correctly the answer is no?
A. I did not know that it was in foreclosure. That is correct.
Q. And you have no evidence that Mr. Vataj knew it was in foreclosure?
A. Well, it was their responsibility to know. Put it like that.
Q. You said that multiple times. And you accept no responsibility. I get that.
A. I was not the one that bought 20 plus years' experience in these types of deals.
Q. But you are also the one that owns 80 percent of the LLC?
A. So what? He had a responsibility of, a fiduciary responsibility to me. Okay.
Q. And you took all the money that was left in the LLC 'right?
A. Yeah, of course. He takes no responsibility. He didn't put any money, doesn't have any responsibility. Of course.
Q. And you employed your sister. And she got money out of the LLC?
A. Yeah, a lot of money, $14,000, whoopee.
Q. And I would assume, you are going to want a piece of the 46, 47?

A. I'm going to want all of it, Mr. Bliss because that's my money.
Q. Well, it belongs to the LLC, right?
A. Okay.
Q. So in part we have to figure out who owns what.
Other than having no evidence that Mr. Vataj received a nickel from this loan --
A. What would be the reason that he did deploy that money to a project that he had no due diligence on.
Q. I didn't finish my question.
THE COURT: Ms. Hall, just let him ask the question.
THE WITNESS: Sorry.
Q. So you have no evidence that Mr. Vataj received a nickel out of the loan --
A. Unfortunately --
Q. -- or out of this deal?
A. Unfortunately, I could not get those records, Mr. Bliss. Shame on me.
Q. In part because they don't exist.
And Mr. Vataj never took a nickel out of Cache after he made his $30,000 deposit.
A. Okay.
Q. Okay. The only one that was moving money around and paying money out was yourself?
A. He took $188,500.

Q. He took $188,500 --
A. And sent it to his friends.
Q. -- with your consent and your permission --
A. Let's be clear these were his people, not mine. I would never deploy that kind of money.
Q. -- and sent it to the borrowers who he then sued?
A. I didn't know these people from a hole in the wall. He deployed that money. So don't tell me he didn't take anything out. He took the bulk of the money.
Q. It didn't go to him?
A. I don't know that, Mr. Bliss, and neither do you, quite frankly.
Q. Well, that's important, I admit. No one in this room knows it.

MR. BLISS: I have no other questions, Judge.

MR. BENJAMIN: Brief redirect.

THE COURT: I just want to ask her a quick question.

Other than the $188,500 that was taken out for the Pendleton loan, did Mr. Vataj withdraw any other money from the Chase account?

THE WITNESS: No.

THE COURT: Mr. Benjamin.

REDIRECT EXAMINATION

BY MR. BENJAMIN:

Q. Ms. Hall, counsel alleged in his cross-examination that you

were moving money from cash to Cache, I should say. And you weren't moving money from Dash to, as he was suggesting, to hide any sort of money from Dash, were you?
A. No.
Q. Why were you moving the -- let's be clear, on why you were moving money at that initial point from Dash to Cache's account?
A. I wanted to purchase a house. And I wanted to also subsequently obtain an investment property. And so I wanted to allocate funds for each. And I wanted Sonny to be a part of that. I looked up to the guy.
Q. It was having nothing to do with taxes?
A. No.
Q. The money that you moved from Dash was after tax money; correct?
A. The benefit was so minimal it's laughable. The loss that I took was far greater.
Q. But it was after tax money from Dash to Cache?
A. Well, could you rephrase the question. I'm sorry. I don't really understand what you are saying.
Q. We'll move on.
You never got a call -- there was a lot of going back and forth --
A. Just to be clear, I never -- the benefit that I got, by the time I got that benefit, it wasn't even like it was

precalculated when I put the money in. Because when you form a business and you get the benefit, you don't get the benefit until a year later and actually maybe a year and a half later because you are filing the return on extension. So it wasn't like some grand scheme where I was going to get this great benefit. I didn't know what was benefit was going to be. It wasn't a premeditated benefit. I set up the LLC to purchase an investment property. I wanted to own something with passive income.

Q. Understood.

Counsel asked you also -- do you want to take a moment?

A. No, I'm okay.

Q. Counsel asked you also about the tax returns you never got a call from the IRS as to any inaccuracies from the tax returns?

A. No.

Q. You were never audited?

A. No, never.

Q. You were never discussed any need for making an amended return as to those years?

A. Never.

Q. And you sent those K1s and those returns to Sonny, didn't you?

A. Yes.

Q. You remember having that done?
A. Yes, I double-checked over the last few weeks, and I saw the emails that I sent to him with everything attached.
Q. At any time did Sonny ever ask you about the tax returns in general?
A. No, he wasn't concerned with that. It was so minimal of a loss. I mean, he had losses from all over the place. He had tons of K1s from of his LLCs that he was getting losses from. It was just another one to add to the pile. When I asked him about it, when I discussed he said he didn't need it. That's why he was fine with it.
Q. So you discussed what was put on the tax returns with him?
A. Yes, I did. I asked permission. I wasn't going to do something like that without talking to him first.
Q. And his answer was I don't even need 20 percent?
A. Correct.
Q. Was it agreed -- strike that.
Was it understand between you and him when you had that conversation that he had a right to take a loss on that money?
A. Yeah, I was giving it to him. That's why I went to him and asked about the 80/20. I felt like we couldn't really determine the proper ownership as far as the operating agreement was concerned because we haven't found a property to actually say who was going to put up what.

But as far as the tax return, the tax return feed needed to be filed with something. So I felt like I given him the 30,000. When I gave that to him I didn't know he was going to put it into Cache, but he did. By my estimation, that was about 20 percent, so I figured -- that's where I came up where that number.

Q. As you sit here today, Sonny never discussed with you what ownership you put on the tax returns?

A. We discussed it before I did it. And then he never discussed it after that. Of I just gave him the K1s every year. He never disputed it and said, hey, this K1 is wrong. I'm supposed to get a K1 with this amount. There was never any push back on it.

Q. On cross-examination you discussed the confession of judgment paper that was in evidence. We don't need to go through it again. You remember what the confession of judgment was?

A. Yes.

Q. You remember what the personal guarantees that the two individuals executed?

A. Yes.

Q. And you remember the note that came along with the personal guarantee?

A. The promissory note, yes.

Q. And you testified those were inducements?

A. That's correct.
Q. What did you mean when you said that those documents, when you received them through Sonny, were inducements?
A. Well, for the initial investment basically he was acting like this -- these personal guarantees were so valuable. Like this was highly unusual to get this from a developer. And that in other words, having them would make the deal ironclad. That I wouldn't have to worry. It was an easy way to earn this interest and get the flip back in the account within six months. So right there, this wasn't a good deal. The fact of the matter is that if he done the due diligence that he said he did he would have seen they were behind in their taxes. He would have seen that they had a first position hard money lender and that they hadn't done any of the major renovations that they were supposed to do.
You know, asking a small lender like myself for $200,000 was not going to bring this property value from 1.6 to $4 million. You would have had to put in, you know, a million, 2 million to get to that type of after repair value. So the fact of the matter him deploying that $200,000 and not looking to see they were already in default with their primary hard money lender, that was an immediate red flag that this project was a disaster. They did not know what they were doing. They were not able to raise the capital to even get to the first money draw. And it was ultimately was why the property was

foreclosed. Once again, these types of lenders, they are not designed to hold the mortgage for 30 years. They want their money flipped back within six months to a year. They might give you some extensions, but it's not going to be that long. And it ultimately it led to the property being foreclosed because they did not do the repairs that they had committed to doing. And they also fled with my money, and they probably didn't do the repairs with that money either.

Q. Okay. So those documents that Sonny gave you, you understand to be inducements at that time?

A. Yes, absolutely. They weren't ironclad. These people didn't have assets. They couldn't even pay their taxes. They weren't even coming up with the money for the first money draw. How could they possibly sign a personal guarantee and have the net worth to guarantee $188,000? None of them owned personal homes. They didn't even own their cars. I mean they had nothing. Nothing, nothing, nothing.

Q. Okay. So that was as the loan that came later in May of 2019.

Now, going back to June 2018, what induced you or what convinced you to put the money into the account in the beginning originally?

A. You are saying that when we first formed --

MR. BLISS: Objection. It seems like we are going to a new direct, not even a redirect. We didn't have testimony as

to why she invested into this or why she put the money in to Cache in June of 2018.

MR. BENJAMIN: It's the whole case, your Honor. Why did she put the money in and cross-examination had to do with inducements. The talk was about inducements, and that's what we're asking about. What inducement did she experience?

MR. BLISS: That's how she described the loan documents. It wasn't my questioning that brought out the word "inducement."

THE COURT: Again, if you want point me to the transcript. I don't recall Mr. Bliss asking anything about the May 2018 period that led to the initial formation of whatever partnership they had going.

MR. BENJAMIN: Okay. I'll ask it a different way.

Q. Were there documents that convinced you to make the initial investment in June of 2018?

MR. BLISS: Objection, Judge.

THE COURT: The problem is he didn't cross-examine her on this. Unless, again, you want to look through, I don't recall that being any part of his cross-examination, and redirect should be limited to what he gotten in on cross-examination.

Q. On cross-examination you also stated that Sonny -- and you stated with Mr. Ciacii, the lawyer, actively concealed information. What did you mean when you said that they

actively concealed information?

A. Well, for one, they initially -- when they first defaulted in November of 2019, Sonny called me up and he asked me to call Destan, which was one of the people that had signed the personal guarantee. He was the ringleader. He was the uncle.

MR. BLISS: I'm going to object, Judge. She's -- the question had to do with them concealing things. She is now telling us that Mr. Vataj Called her up and said he's in default. I don't see that as concealing.

THE COURT: So I'll just read back the question. "What did you mean when you said they actively concealed information?"

THE WITNESS: All right. Let me be more specific. They did not give me the option to -- they did not present to me that it was in my best interest, and in the LLC's best interest to obtain a Tennessee lawyer to immediately find out what was owed on the note, maybe communicate with the hard money lender directly to see if they would sell us the note directly at a discount so that we could take over the project. They never gave me that as an option. And that was probably the best course of action because essentially that was the only asset that had any value in this whole deal. The personal guarantee was basically just a piece of paper for people that had no assets to speak of. And Sonny didn't do any due diligence on them to know that.

MR. BLISS: I'm going to object and move to strike. Because the question had to do with concealment, not what they actually did do.

THE COURT: So I think the testimony was that they basically didn't tell her that she --

THE WITNESS: Didn't tell me my legal options.

THE COURT: -- that she should have obtained this lawyer to essentially go after and purchase the note. I will strike the last portion, which is, the part about Sonny didn't do any due diligence on them to know that.

But just because she mentioned due diligence, and I have a question about due diligence, unless, Mr. Bliss, you want to continue.

MR. BLISS: No. I just stood up because you were talking.

THE COURT: No worries.

Ms. Hall, you repeatedly said that defendant, and I quote "if he had done the due diligence he said he did," what did the defendant tell you he did with regards to due diligence?

THE WITNESS: He testified to it in his deposition.

THE COURT: No. What did he tell you, if we start with, if we're talking about specifically the Tennessee project, what did he tell you in the spring of 2019 that he had done that was due diligence?

THE WITNESS: He didn't really tell me much. He basically just jumped to the fact that it was a good deal and that he had basically looked at the numbers and that it made sense. It made sense to us because we were going to get a quick turnaround and get some interest on the money instead of leaving it in the bank account. But he testified in his deposition that he did more due diligence on that.

THE COURT: In spring of 2019 when he was talking to you about the investment, all he told you was that it was a good deal. I looked at the numbers. It made sense. We would get a quick return?

THE WITNESS: Correct.

THE COURT: I'm sorry, I interrupted.

BY MR. BENJAMIN:

Q. Final question, following up on the Judge's question, the lack of due diligence that you are alleging in this lawsuit had to do with the active concealment part of what -- of Sonny and Mr. Ciacii at that time, is that correct?

A. Well, I'm confused. Ask that question, again, please.

Q. You testified both to my question and to the Judge's question that when we asked about active concealment, what they were doing to actively conceal something from you?

A. They weren't telling me all my legal options, basically. And they weren't telling me the best legal options.

Q. Yes. But you also mentioned due diligence in the same

sentence as the active concealment.

So the question is, in terms of the due diligence or the lack of due diligence that you are alleging here, you are saying that was part of the act of concealing?

A. Well, I mean, yes. Because first of all, Mr. Bliss stated did they even know about the foreclosure? So I guess my question is, were they really doing the necessary research and legal work to find out. Maybe they didn't know, but they should have known. Sonny was an experienced investor. Mr. Ciacii was a lawyer. And I should have been advised on all of my legal options to basically decide what was the best course of action. And I wasn't given those options. I was basically kept in the dark and pretty much Sonny was navigating the whole thing, and I was made to believe he was handling it. He knows what he's doing. He is familiar with these type of deals.

MR. BENJAMIN: Nothing further, your Honor.

MR. BLISS: Nothing.

THE COURT: Thank you.

Mr. Bliss, is your only witness, Mr. Ciacii?

MR. BLISS: That's correct, your Honor.

THE COURT: Do you have a sense of roughly how long it will take?

MR. BLISS: I don't think my direct will be terribly long. But I find when witnesses start talking, sometimes my

estimates are way off, Judge.

THE COURT: Do folks have a preference about whether you want to start with Mr. Vataj today and start his direct? I don't want to interrupt your direct so the idea would be to start and finish.

MR. BLISS: Oh, I'm not sure how late you would go, but I don't think I could finish it in the next hour. I can't -- so I do think -- I don't know how long cross would be. But I think if we are starting at 9:30 tomorrow, we will be done well before lunch time. And counsel -- we could break for lunch, whatever the Court and counsel decide before he crosses.

THE COURT: Okay. So if Mr. Vataj is the only other witness, is the preference just to do him tomorrow entirely?

MR. BENJAMIN: Do we have about an hour left today.

THE COURT: Oh, I think even later if you only want to do an hour that's fine. I can go later.

MR. BENJAMIN: I can do direct and cross and come back for closings tomorrow. I guess, that would be one way. I don't think we should separate direct and cross. Maybe it's better to come back tomorrow.

MR. BLISS: That's fine.

THE COURT: Okay.

MR. BENJAMIN: Because we have a certain amount of time for closings, your Honor?

THE COURT: I would like to get this wrapped up

tomorrow. I think that's totally feasible. So however much we have left in the day, you can take it for closings.

MR. BENJAMIN: That sounds right.

MR. BLISS: 9:30 tomorrow?

THE COURT: Let's do 10:00 just to be on the safe side.

(Adjourned to May 3, 2026, at 10:00 a.m.)

I N D E X

NANCY HALL

Direct By Mr. Benjamin . . . . . . . . . . . . . 4

Cross By Mr. Bliss . . . . . . . . . . . . . . .80

Redirect By Mr. Benjamin . . . . . . . . . . . 152

PLAINTIFF EXHIBITS

Exhibit No. Received

1 . . . . . . . . . . . . . . . . . . . . . . .17

2 . . . . . . . . . . . . . . . . . . . . . . .19

3 . . . . . . . . . . . . . . . . . . . . . . .23

4 . . . . . . . . . . . . . . . . . . . . . . .27

5 . . . . . . . . . . . . . . . . . . . . . . .28

7, 8 . . . . . . . . . . . . . . . . . . . . .34

9, 10 . . . . . . . . . . . . . . . . . . . .38

11 . . . . . . . . . . . . . . . . . . . . . .51

13 . . . . . . . . . . . . . . . . . . . . . .55

15 . . . . . . . . . . . . . . . . . . . . . .57

16 . . . . . . . . . . . . . . . . . . . . . .60

18 . . . . . . . . . . . . . . . . . . . . . .62

19 . . . . . . . . . . . . . . . . . . . . . .63

22 . . . . . . . . . . . . . . . . . . . . . .70

27 . . . . . . . . . . . . . . . . . . . . . .74

DEFENDANT EXHIBITS

Exhibit No. Received

1 . . . . . . . . . . . . . . . . . . . . . . .89

2 . . . . . . . . . . . . . . . . . . . . . 105
3 . . . . . . . . . . . . . . . . . . . . . 112
4 . . . . . . . . . . . . . . . . . . . . . 134

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

NANCY HALL,

Plaintiff,

v. 24 Civ. 2817 (VF)

SONNY VATAJ,

Trial

Defendant.

------------------------------x

New York, N.Y.
June 3, 2026
10:00 a.m.

Before:

HON. VALERIE FIGUEREDO,

U.S. Magistrate Judge

APPEARANCES

THE LINDEN LAW GROUP, PC
Attorneys for Plaintiff
BY: JEFFREY BENJAMIN

PATRICK J. BLISS
Attorney for Defendant

(Trial resumed)

THE COURT: Mr. Bliss, are you ready?

MR. BLISS: I am ready, your Honor. Thank you.

I would call Mr. Vataj, your Honor.

SONNY VATAJ,

called as a witness by the Defendant,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BLISS:

Q. Good morning, Mr. Vataj.

A. Good morning.

Q. Could you please share with the Court your business background and what business you're currently in?

A. My business background is real estate brokerage. Presently I'm still a real estate broker. As well, I'm a volunteer firefighter and city council.

Q. And where do you operate your business?

A. My business is operated in the Bronx, Westchester, and Putnam County.

Q. Strictly in New York State?

A. Yes, sir.

Q. And how long have you been doing that?

A. I've been in my own practice since 2021.

Q. And prior to that, what did you do?

A. I worked as a deli person in a restaurant.

Q. And currently do you have one location that you work at or more than one?
A. Yes, one location.
Q. And where is that location?
A. 985 Allerton Avenue in the Bronx.
Q. And how long have you been based out of that location?
A. Since 2009, end of '9, beginning of '10, maybe.
Q. All right. Did there come a point in time when you met Nancy Hall?
A. Say that again.
Q. Did there come a point in time when you met her?
A. Yes. I met Nancy in Morris Park on one of the community meetings that I would attend.
Q. OK. Do you know when approximately that took place?
A. I want to say sometimes 2017, 2018.
Q. OK. Is it possible it occurred prior to that?
A. It could be.
Q. And you said you met at a community event?
A. Yes.
Q. And how did the two of you come to meet one another?
A. She was applying for a business license in a community that needed the community's blessing. When she came upon to bring this to the community, I was sitting in the back. She wanted to bring this business in the middle of a residential retail district. Community being as tight as the community in Morris

Park was, they felt that a car service would just bring people park in the middle of the street and cause a disturbance, so --
Q. Am I to understand that her business involved a car service?
A. Yes, sir.
Q. OK. And subsequent to your meeting, did you ever perform any services for her?
A. I did.
Q. And what did you do for her?
A. Thereafter, through some of the community folks and her meeting with me, I had -- either she asked me, can you help me with that, and, of course, I offered to help, as I was a Realtor back then, regardless of the matter. I said, I'd be more than happy to help you, and tell me exactly what you are looking to do, and I'll give you my advice where the community would allow it.
Because you couldn't put the service she wanted where she thought she could do it, even though she really wasn't parking cars in front of their establishment. They just -- the community wouldn't allow it. Me knowing the neighborhood as well as I did, I said this could happen just a few blocks down the block, and you could still be within the same area and operate. So she had hired me to help her, as I did, and got her exactly what she wanted.
Q. And did you help her find a location?

A. Yes, sir.
Q. And did she compensate you for those services?
A. Yes, sir.
Q. All right. Then after that encounter with her, did you continue to have a business relationship with her?
A. Yes.
Q. Can you describe what that entailed after you found her the location and helped her get a location in the Bronx?
A. So thereafter I also helped her find a residence to live in the area. I helped her a lot more than a Realtor would ever help because I helped her with some of the things that she needed to move in.
Q. OK.
A. Thereafter we became friends. We were acquaintances where I think she knew right away that if I said something, it meant that.
THE COURT: Mr. Vataj, sorry to interrupt. Mr. Bliss, if you could speak more loudly or into the mic, and Mr. Vataj if you could do the same? I think the court reporter may just be struggling to hear you.
THE WITNESS: No problem.
THE COURT: Thank you.
Q. I'm sorry. Did you finish?
A. Yes.
Q. And did there come a point in time when she changed her

business address?
A. Yes.
Q. And approximately when did that take place?
A. Well, about, I want to say, a year or a year and a half into her business, unfortunately, she ran into some hard times due to the business, the way it was paying bills or doing things. She approached me and said, I need help or I'm going to have to shut this business down. I said, what is the issue? She explained she was behind in rent, I want to say, about three or four months. I said, maybe I could get someone to share the space with you, and I could fund the difference to save the business.
At that time we went to an attorney who is no longer here, unfortunately, William Madonna, and sat together with him, and he had advised that I become a partner. I refused that, as she was my friend and really was looking to help her. I found the person to move in with her, funded the difference of the money. Everything went well for about three years.
Nancy, keep in mind, paid everything back that I gave her at that time. And at that moment she ran into another little situation, which she explained she no longer co-occupied the space because the contractor she had in there was basically doing too much work and bringing the rubbish at the end of the day, and she could not sustain operating that way even though she only needed one little room in the back. Thereafter she

said, I'm going to need your help. You gotta get me out of this. As a good friend, I had no choice really to just help her once again.

At this time I said, Nancy, what exactly do you really need and what exactly do you want to do, because it makes no sense to keep going into hole after hole after hole. Tell me what you need. I need a room where I could put three people to answer phones from 5:00 a.m. to whatever, 6:00, 7:00 p.m. No problem. I have an office. I might be able to build a space. Here is what we do. I'll build you the whole space A to Z. As a result, she had asked me to work for her, for Dash. I went on the payroll, obviously, just like any other employee.

I did not need the money for everyday. I worked hard as a Realtor. I put that money toward the saving, as I didn't have back then a saving. I built the place A to Z. I'm very handy. I work late hours, nights. Obviously I owned the building, and gave her a turnkey operation. As a result, she decided and made a decision that, look, you saved me not only once but twice. I remember it very good when in a meeting with Will Madonna, she was willing to give up more than 50 percent of Dash just to survive that company, and I refused to take her business because then it wouldn't be help; it would be an acquisition, taking advantage of somebody in need.

Q. All right. So with respect to the space that you built out for her, where was that located?

A. That was located at 983 Allerton Avenue, which it was literally in my office, just left and right of -- if you split this courtroom in half.
Q. OK. And did Ms. Hall move her business into that location?
A. Yes, sir.
Q. Do you know when approximately that took place?
A. I want to say sometimes in probably 2018.
Q. OK. And the address of 985 Allerton, is that a stand-alone business?
A. Well, it's a little retail with six offices.
Q. OK. And who else is located in that strip of offices?
A. The only tenants there were——and still is——from day one Della Mura and Ciacci, EXIT Realty, and the pharmacy.
Q. And Della Mura and Ciacci would then have been neighbors of Dash Car Service?
A. Literally a 1-inch wall apart.
Q. OK. Now, after she moved Dash Car Service into that location, did there come a point in time when she approached you regarding possibly doing a business venture together?
A. Yes.
Q. Would you please tell us when that was and what was discussed?
A. Shortly after she said, you know, maybe -- I'm going to make a lot of money in this service -- the way I'm doing the business in the Dash business. She says, I'm going to need to

put the money into investments and yet as a write-off, so I would love to have the opportunity maybe in the near future where we buy a property or two and you run it. You do everything, as you really know -- I was a hands-on Realtor and an owner. I did not do things, let me just put a price tag on everything I ever did for someone.
Q. And did you agree to do that?
A. Yes.
Q. And did that trigger the creation of what we've been referring to as Cache?
A. Yes.
Q. Cache Realty Group LLC?
A. Yes.
Q. Who came up with that name?
A. Nancy did.
Q. And who came up with the idea of doing an LLC?
A. I think for all of the real estate stuff she had seen in my office, as she spent a lot of her time there for those three or four years she was there. Typically when you buy property, you put them in an LLC. You open a business. You put it in a corporation business. It has no value other than the business itself, and in an LLC, it shares the profits and losses with the members.
Q. OK. And at the time that Cache was created, did the two of you have an understanding as to how you were going to handle

the ownership of the LLC?
A. Yes.
Q. And what was that understanding?
A. 50/50.
Q. At any time did your understanding with Ms. Hall change, that it would be other than 50/50?
A. No.
Q. OK. And what happened next in terms of the operation or the business of Cache?
A. When you say what happens with the operation, what operation?
Q. Well, that's my question. So an LLC was created. Did you locate a property? Did it do any business?
A. Just so you might understand what an LLC and what the documents is, it's a simple black book that sits on the shelf.
Q. Right.
A. It was simply for her to -- and legally she could do this. She has two companies. She could transfer losses from one to another as an individual owner on one side and a partner on the other. This was to build a chest that eventually we could buy something. Cache did not need to have any kind of employees or anything. It's simply a book that stood on our shelf in our office.
Q. But did it need office space?
A. Not really. Why would you?

Q. Did it need employees?
A. No, sir.
Q. Did it have any employees?
A. As I found out yesterday, yes.
Q. And that was one employee?
A. That's what I heard yesterday.
Q. And that was Ms. Hall's sister. Now, did you ever encounter Ms. Hall's sister at Cache?
A. No, sir.
Q. Did you know she was working for Cache?
A. No.
Q. Did Ms. Hall ever discuss with you the hiring of an employee?
A. Not for Cache.
Q. And then Cache begins to incur expenses related to having an employee and operating as a business, correct?
A. From what I heard yesterday, yes.
Q. But prior to then, were you aware that those things were taking place?
A. No.
Q. Did you ever have anything to do with the books and records of Cache?
A. I've never seen them.
Q. Did you have any input in the creation of tax returns for Cache?

A. I have never seen a copy in my life.
Q. Of the tax return?
A. Nope.
Q. Were you aware -- withdrawn.
Did Ms. Hall ever inquire of you whether you had expenses that she needed to be aware of so it would be reflected in Cache's records?
A. No.
Q. Did you ever provide her with any claimed expenses incurred on behalf of Cache?
A. No, sir.
Q. Did you make any effort to locate possible business opportunities for Cache?
A. Yes.
Q. And what did do you in that regard?
A. We looked at properties. Unfortunately numbers were too high. Not every business deal in life goes perfect, but at least I'd like to start with thinking that I'm getting into something that makes sense.
Q. And for how long did that go on?
A. For about a year or two.
Q. And with respect to the opening of Cache as an LLC, did you invest any money into Cache?
A. Yes.
Q. How much money did you invest?

A. $30,000.
Q. And with respect to the bank records of Cache, were you a signatory on the checking account?
A. Yes.
Q. After becoming a signatory on the checking account, did you review or maintain those bank records?
A. I'll tell you the truth. Other than the day that I went with Nancy and we opened that account and signed those signatures there --
Q. Right.
A. -- I have never seen it or done anything with it, except when I started to garnish some money, went to the bank, and they said the President closed the account.
Q. And at some point in time, was Cache presented with an opportunity to lend money?
A. Yes.
Q. And please describe for us what that opportunity was.
A. We had an agent who was an employee, sitting in the same table really as we did. Nancy carried the license as well. She didn't do much. However, this young man came in and said, we have a little situation on the property we bought. It's a big unit. Here is the -- we're looking to get a loan for this. It needs a little bit of work. All we need is some money to pretty much fix a couple roofs, fix a few apartments, and we will be issued a loan.

Q. OK. And what is the name of that person?
A. Faton Zogejani.
Q. And he was an agent for your company?
A. Yes, sir.
Q. When you described that conversation, was Ms. Hall present for that conversation?
A. Thereafter. Not for the initial conversation. Thereafter Ms. Hall and myself had sat together numerous hours because Nancy had an open door to me, just like I had an open door to the law firm. She wasn't a stranger. Nancy could call me at 2:00 a.m. and I would answer that call.
Q. And did you entertain making this loan to this individual?
A. Nancy kept pressuring that we need to do something. We're not making money. Times were really rough with the industry on what was going on. The market was at its peak. I could not see myself, not only to put myself in a situation for a few hundred thousand but maybe double or triple more, which she knew they want, that all the work would be done by someone like me, or any additional money in the event we found something.
It would put it -- I would find the money. I had relationships. So as a result, this kid -- well, he is not a kid. He is a man, 50 years old, but he kept saying, we really could use the help. Do you know anyone? I kept brushing it off because I'm not in the business of lending either, hard money. I said, Nancy, Faton is looking for a little help for

about six months or so. When he was presented to us, in a perfect world, it made a lot of sense. The application information for financing. He just needed to renovate those 30 units, and as a result, they would get the financing. We would take the money and instead of having X amount of dollars there, we would have a couple dollars more, and it would make her happy.
Q. At some point in time, did the two of you decide to make a loan?
A. Yes.
Q. And do you recall how much the loan was going to be for?
A. The initial amount was $200,000.
Q. OK. And did the two of you agree to proceed with that loan?
A. Yes.
Q. And the loan, in fact, was for $200,000?
A. Yes.
Q. All right. Now, you heard, as I understand it from yesterday, that $188,500 was advanced on that loan?
A. Yes, sir.
Q. OK. Was that the full amount to be loaned after taking out fees, interest, etc., pursuant to the terms of the loan?
A. Yes, sir.
Q. OK. So from the get-go Cache earned approximately $21,500 by even advancing the money under the loan?

A. Yes, sir.
Q. And the borrowers, was there one borrower——you mentioned one individual——or was there more than one borrower?
A. There was two borrowers, one that was working with us and an uncle of this gentleman, who was an elderly person in his 60s.
Q. And they had an entity also that they were doing business under?
A. They had an entity and the entity was tied to these three properties, which equal 72 or 78 units.
Q. When you say "units," were they --
A. Multifamily.
Q. Residential units?
A. Yes, two- and three-story buildings.
Q. And where were these buildings located?
A. Memphis, Tennessee.
Q. All right. Did Cache proceed to have loan documents prepared?
A. Absolutely.
Q. And who prepared the loan documents for Cache?
A. Per my agreement and conversation with Nancy, we decided to hire Walter Ciacci, as I told her that Walter will not be charging crazy money. It would be fair. And being that Walter was next door, we pretty much had an open door should we have an issue.

Q. Did you have any reason to think that Walter Ciacci or his partner, Mr. Della Mura, didn't have the ability or talent to create loan documents?
A. No.
Q. And eventually the loan documents were prepared?
A. Yes, sir.
Q. All right. And we had some testimony yesterday. Those were the loan documents that were put into evidence?
A. Yes, sir.
Q. OK. So it involved the promissory note. It involved personal guarantees. It also involved the confession of judgment?
A. Yes, sir.
Q. And was there a closing that took place?
A. Not really. It was the day that we had them sign these agreements, they came back. They had to be notarized by an attorney other than our own attorney, so we know 100 percent that the individual who was in Memphis signed the documents under the law, and the documents came back. They sat in our office a few days. I spoke to Nancy. I said, Nancy, we got the documents. We have A to Z to protect us, god forbid anything in life goes wrong, and once that was done, we had promised them they would give them two payments. Why? Because I wanted to make sure that actually they were doing work.
Q. All right.

A. So the initial payment, per my colleague at the time, I wouldn't take or I wouldn't use anybody's bank accounts without the advice of the agreement of two people or the advice of the counsel. Now, the counsel advised us, this is what you need. Me and my partner agreed to lend this money.
Q. OK. So the loan was initially funded?
A. Yes, sir.
Q. After all the loan documents were executed?
A. Yes, sir.
Q. OK. And how much was that first payment?
A. 100,000.
Q. And then you indicated there was to be a subsequent payment?
A. Yes, sir.
Q. A second payment, OK. And when, approximately, did that take place?
A. I want to say like six -- within two to three months thereafter.
Q. All right. And from the first advance of money to the second advance of money, did they communicate with you regarding the status of the work that they were doing on the project?
A. Yes, sir.
MR. BENJAMIN: Objection. Hearsay.
THE COURT: He hasn't said the statements yet. It's

just the question of whether they communicated, so it's overruled.
A. Yes, sir.
Q. OK. And were you satisfied with those communications?
A. Yes.
Q. And were the communications verbal?
A. No, they were via text. They were verbal, but we received pictures. In our conversation with Nancy, myself and her, I've shown her that they've done the work. Otherwise why in the world would we ever give someone more money not knowing where the money is going?
Q. OK. And as a result you then funded the second payment?
A. Yes, sir.
Q. And that was in the amount of $88,500?
A. Yes, in the form of a wire.
Q. All right. And did Ms. Hall know that that second payment was being funded?
A. Yes, sir.
Q. Did she have any objection to it being funded?
A. She could have stopped it if she did. No.
Q. OK. And did she express to you any concerns about advancing the second payment?
A. No, sir.
Q. And no payments were due on the loan, if I understood it correctly, until November of 2019?

A. Yes, sir, until they get their loan.
Q. All right. So it was your understanding that you were giving them a short-term loan to enable them to get financing on the entire project?
A. It was our understanding, and that's the way we lent the money.
Q. When you say "our," you are referring --
A. Myself and Nancy.
Q. OK. And to your knowledge, did they ever get that financing?
A. No.
Q. And did they make payment on the promissory note?
A. Not until I started garnishing.
Q. OK. But when the note was due, did they make a payment?
A. No.
Q. OK. And what, if any, steps were taken to enforce the promissory note at that point in time?
A. Any and all available legal options that I had in my power I used.
Q. OK. And was Ms. Hall aware that that was taking place?
A. Yes.
Q. And how do you know she was aware of that?
A. Because we had numerous conversations in person and over the phone with Walter and next door regarding this.
Q. And were you able through those actions to recover any of

the monies that were loaned?
A. Yes, sir.
Q. And do you know approximately how much has been recovered to date?
A. I want to say about $50,000.
Q. OK. And were some of those monies that were recovered, were they recovered as a result of a garnishment on your company?
A. Yes, sir.
Q. So am I to understand that any money Mr. Faton was making while working for your company, those monies were garnished?
A. Yes, sir.
Q. And what happened to those monies?
A. It was given to the attorney who was representing us, and it's sitting in escrow as we speak.
Q. All right. And to your knowledge, were any other efforts made to collect money from either of the guarantors on the loan?
A. Yes.
Q. OK. What else was done?
A. We also served the same documents to his other employers, as he was a full-time employee working on a union job downtown Manhattan, so we served them as well, and biweekly or monthly the marshal takes a small amount——I don't know the exact——maybe $600 a month, whatever it is --

Q. To your knowledge, is that still continuing?
A. As far as I know, yes.
Q. The project in Tennessee involved real property, correct?
A. Yes, sir.
Q. Did you make any efforts to see if a lien could be put on that property or that funds could somehow or other be attached in connection with that property?
A. Yes, sir.
Q. And what efforts did you make?
A. Of my own cost, I went ahead, hired an attorney down in Tennessee, and paid him all his fees to file all those judgments that we filed in New York in Tennessee as well.
Q. OK. So the same purpose?
A. Yes, sir.
Q. And I --

MR. BLISS: Are plaintiff's exhibits still up front?

MR. BENJAMIN: No, they are right here.

Your Honor, may I approach? These are plaintiff's exhibits.

MR. BLISS: The Court did not retain the ones that went into evidence?

THE COURT: I have them.

MR. BLISS: That's your personal book. He doesn't need it.

THE COURT: I have my own copy if you want the witness

to look at them --

MR. BLISS: That's fine. Thank you, Judge.

BY MR. BLISS:

Q. I'll ask you to take a look at what has been marked and it's in evidence as exhibit 27.

A. I go from 26 to 13.

MR. BENJAMIN: Sorry. Thirteen is 27. I think the tab is off.

THE COURT: It's the notice of filing of foreign judgment, right?

MR. BLISS: Correct, Judge.

THE COURT: Keep going.

BY MR. BLISS:

Q. Have you had an opportunity to look at that?

A. Yes, sir.

Q. Do you know what it is?

A. I guess the filed documents.

Q. Well, there's an indication there of a law firm having filed documents in the state of Tennessee.

A. Yes.

Q. And who is that law firm?

A. I've hired this individual on behalf of Cache as a partner of the firm to put liens, judgments, on anything that these people would ever have.

Q. In the state of Tennessee?

A. Yes, sir.
Q. OK. And to your knowledge, the lawyer that you retained for that purpose did that?
A. Yes, sir.
Q. OK. Did it result in the collection of any monies?
A. No, sir.
Q. Now, was Ms. Hall aware that these efforts were being made?
A. She was.
Q. There was also some testimony yesterday about business expenses of Cache, including, among other things, obtaining business cards. Did you ever have a Cache business card?
A. No, sir.
Q. Were you ever made aware that they existed?
A. No.
Q. Did anyone discuss with you the need for getting business cards or any other --
A. No, sir.
Q. -- promotional things for Cache?
A. No, sir.
Q. Did you in any way benefit from that loan that was made by Cache?
A. No, sir.
Q. Did you ever, after making your financial contribution to Cache as well as sweat equity in Cache, receive any reimbursement or monies from Cache?

A. No, sir.
Q. Did you in any way misrepresent facts, information, anything to Ms. Hall in any effort to try and get her to participate in this loan?
A. No, sir.
Q. Did you in any way conceal information from her in an effort to get her to participate in this loan?
A. No, sir.
MR. BLISS: I have no other questions, your Honor.
THE COURT: Mr. Benjamin?
MR. BENJAMIN: Yes. Thank you.
CROSS-EXAMINATION
BY MR. BENJAMIN:
Q. Good morning, Mr. Vataj.
A. Good morning, sir.
Q. On direct examination, your lawyer asked you as to how Nancy put her sister on the payroll and was paying her expenses. Do you remember that testimony?
A. Yes.
Q. I'm sorry?
A. What I've heard just recently, yes.
Q. OK. The money in the account -- starting with the initial questions from your lawyer, the money in the account was Nancy's, correct?
A. Not all of it.

Q. OK. You testified that it was $30,000 that you put in there?
A. Yes, sir.
Q. That $30,000 originally came from Nancy, correct?
A. It came to me from Dash. Nothing to do with it.
Q. Isn't Dash the same thing as Nancy?
A. That might be. I haven't looked past that. I could have owned Dash. I didn't take it from her.
MR. BENJAMIN: That's not -- move to strike.
Q. My question was: Did Nancy have the right to use that money for her sister or any employee for that matter?
MR. BLISS: Objection.
A. Once you open a company --
THE COURT: One second. If the attorney objects, just give him the chance to --
THE WITNESS: I apologize.
MR. BLISS: That wasn't the question. It's the question about specifically the $30,000.
THE COURT: He's correct. You were asking, and I'll just read: That $30,000 was originally from Nancy, and then you switched tracks to start asking about her sister.
MR. BENJAMIN: Right.
THE COURT: I don't know if you want to get an answer to the 30,000-dollar question first.
MR. BENJAMIN: I think he answered. He said it was

his money. I'm moving on to the money used for the sister's payment.

THE COURT: You want to ask that.

MR. BENJAMIN: I'm switching to that issue.

BY MR. BENJAMIN:

Q. Did Nancy have the right to use that money to expense payroll to her sister?

A. As a partner, I feel that she has the right to ask the partner what to do. I'm not saying I would disagree. I'm telling you if me and you were partners in a company, it would only make common sense to ask.

Q. You were partners in the company, right?

A. I was partners in the company.

Q. And you expected to be 50/50 partners, is that true?

A. I didn't expect. That's what -- this was all done because of her mastermind. This was not -- I didn't need partners. She asked me, and she put up all of -- everything that's on those documents, it was her saying, this is how I want it. This is the reason I want it. All I did was go next door and ask the attorney to draw documents that she wanted.

Q. Mr. Vataj, try to focus on the question, please. I asked you: Did you expect to be 50-50 partners with her?

A. I would assume, yes.

Q. I'm sorry?

A. Yes.

Q. OK. And the basis for you expecting to be 50/50 partners, was that because you were going to contribute 50 percent of the money to this venture?
A. In some way once we bought the property, absolutely.
Q. So you weren't going to put in any money until you bought a property. Is that your testimony?
A. Yes.
Q. Prior to -- strike that.
You never bought a property, right? Cache never brought a property, correct?
A. No, sir.
Q. It was your role in the partnership to find a property, correct?
A. To look for properties.
Q. You said on direct testimony that for one to two years you didn't find a property, right?
A. Not for a value that was worth buying it for.
Q. So there were -- strike that.
Is your testimony that there were other properties that were more expensive that you didn't even present to Nancy?
A. I wouldn't look at more expensive.
Q. In other words, you wouldn't have put in more money to buy --
A. Had nothing --
Q. -- a more expensive property?

A. Had nothing to do with the money, sir.
Q. So why didn't consummate or why didn't you find anything for one to two years that the two of you could have considered?
A. I'm not sure if you are aware of the market between 2018 and 2020, but I didn't buy anything to say it's worth something, so I would not advise her to buy it.
Q. A one- to two-year period went by with absolutely nothing, correct?
A. Yes, sir.
Q. And you are here to testify that you didn't look for properties?
A. We had our agents look for, she looked for, I looked for. Every time she brought something in front of me, I looked at it. I gave her my opinion. Keep in mind, she could have made her own decision, we want to buy this now.
Q. How could she have made her own decisions?
A. She didn't. If you are saying it was her money and she had control and she paid her family members, wouldn't she have the same authority to do the same?
Q. So she did have the power to use the money in the money, correct?
A. As a partner absolutely. For real estate?
Q. What was the answer?
A. For real estate?
Q. Sure.

A. Sure, she did.
Q. And for expenses, correct?
A. What expenses?
Q. Whatever expenses were for the business that would be legitimate, correct?
A. I'm going to store this right here, and leave it in a shelf. What expense would this book have?
Q. You can dispute the expenses all you want. The business can pay for its expenses.

MR. BLISS: Objection, your Honor. He asked a question. He answered the question. Now he is arguing with him.

THE COURT: Can you ask another question?

Q. Do you have a counterclaim against Nancy in this case?
A. I only have counterclaim against the people that borrowed the money.
Q. "The people" meaning?
A. Destan and Faton. Those are the only people I personally want to go after until they pay us both the money they owe us, and I never stopped.
Q. Faton was your agent and your employee, correct?
A. Yes, sir.
Q. He was your friend also?
A. Negative.
Q. Didn't you -- strike that.

You don't have a counterclaim against Nancy in this case, correct?

A. No, sir.

Q. So there's no allegation, though you're making it now, that the way Nancy used money in the account was in any way improper, correct?

THE COURT: Can you ask him a different question?

THE WITNESS: Thank you.

MR. BENJAMIN: What was unclear, your Honor?

THE COURT: He is not making an allegation. He is giving testimony.

BY MR. BENJAMIN:

Q. Your statement here is that there were no legitimate expenses for her to pay out of the account that she funded for those expenses; isn't that what your testimony was earlier?

A. Yes.

Q. You didn't counterclaim because she was using partly your money for those illegitimate expenses, did you?

A. I never knew that she had used anything or filed anything. The only thing I know as I stand here today is that 2018, she said to me, I'm going to file these taxes. I'm going to use more of the expenses because I need them to cover me on the other side. I said, Nancy, I'm OK because I'm not going to -- I don't care for it. And thereafter, for all these years that you claim you've filed taxes and done something, I have never

received one. I have never filed one. I have never claimed one.
Q. Because you agreed, as you just said, that she was using the money in the right way, correct?
A. Counselor, I wouldn't say that's using the money the right way. I'm sorry.
Q. If you expected to be a 50/50 partner, what was your -- how were you going to earn equity of that 50 percent in the business of Cache?
A. I was going to rehab. If we bought the property that I thought it makes sense, and she mentioned yesterday that I have a proven record of not letting people down. No one would outwork me. I can assure you that. I would work day, nights, weekends whatever it took for us to eventually become successful. One thing is sure, as god is my witness, that I will never stop working for something I believe in.
Q. And you said that in direct testimony also, and you said that Nancy knew that about you. Do you remember saying that?
A. Yes, sir.
Q. So she trusted you?
A. Yes, sir.
Q. She trusted you as a partner, a business partner?
A. As I trusted her, yes, sir.
Q. And she trusted you as a friend over the years?
A. I assume until the day that she said what she said to me on

text.
Q. And did she trust you to come out of your pocket with the rehab funds that you just stated just now --
A. Yes, sir.
Q. -- for Cache?
A. Yes, sir.
Q. So that was a promise for later funding, correct?
A. I don't know if it's a promise. It was one friend to another that I will not let you down.
Q. So you felt you had a duty to her to not let her down and not squander this money that she invested, right?
A. I had a duty to us.
Q. You had a duty to the two of you?
A. Yes, sir.
Q. You had a sense of obligation to preserve the funds that she put in, correct, that's number one?
A. I didn't do anything with them that I didn't preserve.
Q. Well, you went out after the fact to do all these collection efforts and enforcement efforts, correct?
A. That would only be the appropriate thing to do.
Q. After the fact, once the money was lost, right?
A. I was a partner in the company still, yes.
Q. OK. We'll get there. You mentioned on direct that Cache was formed to, quote, unquote, "build a chest." Do you remember when you said that?

A. Yes, sir.
Q. Building a chest meant that money would go into Cache to fund for a property, right?
A. Yes, sir.
Q. But it was possible that more money than what Nancy originally invested had to be put in to acquire something, isn't that true?
A. Yes.
Q. And you hired Walter Ciacci yourself to first do the corporation documents, the LLC documents, right?
A. We hired Walter Ciacci.
Q. When you say "we" --
A. I cannot hire Walter Ciacci to open a corporation that I never knew what name was going to be. She picked the name. We, we. This is a team. We hired Walter Ciacci. I do not go around and hire people just to hire people.
Q. You said that, but there's no retainer agreement with Walter Ciacci that exists, is that correct?
A. Counselor, to open an LLC there was no retainer.
Q. Was there ever a retainer agreement with Mr. Ciacci?
A. For this particular stuff?
Q. I mean -- yes. With any relation with Cache?
A. No.
Q. There was never a retainer agreement?
A. Never, sir.

Q. So how do you say -- there's no shred of proof -- when you say we retained Walter Ciacci, there's not a piece of paper that is anywhere that Nancy agreed to hire Walter Ciacci for anything, isn't that true?
A. That is not true, but that is -- if you say you are looking for a piece of paper in writing, I have 25 years of business, and I've shook peoples' hands. If I told you I was going to pay you $5,000 legal fees, you got paid, sir. So I understand courts or you might operate different. I have a 30-year relationship with those folks, and I'm pretty sure if you had a client that you've had 30 years of understanding and information, you do not sign agreement for every single little thing that they do. He also did work for Dash for Nancy. Ask her if they have that agreement.
Q. Please try to focus on the agreement. You were doing a great job until you talked about Dash.
MR. BLISS: Objection, your Honor.
MR. BENJAMIN: I'm trying to focus the witness on my question.
THE COURT: We can focus if we can leave the comments out.
Q. The retainer with Walter Ciacci was on a handshake is what you just said?
A. Really verbal. There was no retainer. Walter never -- Walter just helped us. This is not a firm --

Q. He helped you with --
A. Not me, we. There was two of us.
Q. OK. Was there a meeting with the three of you?
A. Yes, there were meetings.
Q. OK. You heard Ms. Hall's testimony yesterday, right? You were in the room, correct?
A. Yes, sir.
Q. You heard her say she never knew anything about the retention of Walter Ciacci after the operating agreement?
A. You know, only God knows what the real truth is, but I'm telling you, as——and god help me——I stand here today, that we spoke to Walter Ciacci.
Q. And it's your testimony that Nancy knew that Walter Ciacci was her -- was your lawyer together?
A. Yes.
Q. Did you ask Walter Ciacci to draw up the operating agreement yourself?
A. Negative.
Q. Who asked him to do the operating --
A. Nancy asked him for the operating agreement.
Q. OK. So take a look at exhibit 2 in front of you, which is marked in evidence. Do you see exhibit 2 that is in evidence?
A. Are you talking on page 1?
Q. Yes. Let's look at page 1 first.
A. OK.

Q. Do you see that appears to be an email?
A. Yes.
Q. If you look at the bottom email, do you recognize the email pdellamura@dcllawllp.com?
A. Yes.
Q. Who is that?
A. Peter Della Mura who is the partner with Walter Ciacci, who handles the real estate end of the firm.
Q. OK. And that's the firm that you had a relationship with, what I think you just said was about 30 years, is that right?
A. Yes, sir.
Q. And is it your testimony that you received this email sent to you from Peter Della Mura attaching the operating agreement?
A. Yes.
Q. You did, OK. And then above, do you remember an email from Nancy saying, yes, let's meet him tomorrow?
A. If you're asking me if I remember both of these emails, the answer is no. If you are asking me, did they happen, the answer is yes because it's obvious.
Q. Was there a meeting planned to set up the operating agreement between the two of you?
A. To finalize, you mean to sign it because the agreement was written as per Nancy's advice. It was drawn by the attorney as the way Nancy wanted.
Q. It was drawn by the attorney how Nancy wanted it. You

didn't want an operating agreement between you?
A. I'll tell you the truth, until you buy the property, it's worthless. What is it good for?
Q. Is that why you didn't sign an operating agreement?
A. I'd be happy to sign anything. That isn't why I didn't sign.
Q. OK. So you didn't sign an operating agreement between the two of you, correct?
A. No.
Q. And you didn't come to the meeting the day after, as it says in this email, correct?
A. I don't recall what happens that day or the day of because I don't remember the weather, the circumstances of what happened. I can tell you this. The last four years I've dealt with my brother's cancer, so on top of this, that to me was the life I was dealing at home. So I don't know what exactly -- if it occurred what she's seeing in that email, but we were next door. Nancy had an open door. This wasn't where we needed to ask the judge to give us this room. This was simply open the door, ask a question.
Q. But from June 2018 when this was first proposed, right, you never agreed to sign an operating agreement, correct?
A. It had nothing to do with my agreement or disagreement. It was an oversight that had no purpose to me.
Q. It was an oversight?

A. Yes.
Q. You didn't sign an operating agreement at the time that the loan to Faton was consummated either, right?
A. No, sir.
Q. Shouldn't you have signed an operating agreement when that money was dispersed? When you dispersed the money to Faton, shouldn't you have done an operating agreement then?
A. If that was important to her and me, I promise you she wouldn't have not let that money go out.
Q. But it wasn't important to you, correct?
A. What for?
Q. I'm asking you a yes or no question.
A. No.
Q. If you could flip to page 10 of 14 of that document? You see paragraph 52?
A. Yes, sir.
Q. It reads: The tax matters partner will be Sonny Vataj. The tax matters partner in quotes. It's called the tax matters partner. And it says, "The tax matters partner will prepare or cause to be prepared all tax returns and reports for the company and make any related elections that the members may deem advisable." Do you see that?
A. I do see it now.
Q. Were you supposed to be the tax matters partner?
A. I guess.

Q. Is that information that you gave to Mr. Ciacci to put in here?
A. No, sir.
Q. How did that get in there that you were going to be the person doing the tax returns?
A. I wish I could answer that question for you.
Q. Suffice to say, you left Nancy to do the tax returns for the business, right?
A. No, sir.
Q. Who did you leave the tax returns for?
A. There was no reason to file a tax return. There was nothing happening with the company.
Q. There was no reason to file a tax return despite the fact that it had an asset of funds; is that your testimony?
A. The asset of funds was filed on the first year, sir, and she filed. She decided that she was going to use her accountant because for all my real estate, I have one accountant for 30 years. She chose to use this individual that she used for Dash because she needed to move the money for one account to another so she could build this chest.
MR. BENJAMIN: Move to strike as nonresponsive.
MR. BLISS: Objection. It was responsive.
THE COURT: I'll allow it.
Q. It's your testimony that no tax return was needed to establish the ownership between the partners. In other words,

the K-1 partner. You understand what a K-1 is, right?
A. Yes, sir.
Q. There was no reason to file a tax return as to the ownership of the LLC?
A. The initial 2018, I believe it was, she did tell me she's filing it, and I was OK with it the initial. That's it. No more, no less.
Q. Even though there was no operating agreement and nothing in writing between the two of you, you understood your role in this partnership to be to look for properties, correct?
A. Yes, and manage it.
Q. And you were going to manage it also. And were you going to have some role in the construction if it was necessary?
A. Absolutely.
Q. And what was your understanding of what Nancy's role was going to be if you were doing that?
A. She was going to bring the money from Dash. Keep in mind that originally the reason Cache was open is because I saved Dash. I didn't want partnership.
Q. Please focus.
A. I'm focusing. Let me finish my sentence, and I'll be happy to answer your question. Unofficially, I was a partner of Dash. I didn't take that. As a result, she started paying me, and I became an employee of Dash.
Q. Sir, sir, I asked you about her role. You just nicely

described for me what your roles were as a partner of Dash. What were her roles?
A. Dash?
Q. Excuse me. In Cache?
A. That's what you --
Q. Sorry. I made a mistake.
A. Her role, to put more money in the account, and we eventually would buy more properties as they come.
Q. So you were expecting her to put more money in?
A. She had more money in the account. She had put more money in the account, more than 200.
Q. OK. So her job was to put more money in, and your job was to manage and do construction and find properties, right?
A. Manage the property that we buy, not manage the money. She had control of it.
Q. She had control of the money, correct?
A. Yes, sir.
Q. Your testimony and answer to your counsel's question earlier was that you were never really involved until the garnishments. Was that your testimony?
A. Involved in what? What was the full --
Q. In the business of Cache.
A. Yeah.
Q. But you were looking for that one to two years for properties, but you were unsuccessful during that time,

correct?
A. Yes, sir.
Q. Did you expect some kind of compensation for that?
A. No, sir.
Q. In fact, you didn't expect any compensation from Cache Realty or Nancy for that matter for anything that you did for Cache, correct?
A. No, sir.
Q. Because you were a partner in the Cache business, and any money that you would have gained would have been from the profit from Cache, right?
A. I really don't know what the actual question is. I'm losing you. What exactly are you asking?
Q. You didn't expect any compensation for work services rendered?
A. From Cache?
Q. Correct.
A. No.
Q. But you expected at some point to profit as what you're alleging is a 50/50 partner, correct?
A. If me and you are going to buy a property and tomorrow we decide to sell that property, absolutely, because it would have gotten there because of me.
Q. OK. And you had -- strike that.

Take a look, please, at exhibit number 5 that is in

the packet. It's a two-page exhibit. Do you see that, Mr. Vataj?
A. Yes, sir.
Q. Do you recognize the first page?
A. Yes, sir.
Q. Do you recognize the individual in the photo?
A. Absolutely.
Q. And who is that individual?
A. An agent with my company.
Q. OK. This is an email -- it purports to be an email from Mr. Otis Gore——Gore is G-o-r-e——to Nancy and you. Do you see that?
A. Yes, sir.
Q. Do you remember this email being sent from your agent to you and Nancy?
A. Vaguely.
Q. OK. Take a look at the second page. Do you recognize that document?
A. Yes. Offer to purchase. Standard in my practice.
Q. Did you direct Otis to send this email with this offer to purchase?
A. I don't know about direct as much as: Here is my offer, and my offer is noncontingent.
Q. I'm sorry. You said the offer is not contingent?
A. Meaning like, as you can see here, it's not subject to a

special financing or things of that nature. That's what I mean by noncontingent.

Q. Did you vet this property? In other words, did you investigate this property as a viable property to bring to Nancy to purchase for Cache?

A. So this wasn't about bringing properties to Nancy to purchase. This was about myself and her looking to buy as a team. The way I practice real estate is my way of practicing real estate. I won't change that practice for anyone.

Q. OK. Thank you. But this was an example of you bringing a potential purchase to Nancy, correct?

A. That was a property that was brought to us by one of our agents because everyone in the office knew we were in the market to buy. Should something come in that might be worth it for us to buy, please let us know. We presented an offer in good faith. We did not get that offer accepted. That's where it ends.

Q. So you did present an offer on this property to the seller?

A. Yes, sir. Well, the office did on my and her behalf.

Q. OK. And it was for these numbers on this second page?

A. Yes, sir.

Q. OK. Where was the money supposed to come from for a $1.15 million property when you made that offer?

A. From the money we had, and additionally whatever money I need once the banks -- most of my funding is with a credit

union that I have a relationship for 20-plus years. So this was going to go through the same process as every other property I've ever bought in the United States.

Q. So you had $200,000 in the Cache account that Nancy deposited?

A. I would say at one point it was almost $250,000, but OK.

Q. How were you going to come up with the rest of this? You were going to finance the rest after $200,000?

A. A million dollars, 20 percent, $200,000. Million one, 20 percent, do the math, plus closing costs. So, yes, I would have came up with an extra $100,000 out of my pocket.

Q. You didn't execute a contract for this property, right?

A. Negative, sir. Didn't get anywhere past this offer.

Q. The offer wasn't accepted by the sellers; is that your testimony?

A. That would be the answer. I don't know because I was not the agent. Once it got turned down, we moved on to the next.

Q. And you didn't apply for financing for this property, right?

A. You wouldn't apply for financing unless you agreed to my terms in there.

Q. But you were pretty confident that you would get financing if you had a contract in hand, right?

A. My name shows for its credibility, sir, based on what I've done.

Q. OK. You testified earlier though that there were properties that were too expensive over that one to two years that you didn't find anything. This property was not too expensive?

A. I don't know the answer back then why we got turned down. If she knows, she could say it. I don't know the answer. I just know that we didn't get past this. Otherwise we are in the business to sell, especially this agent here. I'm in the business of sales and acquisition, but my agents are in the business to sell. If they don't sell, they unfortunately can't feed their family.

Q. This property was offered to you, in other words, you and Nancy, as Cache Realty members, correct?

A. Based on this document, yes.

Q. So your prior testimony was that you turned away from multiple properties in the one to two years you were looking because they were too expensive. That was your prior testimony, right?

A. Yes, that was some of the properties that Nancy had brought to my attention.

Q. OK. So Nancy brought properties to your attention, and none of them were in the price range that you are looking at here $1- to $1.15?

A. I don't know, sir.

Q. Suffice it to say, $1.15 was not too expensive, correct?

A. No, if I'm presenting that offer.
Q. Did you investigate this property before making the offer?
A. Probably not.
Q. Wouldn't that have been something that you should have done before making the offer?
A. I have an expensive knowledge of real estate, sir, and I assure you that 70 percent of the properties I own today, I have simply looked at the numbers and possibly sometimes drive by once they say that they would initiate or think about the offer. And then, yes, as you can see in my notes here that I tell my agents in general, I need to do my due diligence. This is the time I need, and within that time, I typically get granted what I need.
Q. You mentioned due diligence.
A. Yes, sir.
Q. Is your definition of due diligence simply looking at the numbers?
A. No, sir. My due diligence is after you accept my offer, so I don't waste my time going and running around like chicken without a head to look at things that are never going to come out in fruition. So once you accept my offer, I will go and do the due diligence, which means if you told me you have a tenant for $3,000, you have a tenant for $10,000, you have a tenant for $5,000, I'm going to verify the tenants are there, those leases are there, and you are selling me what you have.

Q. That's after making an offer?
A. Absolutely.
Q. So you extend yourself with an offer before looking at rent rolls?
A. Well, a rent roll, you could look at in email over the phone. You could tell me verbally. If you tell me verbally a two unit has a rent roll of $4,000, what do I need to go look at at the property?
Q. You don't need to look at anything more if somebody tells you over the phone?
A. Absolutely. If the price -- keep in mind that I own in this immediate area, like within less than a mile, so I know the neighborhood.
Q. You don't know the neighborhood of Memphis, Tennessee, right?
A. No, sir.
Q. You testified just now that rent roll is something that is important to you when making an offer to purchase a property. What about the tax records and whether the current person -- whether there's any tax liens on the property?
A. Why would that have to do with me?
Q. So liens would not concern you, correct?
A. No, sir, because on the day of my purchase or the day of refinance or the day of anything, you would have to pay as the owner.

Q. Same question as to a mortgage or a defaulted mortgage or one threatened with foreclosure. At your closing, that would have to be resolved at the closing, correct?
A. Say that one more time.
Q. A prior mortgage on a property that you offered to purchase would have to be resolved at the closing where you decided to buy the property, right?
A. Yes, sir.
Q. So, so far we have rent rolls, tax liens, mortgage liens. Those are all things that would be resolved at a closing, right?
A. I would assume so.
Q. OK. And if they are not resolved in the closing, you wouldn't go forward with an offer to purchase, right?
A. I would reduce the --
MR. BLISS: I'm going to object, Judge.
A. I would reduce the price.
MR. BLISS: Objection. There's a big difference between an offer and a closing, and it seems like this questioning is equating the two.
MR. BENJAMIN: Not at all, your Honor.
MR. BLISS: But you just said if it wasn't resolved at the closing, you wouldn't go forward with the offer.
THE COURT: I think he might have meant purchase. If you want to ask another question, I just want to make sure he

is understanding the question being asked and answering that question.

BY MR. BENJAMIN:

Q. OK. If there were unresolved liens, like a mortgage or a tax lien, we heard you say that you would reduce your purchase offer price to accommodate that, right?

A. If they couldn't pay it, yes.

Q. You mentioned in direct testimony that Faton came to you with the loan proposal?

A. Yes, sir.

Q. Because Nancy didn't have any connection with Faton, right?

A. Nancy was working in the same office as Faton. Nancy was an agent at the present time when Faton was an agent.

Q. But did she have a connection to Faton?

A. When you say "connection," what exactly did you mean?

Q. Did she know Faton?

A. She passed by the same walkway. If you passed by this path right here, and this young lady is standing here day after day after day, I don't know if you know her or don't know her. She's standing there.

Q. Faton was not an employee of Nancy, right?

A. No.

Q. Faton came to you, and your testimony is you were not friends with Faton, right?

A. No.

Q. He came to you and said, quote, he had a situation. That was your testimony, right?
A. Yes.
Q. What situation did he describe to you that he wanted you to invest in?
A. He had these 72 or 78 units, and they ran out of money renovating it. They had a first loan. They needed the extra money to renovate 36 units so that they could finalize the loan and eventually get a long-term loan versus a short-term loan that they had.
Q. They had a first loan?
A. Yes, sir.
Q. That was short term, correct?
A. Yes, sir.
Q. And how much was that loan for?
A. I want to say $1,600,000.
Q. So he came to you and immediately told you that that loan was out there?
A. Yes.
Q. Did he tell you that he was in default with that loan?
A. I don't know default, but they said they were struggling, that they needed to renovate this so that they could pay off that loan.
Q. And it was at that point that you went to Nancy and gave this proposal to her?

A. At that point, I went to Nancy and I had a discussion with her regarding what he told me.

Q. And it was your opinion at that time that allocating the money from Cache was a good investment for somebody who told you there was a first lien he defaulted on in the amount of 1.6 million?

A. For 78 units, yes, sir.

Q. Why did you think that was a good allocation of investment?

A. I am assuming you are not in real estate.

Q. You don't have to assume anything. You can answer the question. Why did you think that something that you already knew was already in default on a first loan was a good follow-up to throw money at?

A. 78 units, counselor or 72. Even at 72, at 20,000 is a $1.4 million. At 30,000 it's $2.1. At 40,000 -- the data is out there. You don't need to live in Memphis, Tennessee, to know what a multifamily is going for. You could search today, right at this moment, go on it, put the dates 2018 to 2022, it will give you the value of a property.

Q. So those were the numbers that you stated that you look at, right, to see if, in this case, a loan was going to be good, right?

A. I had no doubt that these people would default on this loan, otherwise I would have never asked our colleague to put our money there.

THE COURT: Can I just interrupt? I want to confirm for the record, Mr. Vataj, I just want to ask: Did you know that Faton and Pendelton were in default of the $1.6 million loan?

THE WITNESS: No, ma'am.

MR. BENJAMIN: I think that that was not his testimony.

THE COURT: That's why I asked to confirm. Your question assumed that he said but he never said either way, and he just now confirmed that he did not know that they were in default.

BY MR. BENJAMIN:

Q. Wasn't the situation that Faton came to you with the fact that he was in default?

A. Work related.

Q. Was that --

A. He needed to fix the units. It had nothing to do with the financing. They were in the process of getting the new financing.

Q. Ultimately this property went into foreclosure on that loan, correct?

A. Yes, sir.

Q. And you're saying, as you sit here today, that there was no way of anticipating that that would have happened when you first allocated this money to this person?

A. No, sir.
Q. You said earlier also that you were not in the business of lending hard money. That is what you told your lawyer, correct?
A. Yes, sir.
Q. Were you unfamiliar with the due diligence that was necessary to see whether this loan was a good idea, good investment?
A. No, sir.
Q. If you were not in the business of hard money lending, as you said, what due diligence did you do for this that convinced you that this was a good investment?
A. The value was there, sir.
Q. And that's all you looked at?
A. There was more than a million and a half to $2 million in equity at that point when we lent them this money.
Q. That's all you looked at, right?
A. Yes, sir.
Q. And you could have looked at that through a Google search, right?
A. Not Google search. Google search, you could go to see that the properties exist. Google search, you are not going to do the loan.
Q. Even though you were not in the business of hard money lending, you didn't look at the tax records on the property,

right?
A. No, sir.
Q. Did Faton -- and you didn't understand that Faton was in default on the taxes, did you?

MR. BLISS: Objection, your Honor. It's assuming facts that are not in evidence. There was an attempt to testify as to those items yesterday, but my objection to that was sustained.

THE COURT: I don't believe there's any testimony establishing that Faton and Pendelton hadn't paid their taxes.

MR. BENJAMIN: There was testimony from Ms. Hall, yes.

THE COURT: Ms. Hall wouldn't have first-hand knowledge of that.

MR. BENJAMIN: Well, she checked the public records. She testified she checked the public records on it.

MR. BLISS: It's the same argument we had yesterday, Judge, when my objection was sustained.

THE COURT: Do you not have the original, like the tax records, that you can introduce into evidence?

MR. BENJAMIN: We do. We'll do that then. I didn't think we had that but -- OK. I'm handing a copy to counsel.

May I approach?

THE COURT: OK. Mr. Bliss, do you have any objection to this coming in?

MR. BLISS: I do, your Honor. It's some sort of a

printout, but it gives no indication whatsoever that it's an official record of the Shelby County receiver of taxes or anyone in connection with Shelby. But also I'm looking at, with respect to taxes, a payment history, and this is all dated 2023, so not indicating what was going on in 2018.

MR. BENJAMIN: The tax year indicated on the first page is 2018. Maybe that's when it was run. Maybe that's when this printout was run but --

MR. BLISS: Well, that adds to my objection.

THE COURT: It also shows payments, but it doesn't show a deficiency.

MR. BLISS: Correct, but we're also guessing that this is even an official record.

THE COURT: Are there any other records?

MR. BLISS: There's also been no testimony as to the address of the property.

MR. BENJAMIN: Well, the address is, it says Pendelton, and the taxes are indicated on the top left. And when you say it's a public record, this is -- the link at the top left is viewable by all by simply looking at that link. But I have questions in and outside of this, but the first step would be to have him identify it.

THE COURT: He can't identify this.

MR. BENJAMIN: Did he already say that?

THE COURT: No, but you would need a witness with

knowledge of whatever this is.

MR. BENJAMIN: It's public record. I would ask him that --

MR. BLISS: There's nothing on here that indicates it's even a public record. This could have been taken from some other source that's purporting to be reporting information on this property. But other than Shelby, I don't know how they do it in Tennessee. I don't know if it's the county clerk. I don't know if it's some other land records or if they do it like in Connecticut where it's the local municipality.

MR. BENJAMIN: So why can't I ask him whether this was run by him, or if he identifies it or if he even looked at it? I'll do that any way but --

THE COURT: Mr. Bliss, I understand your objection. I'm going to admit it at the moment. Ask him the questions and let's see where it goes. I'm going to hand it to him.

MR. BLISS: OK. I think we need a number.

MR. BENJAMIN: Yes, sure.

THE COURT: Mark it. I think we're up to --

MR. BENJAMIN: 30.

THE COURT: The last one you had admitted was exhibit 27, so 28 is available. So I'll mark it Plaintiff's Exhibit 28 for identification.

MR. BENJAMIN: Thank you.

BY MR. BENJAMIN:
Q. Mr. Vataj, do you recognize this document?
A. No, sir.
Q. Had you ever run the tax history on the property at all --
A. No, sir.
Q. -- before allocating the money?
A. No, sir.
Q. Did Faton -- did you ever learn from anywhere that they hadn't paid the taxes since 2018?
MR. BLISS: Objection. It calls for a hearsay answer.
Q. Did you ever learn from any source --
THE COURT: You are assuming that the taxes haven't been paid, and we don't know if they have or haven't.
MR. BENJAMIN: I can ask the question, your Honor. It's part of due diligence and in part --
THE COURT: I think you can ask him if he looked into the tax records, if he looked into whether or not they had been paid, but your question can't assume they haven't been paid because that's not evidence.
MR. BENJAMIN: I'm asking the question whether he learned they had not been paid, whether he knew.
MR. BLISS: You already asked that question.
THE COURT: But your question was: Did you ever learn from anyone that they hadn't paid the taxes since 2018? That assumes that they hadn't paid the taxes, and there's no

evidence that the taxes weren't paid.

MR. BENJAMIN: I'm not assuming.

MR. BLISS: Well, the question assumes it. More importantly, he testified that he did not check the tax records.

THE COURT: He did not run any tax record, right?

BY MR. BENJAMIN:

Q. It wouldn't be important to you, Mr. Vataj, to check the tax history on the hard money loan that you did here, right?

A. No, sir.

Q. The numbers themselves as to value and rent was enough for you to allocate the money; isn't that how you did it?

A. The size of the property was substantial for me to allocate anything. Rent wasn't as important because I knew there was vacant units. I knew that there was work to be done, and Nancy knew that as well.

Q. You testified earlier that the money that you allocated on behalf of Cache was to go to fix roofs and fix the apartments, right?

A. Yes, sir.

Q. And it was your opinion that that money -- amount of money would have fixed the situation that Faton came to you about, right?

A. Yes.

Q. So $188,000 on, I believe, you testified it was a

4 million-dollar property?
A. In my opinion, the value would have been once it's fixed and rented, yes.
Q. And to fix it, you made the decision that $188,000 was enough, correct?
A. To get the new loan to proceed with fixing the rest.
Q. OK. At that time when you extended the loan, you didn't feel you needed to put your money in yourself to either match Nancy's or go more than Nancy's at any time, correct?
A. No. Because this was not something that we agreed, nor was the intent of this LLC. This was merely simply Nancy saying, well, I'd rather make 8 percent than do nothing. We don't have a property.
Q. Let's talk about that. You negotiated that term with Faton, didn't you?
A. I negotiated that term when me and Nancy spoke. That's what they offered us. That's what I presented to her, and eventually together we lent the money.
Q. And that was reduced to writing in the way of a personal guarantee that you got from Faton, right?
A. Yes, sir.
Q. But the plan was to put that money into that property or at least give it to Faton to ultimately finance -- refinance that property, right?
A. The purpose of the money that we lent was to fix the 36

units, one of the units that needed the most repair so that the bank could lend them the long-term loan, and they could eventually do all the other repairs, which I could care less about.

Q. With what you just said, of course, they would have to settle the $1.6 million first before they financed and paid Nancy back in that scenario?

A. Yes. The loan that they were going was well over $2.5 million -- they applied.

Q. There weren't any documents that you saw to support that application?

A. I've seen back-and-forth. I've not had any actual documents, but I'm pretty sure it's something we could subpoena and you could get it.

Q. You didn't produce any documents here that showed that application, did you?

A. I never had it either.

Q. Because you didn't think that that was important?

A. No, sir. Like I said, the value was what I was looking at the property.

Q. But those loan documents, which would have reimbursed Nancy the money, did you think as her partner that would have been important to her?

A. I'm not sure I'm understanding, but I don't think loan documents give anybody back the money. A loan given would have

paid me and Nancy back.
Q. Suffice it to say, you didn't insist on getting any loan documents from Faton at any point really?
A. No, sir.
Q. The answer was no? I'm sorry. I didn't hear you.
A. No, sir. Neither did my colleague.
Q. Let's skip to exhibit 22 that is marked in evidence.
A. Go ahead, sir.
Q. Do you recognize the first page?
A. No, sir.
Q. OK. Let me read to you the first page and ask you to tell me what you know about it. Do you see at the very bottom where it says, "I checked?" It starts with "I checked."
A. Yes, sir.
Q. OK. So this email which purports to be from David Anthony. Do you know who David Anthony is?
A. No, sir.
Q. OK. So Mr. Anthony is saying that: I checked the register of deeds in Memphis, and it appears that the real property owned by Pendelton Court was foreclosed in February and sold to a third party. Were you aware of that, that it was foreclosed in February?
A. The moment that I found out that the property was foreclosed, we filed all our judgments, liens, everything that I had in my power to protect me and Nancy, and tried to assume

some of this control.
Q. So you went at that point to Mr. Ciacci, and you filed to collect at the moment that you found out that it was foreclosed and sold, right?
A. Well, it wasn't officially sold. It was foreclosed in court. Thereafter, Faton tried to sell this property with his uncle to an investment group, which the court had given them 30 days or something to eventually bring this buyer upon. And Nancy knew about this, that they had a buyer, and we were very close to getting the money. Unfortunately, something happened, and they had a major frost or something in Tennessee, which was a disaster and froze all the pipes and leaked and --
Q. Let me ask you. Why didn't you go to Tennessee to try to attend the auction and maybe buy the property yourselves?
A. I did not know, unfortunately.
Q. On page 3 of that email, if you look at page 3, halfway down the page, do you see the sentence, "It appears that another creditor"?
A. OK.
Q. It says, "It appears that another creditor is actively proceeding against Pendelton Court. See the lien *lis pendens* they filed in an action from January 2022." Were you aware of another lender that filed a lien in 2022?
A. That could have been the first lender that they had the money. I don't know, no.

Q. And you didn't know any time prior to that about that lien?
A. No, sir.
Q. OK. So flip to the actual --
A. May I just ask who hired this attorney?
Q. I'll ask you the questions.
A. OK.
Q. Please flip to what is page 5 of this document. Do you recognize the first page of this? Do you see it there the top says "Shelby County, Tennessee"?
A. Right.
Q. I submit to you that this is the public record from the Shelby County register. It says that on the top.
A. OK.
Q. Did you ever see this document before?
A. Might have seen it with the documents with the attorney, but --
Q. You sent this document to Walter, correct?
A. I didn't send it to Walter. The attorney that I hired to defend us might have sent it to Walter. I'm not an attorney, sir, so --
Q. You didn't send it to Walter?
A. -- I sent my legal stuff.
Q. You did not send this to Walter?
A. Maybe the attorney sent it to us, and the package was sent to Walter. I don't recall.

MR. BENJAMIN: OK. Your Honor, I want to present to the witness with what I previously marked as exhibit 29. Do you have 29, counselor?

MR. BLISS: I think so.

MR. BENJAMIN: It's 29 that I marked. Your Honor, do you see exhibit 29?

THE COURT: I have it. If you want to show it to him to refresh his recollection, it doesn't necessarily need to come into evidence. Presumably you are going to show it to him for the email stream, which should refresh his memory.

MR. BENJAMIN: In part, but maybe I want to admit it also. I'm not sure, but can I show it to him?

THE COURT: Yes.

Q. Do you have exhibit 29?

A. You don't have a button here for 29. Could it be a different number?

Q. It's the very last exhibit. It is an email from Walter Ciacci at the top.

A. So is the email that was on February 17, is that what you are --

Q. No, sorry. It's February 24. It's the very last exhibit.

THE COURT: You can use mine. This is it.

THE WITNESS: I apologize. OK.

Q. OK. So you see that email on February 24?

A. Mm-hmm.

Q. Was that an email from you to Peter Della Mura?
A. Yes, sir.
Q. And that was an email just simply asking, "Please give this to Walter," correct?
A. Yes.
Q. So you gave this to Walter?
A. It gave it to the law firm, it seems like.
Q. So that is the document, and the attachment is what I'm telling you is the Shelby County register --
A. Foreclosure.
Q. -- of the foreclosure, correct.
THE WITNESS: Thank you, Judge.
Q. If you look at -- we'll go back to exhibit 22, and you look at the sixth page. And the heading is: Substitute trustee's D. Do you see that?
A. I'm missing that page. There's only four pages. Is this six not counting?
THE COURT: Are you on exhibit 22?
THE WITNESS: I think so. Does it say sixth page on the actual document?
Q. Do you see the substitute trustee's D?
A. Yes, sir.
Q. That was the same attachment as your email to Mr. Della Mura and Walter Ciacci, do you see that?
A. Yes, sir.

Q. In the second paragraph, can you read the second paragraph——not out loud——for the moment? But can you read the second paragraph? I direct your attention there, the first "whereas" paragraph?
A. Right, "whereas the certain deed" or "whereas the multiple default"?
Q. "Whereas by that certain deed."
A. OK.
Q. In that first paragraph, it says that there was a deed of trust for this property for Pendelton Court Apartments that was dated December 26, 2017. You see that?
A. Yes, sir.
Q. Were you aware of the deed of the trust?
A. No, sir.
Q. You didn't investigate to see that there was a deed of trust of Pendelton Court, correct? That wasn't something that -- the loan history of this property was not important to you at the time that you accepted this from Faton, right?
A. No.
Q. The second paragraph indicates, do you see the "whereas? "Whereas multiple defaults," do you see that section?
A. Yes, sir.
Q. It says, "Whereas multiple defaults occurred by borrower's failure to comply with the terms and conditions in the deed of trust, and the indebtedness has been declared due and payable

as provided in the deed of trust and the indebtedness has not been paid." Do you see that section?
A. Yes, sir.
Q. Were those multiple defaults the situation that Faton was talking about when he first came to you for this money?
A. No, sir. I mean, how would I know about the foreclosed property before I lend the money?
Q. You would agree that multiple defaults on a loan is a bit of a situation, right?
A. If you look at 1970s Manhattan, buildings have foreclosed 20 times, but that doesn't mean they are not worth anything.
Q. Would you agree that a default is a situation that Faton probably had back then?
A. No.
Q. You would disagree with me, wouldn't you, when I say that you not having looked into this to see other things other than just the number or the value, that this loan that you made on behalf of you and Nancy was doomed to fail from the beginning?
A. That we made, no.
Q. You thought it was going to be successful?
A. Absolutely.
Q. Even though you didn't have a lot of experience with hard money lending, right?
A. Had nothing to do with hard money lending. This was a real estate transaction pretty much if you look at the gist of it.

I know what something is worth, and I know what I could turn if I buy something as such. And even when it foreclosed, for the record, we tried to buy the property. They wanted so much money that it wasn't worth it. Then I decided to go after them for the money rather than buy it.
Q. You tried to buy the Tennessee property?
A. Yes, sir.
Q. OK. Turn to page 2 then, please. And if you just skip down to the fourth "whereas."
A. Go ahead.
Q. OK. If you would familiarize yourself with that, it says, in sum and substance, that on February 4, 2022, the trustee sold the property. Do you see that?
A. Right.
Q. And he sold the property for $1,050,000. Do you see that?
A. Mm-hmm.
Q. Did you honestly try to buy the property in Tennessee?
A. I have documents to prove that.
Q. Could you have bought it for somewhere around $1,050,000?
A. At the date that they foreclosed or I got notice that he just -- in the auction, the bank foreclosed on it. I offered, back then, that bank $1.6 to buy them out.
Q. Instead, they sold it for --
A. They sold the money -- it was -- I had Walter reach out to them. I spoke to them. It was a person downtown that had the

loan. He wanted close to $2 million. I said, look, I'm willing to give you your money. I'm losing money.

MR. BENJAMIN: I move to strike as hearsay.

A. I have papers to prove that. I have papers to prove that.

MR. BLISS: Judge, he is responding to the question.

MR. BENJAMIN: He is talking about multiple people.

THE WITNESS: It's the same person regarding the --

MR. BENJAMIN: I am asking about a number in a document that sits before him.

THE WITNESS: This is somebody selling basically the money. It's like a bank that says --

MR. BLISS: No, no. The bank was the high bidder --

THE WITNESS: Yeah, yes.

MR. BLISS: -- and it sold to the lender for $1,050,000.

Q. So the bank would not have accepted your $1.6 if you went down there and made the bid?

MR. BLISS: That wasn't his testimony. This is a new question.

BY MR. BENJAMIN:

Q. I am saying there is testimony that he could not have purchased this property for something around $1.05 million when this was foreclosed and sold.

A. But look at the actual sale date and the actual when I filed the judgments. There's two different things here. You

can't burn something down to the ground and then offer it to sell. It's not going to have the same value.
Q. My point is you could have saved the money that was invested --
A. I did everything in my power.
Q. Excuse me. Let me ask the question.
You could have saved the money by going down and making an offer that was something that you thought would have been a gold mine according to your valuation of the property, correct?
MR. BLISS: I'm going to object. It's a hypothetical, Judge.
THE COURT: Yes. The last question answer is not comprehensible. I think we need to establish what he -- the testimony is all over the place. If you want to get him to testify as to what he tried to buy it at, what it ultimately sold at, but right now it's not making much sense.
Q. You made an offer on this property by phone for $1.6 million, is that what you did?
A. Yes, and in writing.
Q. But you never produced that. Did you ever discuss that with Nancy?
A. I believe I did.
Q. And you never produced that in writing in this lawsuit in discovery, correct?

A. It's in the papers with the previous attorney. The attorney wrote a letter to this individual downtown.
Q. You're saying that there was an offer to purchase for $1.6?
A. Yes. And their response back was, we have a higher offer. There's a buyer. If you want to bid on it, you need to do it now, and I pulled out.
Q. In the meantime, it sold for $1.05?
A. I don't know what it sold for.

MR. BLISS: I'm going to object because we don't have a time frame as to when the lender was the high bidder. So I don't call that being sold, the lender kept the property and when these offers back and forth took place.

THE COURT: How do we know that the lender even kept the property?

MR. BLISS: Well, we know in this document it says: The lender, there being no higher bidder -- sorry -- sold the property to the lender at the price of $1,050,000 million, this being the highest and last and best bid. It's in that one, two, three, fourth --

THE COURT: I see it.

And, Mr. Vataj, do you remember when you made the offer of $1.6 million?

THE WITNESS: Your Honor, I have documents in the papers there if you would like me to --

THE COURT: Are they in evidence?

MR. BLISS: No. I don't think so.

THE WITNESS: If you would like me to get them, I'm happy to.

THE COURT: Do you know if the offer was made before February 4 of 2022?

MR. BLISS: It's on those documents. They are legal documents. My attorney wrote the letters.

THE COURT: Mr. Bliss, if this is something you want to address later on in redirect?

MR. BLISS: That's fine, Judge. I also don't have an issue -- certainly I think there's a letter here, I believe, that was produced, but I don't know if Walter's was produced. I haven't seen part of this before.

MR. BENJAMIN: Your Honor. I have never seen a letter of offer. This is a seminal part of this case, and I'd like to see the letter. The witness just testified to it.

THE COURT: You said you have it, Mr. Bliss?

MR. BLISS: I'd like him to tell me, yes, that's the letter, but --

THE WITNESS: I have it in my documents as well.

MR. BENJAMIN: Can I see it for the first time?

THE WITNESS: I don't know if he has the same. Is it the letter Walter wrote to the Manhattan firm?

THE COURT: Mr. Bliss, this is the first time you are seeing it?

MR. BLISS: That's correct.

THE COURT: So it hasn't been produced in discovery?

MR. BLISS: I produced a lot of Della Mura Ciacci letters. I can't say, yes, this was in there or no, it wasn't in there.

THE COURT: Mr. Benjamin, can you take a look and see if you have seen this before?

MR. BENJAMIN: Yes. I have never seen this before.

Your Honor, this was never produced in discovery. We tore through multiple documents, multiple letters from the Ciacci firm. I mean, this is like --

THE COURT: And just so I understand, this letter is purportedly what was sent, we're unsure about the timing, but what would have communicated an offer of $1.6?

MR. BLISS: What I took from the letter was it was a letter from Mr. Ciacci's office to Mr. Vataj essentially explaining a response to an offer that was made and what the counteroffer is.

MR. BENJAMIN: This is -- the offer here is not $1.6. It's more, but I mean, we have never seen this. This has never been in the packet. This is a major document. This is not just a bank statement. This is something that --

THE COURT: And, Mr. Benjamin, what relief specifically would you be seeking?

MR. BENJAMIN: Your Honor, I need a moment to confer

with my client real quick.

THE COURT: Why don't we take a bathroom break?

MR. BENJAMIN: Yes, please.

(Recess)

THE COURT: You can sit.

MR. BENJAMIN: May I make a statement for the record, first?

THE COURT: Yes.

MR. BENJAMIN: The witness testified to something just now that was a complete surprise as to the testimony. But then counsel produced what purports to be a letter from February of 2022, that was also not produced in discovery at any time during this case. It's not a minor document. It purports to be something that was critical and extremely relevant to the plaintiff's case, the theme.

So I wanted to make that statement for the record. I'm going to object to its introduction not just based on disclosure but the substance. But I wanted to make that clear for the record, that this is a complete surprise and not a minor issue.

THE COURT: So is your objection to the testimony that defendant had made an offer to purchase the property and the offer was declined?

MR. BENJAMIN: Yes, that's right.

THE COURT: Mr. Bliss, do you want to respond?

MR. BLISS: I don't believe my office ever received a document demand on these guys. This particular document wouldn't have been in my possession anyway, but I also don't believe that prior counsel ever received a document demand. We did have depositions, and there were no post-deposition demands for documents.

THE COURT: There was never a document request?

MR. BLISS: I never received one.

MR. BENJAMIN: Yeah, there was. I'm sure.

MR. BLISS: Well, you are sure, but you do have a copy of it?

MR. BENJAMIN: I mean, I certainly have the email that I sent. We could go through it. We asked for all documents related to the Tennessee property, all documents that were going to be used for a trial. Those were the two main ones that would pertain to this document.

MR. BLISS: This was not part of anything to do with my trial production that was all submitted. Also, it did not come to our attention that attempts to buy the Tennessee property were an issue in this litigation or an important issue in this litigation until yesterday. There's nothing in the pleadings that goes to any fact-related issue regarding attempts to buy the property.

THE COURT: Why don't we do this because the flexibility of a bench trial, I think, would allow for this. I

understand the objection that you would not based on the fact that this document was not previously turned over -- is it accurate that there's no dispute that that document was not turned over in discovery?

MR. BLISS: That's my understanding. I'm not representing that it was previously provided.

MR. BENJAMIN: It couldn't have been provided, your Honor, because counsel said that he didn't see it until today.

MR. BLISS: That is consistent.

THE COURT: Yes. It sounds like we're in agreement that it wasn't turned over in discovery, and it sounds like this line of questioning was not done at the deposition, such that there would have been no inquiry into what efforts were made, if any, to purchase the property in foreclosure. Is that accurate?

MR. BENJAMIN: Correct.

THE COURT: So it sounds like plaintiff's objection as to any testimony coming in with regards to this attempt to make an offer to purchase the property and any response to that offer.

MR. BLISS: But that testimony was in response to his question.

THE COURT: Yes, I understand that.

MR. BLISS: OK.

THE COURT: But, again, because it's a bench trial and

I don't need to rule on it at the moment because I would like to just go back through the claims, I'm not sure --

MR. BLISS: I don't think this has anything to do whatsoever with the case.

THE COURT: Right. I'm not sure I need to actually consider this at all to rule on the merits of either the breach of fiduciary duty or the fraudulent inducement/misrepresentation claim, or I know there's an unjust enrichment claim.

MR. BENJAMIN: If I may respond, it has everything to do with the preservation of my client's money, how -- and the partnership, as to what was being done under this Cache asset that was in the property in Tennessee. And if there was an attempt to redeem that money by making an offer of purchase, your Honor, my line of questioning was that this was sold for just over $1 million. If my client knew one thing about an offer to purchase and for anything around that or even more, she should have been given that notice.

This just opens up a whole line of questioning that should have been made at deposition. I would have made those questions at deposition and written discovery as well, but I think we're beyond the point where this was not in discovery. My motion is to strike that portion of an offer being made because there is no evidence to the contrary. There's no evidence that will be submitted or admitted to the contrary.

And I can -- I'm just finishing up my questioning on that number that's in the record, that has been admitted in this exhibit, as to that number that it was purchased for, that the parties could have purchased that for or somewhere around there. If they went there and participated in the auction, that's my point of the questioning.

MR. BLISS: If I may, Judge, there's been zero testimony as to when anyone found out about this auction or whether they had advance notice of the auction. That's number one. Number two, plaintiff testified yesterday that at the time of this auction, which is 2022, she considered herself the sole owner of the LLC, and she prepared a tax return reflecting that. So it's a little disingenuous for her to claim a fiduciary duty on the part of Mr. Vataj to protect her investment when she unilaterally took control of the only asset that they had in kind.

The other part of this is the claims here really all have to be limited to the original deal. There's no claims in the pleading which talk about actions that took place beyond the loan.

MR. BENJAMIN: Well, let me respond to the first part, if I remember it. Mr. Vataj was acting on behalf of Cache Realty when he just made a statement that he made an offer to purchase the property. He wasn't purchasing it for himself. He wasn't purchasing it for Nancy. He was purchasing it for

the combined partnership, and so it would have every piece of relevance in discovery in the case. And I don't think it's an easy issue to strike that portion of the testimony, and it's already in evidence that it was bought for $1 million.

I think we've established that -- well, I was going to ask a follow-up question that I think will solve all this actually, but I think we're fine. My motion to strike stands. That's before the Court. But this was absolutely fodder for major discovery in the case. And it's just -- we don't have to belabor this point, I don't think.

THE COURT: Just so I understand, the remedy you want is to strike this testimony?

MR. BENJAMIN: Yeah. That's the immediate, yes.

THE COURT: You said that's the immediate request. Is there going to be another request for something else?

MR. BENJAMIN: Not at this time. I've made my objection on the record. Am I talking about extra time for discovery? No.

THE COURT: I'd like to understand what the totality is that you want, so when I consider this I understand everything you are asking for.

MR. BENJAMIN: Right now it's a motion to strike immediately. I have follow-up questions with regard to the document that I was on, but it's nothing further. I mean, it's nothing further until perhaps post trial. I don't know. I

don't know how this is going to shake out in terms of your decision, so I can't say anything yet.

THE COURT: And, Mr. Bliss, understanding what he is asking for is just striking his testimony?

MR. BLISS: My objection to that is that he asked the question, but in terms of -- I still maintain it has no relevance to the relief sought in this action anyway.

THE COURT: Again, because this is a bench trial and we have some flexibility, I will reserve a decision on this. I'd likely give you an answer before you give me your closing remarks and that way you know whether you have to discuss this at all.

So Mr. Benjamin, it sounds like you want to still ask him a few more questions about the foreclosure deed?

MR. BENJAMIN: Yes. I'm not quite finished with that yet.

THE COURT: And I want to make clear, plaintiff did make document requests that sought all documents related to the Pendelton Court loan for the Pendelton Court Apartments?

MR. BENJAMIN: Absolutely. We wouldn't have gone forward with depositions without them.

THE COURT: OK. And, Mr. Bliss, you don't recall that this was a document request that was made?

MR. BLISS: I never had a formal -- there's nothing in my file that's a formal demand for that.

THE COURT: Are you substitute counsel?

MR. BLISS: I was.

THE COURT: So there was an attorney before?

MR. BLISS: There was an attorney before. I believe he produced some documents, and I also produced additional documents. And some of the additional documents that I produced were documents that I got from the prior attorney, but this letter was not in those documents.

MR. BENJAMIN: Some of my exhibits, your Honor, are from the other side, so somehow——unless they were just given——they came to me from a demand.

MR. BLISS: Well, it may have been informal or whatever, but absolutely I supplied a lot of those documents, including documents that I will represent were records maintained by the Della Mura Ciacci firm that were sent to me and I passed them on to counsel.

MR. BENJAMIN: May I continue, your Honor?

THE COURT: Yes, please.

BY MR. BENJAMIN:

Q. OK. After all that, from exhibit 22, we see that the property was at least sold for that number of $1.05 million. Do you see that?

A. What page are you in?

Q. The second page of the -- page 2 at the bottom has the number in the middle of the page of $1.05.

A. And you said 22?
Q. Yeah. Number 22, yes.
THE WITNESS: Judge, there might be something wrong here because that's page 2.
THE COURT: He is referring to this pagination.
MR. BENJAMIN: Yeah. It's page 2 of the deed.
THE WITNESS: Page 7 on my side. OK.
Q. Yes. Sorry, page 7.
A. It's OK.
Q. It says page 2 at the bottom.
A. Yes.
Q. But, OK, you see the number $1.05 million, right?
A. Yes, sir.
Q. If you flip to exhibit number 5, we talked about this before.
THE WITNESS: Can I flip your pages?
THE COURT: Are you moving on to Plaintiff's Exhibit 5?
MR. BENJAMIN: I'm moving back, yes.
THE COURT: So you should use your copy.
THE WITNESS: No problem.
A. Are you going back to my offer from the company?
Q. Yes.
A. OK. Go ahead.
Q. If you look at that second page of that offer, at least for

that property, in October of 2018, it was $1.150 million, right?

A. Mm-hmm.

Q. So $1.150 million, at least on October 18, was the range where you felt was a good offer for Cache Realty to make to acquire a property, right?

MR. BLISS: I am going to object, Judge, because it assumes that an offer is just made based upon price.

THE COURT: I didn't catch that. Assumes an offer is made based?

MR. BLISS: Just based upon the price as opposed to the condition of the property, whether it's occupied, the nature of the property, all of those things.

MR. BENJAMIN: Your Honor, his prior testimony, up and down, was that for two years many of the properties that Ms. Hall gave him were too expensive and that price was an issue always. That's what he testified to.

THE COURT: But the question you asked assumes that all properties are the same and the $1.15 million on October 18 was a good offer for Cache to make to acquire the property. But his testimony was specific to this Westchester Avenue property. So do you want to ask him specifically whether the $1.15 was a good offer for that property? But I don't think he testified just generally that $1.15 would have been a good offer generally untied to a property.

MR. BLISS: That offer also had contingencies.
BY MR. BENJAMIN:
Q. Mr. Vataj, please flip to exhibit number 25, which should be in that packet. That's a 20-page exhibit. Do you see that? It starts with a Dash email. Do you see that?
A. Yes, sir.
Q. OK. Take a moment to review those documents that are in evidence as number 25 and just familiarize yourself with them for a moment.
A. Other than the MLS ID here where it's showing me and claiming do you know what properties these are? Do you have pictures or anything? Property descriptions other than --
MR. BLISS: Objection, your Honor. I don't think there's been a question.
THE COURT: Yes. I think you were going to ask a question.
MR. BENJAMIN: Yes.
Q. Between the -- I just wanted you to familiarize yourself with the documents themselves and look at them. Have you seen those documents before?
A. As Nancy asked me about some of the properties that she was getting from a friend? Yes. Have I seen them? No.
Q. OK. So is it fair to say that between June of 2018 and August 2020, which is the date range in this exhibit, is it fair to say that Ms. Hall sent you various listings for you to

consider?
A. Well, I don't think it's fair to say she sent them to me. I think she asked the Realtor to automatically produce the MLS. Once she puts a client's name on it, then you get every single listing that lists on a certain property. If that's what you're asking?
Q. So technically that's how these were transmitted to you is just the MLS listing?
A. Probably, I don't recall.
Q. OK. But you testified earlier that the ones she gave you, they were too much money to invest in, right?
A. If I didn't invest in it, for sure.
Q. One of them says Fells Point, Baltimore. Do you remember her sending a listing for Fells Point, Baltimore?
A. No, sir.
Q. Do you remember any listing she sent?
A. I know she looked at a couple properties after she moved, in Jersey. I know at one point she mentioned a property that the daughter was going to college somewhere, and we had looked at it, and it got nowhere.
Q. OK. If you could flip to number seven, number seven in evidence?
THE COURT: It's exhibit seven.
A. Go ahead, sir.
Q. Do you recognize this document?

A. Yes.
Q. And what is this document?
A. The personal guarantee that I had the individuals, who borrowed the money from us, sign.
Q. Did you write this personal guarantee up?
A. No, sir.
Q. And you had who do it?
A. My attorney and her attorney, Walter Ciacci and Peter Della Mura.
Q. When you say "her attorney," you mean?
A. Nancy Hall.
Q. So it's your understanding that Nancy knew that Walter was doing this document?
A. Yes.
Q. Was there a meeting for that at some point?
A. Yes.
Q. And did you yourself present this document to Nancy for her approval?
A. The attorneys sent it to both of us. We, in person, were shown the personal guarantees. We wouldn't lend and no one, not me, not her, not anyone in their right mind would lend someone money without having a document that says you will pay us. This really means you will pay us. If you screw up, you are going to pay us. It doesn't matter. So the thought that somebody would allow, to me, it's like --

Q. OK. This personal guarantee is against Destan and Faton only, right?
A. Yes, sir.
Q. Did you ever seek a personal guarantee from Pendelton itself, the LLC?
A. Well, it automatically put a lien and judgment against Pendelton. The moment we put the -- we gave them that loan, there was a lien and a judgment against Pendelton through my Tennessee attorney. The moment I found out that they were defaulting, obviously you are not going to be putting default liens on individuals or properties before they actually default. The moment I found out personally that -- and she knew the next day because a call was made where, Nancy, I just found out the bank took back the property.
We went to Walter and I had him initiate thereafter all the liens, notes, judgments, affidavits. And thereafter, I've also -- keep in mind that Nancy got a little erotic, so I didn't really want to argue. It's not my personality to argue.
Q. There was no lien on Pendelton -- there was no guarantee on Pendelton automatically, as you say, when there was a personal guarantee for the individuals only, right?
MR. BLISS: Objection.
A. The property Pendelton --
THE COURT: Wait. Sustained.
MR. BENJAMIN: What is the objection?

THE COURT: The question was there was no personal guarantee on Pendelton. There was a promissory note with Pendelton. That was the LLC. That is what gets the LLC on the hook.

MR. BENJAMIN: Your Honor, he testified that there was an automatic lien upon this personal guarantee on Pendelton, and the question was that's not true. There was no automatic lien on Pendelton when these individuals signed the personal guarantee. That's all I was asking.

THE COURT: The question you asked that he objected to was: There was no guarantee on Pendelton automatically, as you say, when there was a personal guarantee for the individuals only, right? And before that, you had also asked: Was a personal guarantee on Pendelton? I believe his objection had to do with the fact that you cannot get a personal guarantee on Pendelton. They are already on promissory note.

Q. I asked automatically for a reason, because it came from him that it was automatic. I'll move on.

You had to ask the Tennessee attorney to actually file in Tennessee with the New York judgment, right?

A. Yes, sir.

Q. So you didn't have any liens on Pendelton until you got the judgment in New York, right?

A. No, sir.

Q. If you could please turn to exhibit number 8? Do you

recognize that document?
A. Yes, sir.
Q. OK. What is that?
A. A promissory note.
Q. And who drafted this note?
A. Same law firm, Della Mura Ciacci.
Q. And on the third page is your signature? You signed it?
A. Yes, sir.
Q. And this was a document that you directed Mr. Ciacci to execute, right?
A. As per our agreement with Nancy.
MR. BLISS: I'm going to object. Mr. Ciacci to execute?
BY MR. BENJAMIN:
Q. Mr. Ciacci -- I'm sorry -- to draft.
MR. BLISS: As modified.
THE COURT: Can you ask it again?
A. I apologize. Can you ask it again?
Q. You retained Ciacci to draft this document --
A. Yes, sir.
Q. -- the promissory note.
OK. And it's your testimony that Nancy knew about this document before it was drafted?
A. Yes, sir.
Q. Did you present these documents, both the personal

guarantee and the note, to convince her to do the loan, to go forward with the loan?
A. Absolutely not.
Q. No, you didn't. So why did you produce these documents to her?
A. This is to protect me and her. There was no reason to convince anyone. People do things because of their choice.
Q. You didn't have to convince Nancy to allocate this money to Faton in this loan with any document?
A. What interest would I have to do that?
MR. BLISS: I'm going to object to the form of question, Judge. There's already been testimony about the terms of the loan, and then documents were prepared to reflect those terms. And then actually he didn't say it was a closing, but a closing of sorts took place. So I'm having an issue with these documents were prepared to convince her as opposed to these documents memorialized what they had already agreed to.
THE COURT: And, Mr. Bliss, you are certainly welcome to argue that in closing, but the question was proper. I'm going to repeat it because he didn't give you an answer to the question. The question was:
"Q. You didn't have to convince Nancy to allocate this money to Faton in this loan or any document?"
And that's a yes or no answer, Mr. Vataj.
THE WITNESS: No.

BY MR. BENJAMIN:
Q. If you look at the first paragraph of the promissory note, midway down the first paragraph, you see it says, "The remaining" -- do you see where it says, "The remaining $100,000"?
A. Yes, sir.
Q. The remaining $100,000 will be dispersed upon a show of work progress satisfactory to the lender after inspection of completed work by the lender.
You signed this document, correct?
A. Yes, sir.
Q. One of the terms of this note was that the lender -- and who was the lender, to be clear?
A. Cache.
Q. OK. The lender would do an inspection of the completed work, right, before this next disbursement would go out, correct?
A. Yes. That's what this says.
Q. OK. Was that inspection done?
A. It was. It might have not been done physically to go there. We were on the phone. They sent pictures before we released the $88,000, which was the balance really of the extra $100,000 minus all the fees and interest that was due to Cache, which was left in Nancy's account. They showed evidence, pictures of the roof, electrical, apartments they renovated,

plumbing they did, probably 30, 40, pictures.
Q. Which you never produced in this lawsuit, the pictures, correct?
A. To be honest with you I never thought that day would come to this. But the answer is no. I do have them.
Q. And you didn't --
A. She has seen them. She might say she didn't see them. I do have them.
Q. You didn't produce any texts that you mentioned that would have related to this inspection of the construction down there, did you, sir?
A. Me and Nancy had conversations. It's the only reason the money got released.
Q. Right. But you did not produce the text that you indicated satisfied you that work was being done under that paragraph, correct?
A. I showed her the text. I showed her pictures. When this was going on before their money was released. I did not send any kind of back-and-forth because I could tell you that we -- when I was away out of the country, Nancy handled other things for me that nobody would have the opportunity to do so.
Q. OK. Let me ask the question one more time. Did you produce, in this lawsuit, the texts that you are referring to?
A. No, sir.
Q. So you conducted a remote inspection, would that be fair to

say?
A. Yes.
Q. A remote inspection by text and photos, correct?
A. And a Zoom -- not Zoom, but FaceTime type of thing to prove that I was seeing what I was seeing.
Q. And you never talked to Nancy about doing the inspection with her, correct?
A. When you say "never talked to Nancy"?
Q. About this portion.
A. This portion?
Q. About this inspection, yes.
A. Not Zoom, no.
Q. You didn't invite Nancy to participate in the inspection?
A. It shouldn't say Zoom. It was a phone FaceTime.
Q. That's fine. You never invited her to the FaceTime meeting, did you?
A. No. I've shown Nancy the pictures from Faton.
Q. Do you think that she would have wanted to be on the FaceTime call for the inspection?
A. I can tell you that a lot of times with what she was dealing with the family, to a certain extent she would come in 8:00 p.m. and work through the night or 4:00 a.m. to deal with. Nancy, at a certain point by this time, where issues were becoming -- she was handling some family issues that are not for this court, but she was -- however, she did see the

pictures from my phone. She was told 100 percent, hey, they did this work. They are asking for the other money. Are you OK to release this? And the answer was yes, and that's the reason they got the money. Otherwise they would have never gotten the money.

Q. And it's your testimony that the work was completed after this remote inspection, right?

A. Based on what they were showing, yes, it showed that work is being done. Completed? It wasn't completed. They were asking for the rest of the money to complete the work.

Q. That's not what this says. This says that the second disbursement of the $100,000 will come after inspection of completed work by the lender. This was a post-completion disbursement. Do you understand what that is?

MR. BLISS: Objection. It doesn't say it's a post completion disbursement. It also uses the word progress in a note.

THE COURT: Mr. Benjamin, can you ask a different question?

MR. BENJAMIN: Sure.

Q. The $100,000 was not supposed to go there until the work was completed to the satisfaction of the lender, wasn't that true?

A. No.

Q. What did -- it says it right here. Satisfactory --

A. Satisfactory is based on what me and her think. And keep in mind, they also asked; she could have flown to Tennessee and looked at the properties.
Q. Please focus on the question, OK? It says completed here. It doesn't say a progress payment or something to that effect. It says completed.
A. I did not, word for word, read this document, as I've obviously hired counsel for it. Just like any normal human being, you ask a legal to handle legal, a medical -- a doctor to handle medical and not a Realtor so.
Q. Setting aside that you didn't read this portion, wasn't it part of the due diligence before you sent the second payment to verify that the work was completed and not just halfway through?
MR. BLISS: Objection. It's still not what the document says.
MR. BENJAMIN: Your Honor, this is just obstruction. I mean, these are questions based on a document that he has already testified to, and every single objection has simply been to disrupt and disrupt the flow.
MR. BLISS: Absolutely not.
MR. BENJAMIN: Yeah.
MR. BLISS: The objection is you are not asking the question based upon what the document says. You are trying to imply that the document says something else.

MR. BENJAMIN: That's utterly wrong.

THE COURT: Because I realize -- I'm going to take you at a sidebar since the witness is still on the stand.

(At sidebar)

THE COURT: The problem with the question is the full sentence is: The remaining $100,000 will be dispersed upon a showing of work progress satisfactory to the lender after inspection of completed work by the lender. That can be easily be read to whatever they completed whatever work progress was in place but doesn't necessarily require a finding that all work was completed.

MR. BENJAMIN: I understand what you're saying. I didn't want to -- that was not the objection.

MR. BLISS: That was the objection.

THE COURT: It's the same. Let's say there were ten things they had to do. This doesn't necessarily say they have to complete all ten for the $100,000. They could have completed five of ten, and they could have found it sufficient to justify the disbursement.

MR. BENJAMIN: All right.

THE COURT: Thank you so much.

(In open court)

BY MR. BENJAMIN:

Q. When you had that FaceTime call and those photos and the texts of the remote inspection, what portion of the work would

you say was completed before you made that second disbursement?
A. Electrical work, roof on one of the buildings, apartments updated, some of the plumbing that needed, windows and doors. These were pictures that I'm sorry you didn't get them. I know she has seen them. I'm happy to produce them.
Q. Well, they weren't produced here.
A. I understand.
Q. But would you say it was a certain percentage?
A. A lot of work was done.
Q. So when you saw that, though you didn't read that portion of this provision -- of this note, you felt that the money that was -- the balance of the money that was left in the account could go to Faton at that time, is that true?
A. In my professional opinion, yes.
Q. So the first payment, there was no dispute that the first payment was on May 3 of 2019, right? Do you remember?
A. I don't recall. There's a check for it.
Q. Let's look at the two exhibits. We'll look at them together, 9 and 10. If you flip to 9 and 10, and you see that -- if you flip to the last page of exhibit 9?
A. Yes, sir.
Q. Did you write that check out?
A. It looks like it.
Q. And you signed it, correct? That is your signature?
A. It is.

Q. The date of that check was——do I have it right——5/13 of 2019?
A. Yes, sir.
Q. And according to the endorsement, it appears that Destan negotiated that check on the same day, 5/13. Do you see that?
A. Yes, sir.
Q. Did you meet Destan to give him this check?
A. They picked it up in the office.
Q. OK. So they were in New York at that time?
A. Faton worked in our office, as I mentioned before. He was -- as far as you are from her and me, that's how far we worked from each other.
Q. OK. So he cashed that check the same day you gave it to him, right?
A. He signed the document. Nancy approved it, released it. I don't care when he signed it.
Q. OK. And the second one on the 10th, if you look at the first page of the exhibit --
A. I'm sorry. What exhibit are you looking at?
Q. Exhibit 10, sorry.
A. OK.
Q. It says, you see at the bottom there, electronic withdrawals?
A. Yes, sir.
Q. And then if you flip to page 3 of 4 of that document, it

says page 3 of 4; do you see that?
A. Yes, sir.
Q. Do you see the signature line? Is that your signature?
A. Yes, sir.
Q. Right. So you executed that wire transfer, correct?
A. Yes, sir.
Q. And that was on July 3 of 2019?
A. Yes, sir.
Q. OK. So you had been satisfied somewhere between May 3 and July 3, from first payment to second payment, that the work had been done -- the work was being done?
A. Yes, sir.
Q. And then you said in your testimony that you discussed with Nancy the progression of the work, and it was your understanding she was satisfied with how the work was progressing?
A. Yes, sir.
Q. When did you have that conversation? If you see these two payments, when would you say you had that conversation within that two-month period?
A. When the individual asked, can you release the money? There's back-and-forth in texts somewhere. I'm sorry that -- you know, you might feel the truth might not be the appropriate answer, but anything I tell you, I could provide it somehow because I didn't erase anything. I had no reason to.

Q. We've agreed that it wasn't produced in this case.
A. OK.
Q. But you testified that that note and that guarantee was given to protect -- your answer to your counsel was to protect the money that was in the account?
A. To protect us, too, as the partners of Cache.
Q. In other words, your $30,000 and her $188,000, is that right?
A. Our agreement, it had no individual value in it.
Q. The money to do the repairs that went from Cache to Faton and Pendelton, that was to do certain limited amount of work, correct? You mentioned what it was.
A. To do work. Obviously, I wasn't there to -- nor did I price the jobs. That was not my intent.
Q. No. But you testified earlier that it was for roofs, apartments, electrical, plumbing, correct?
A. Yes, sir.
Q. Was it your understanding that the $188,500 that you sent to them would allow them to refinance?
A. They were in a refinance position prior to us lending them the money. They were negotiating with the bank in receiving a loan prior to. The bank gave them a condition that said you need to do X amount of work in order for us to proceed with the loan. That's how we came about.
Q. Did you ever give notice to that lender that you had been

extending a loan yourself to their borrowers?

A. No.

MR. BENJAMIN: Just give me a moment, your Honor.

THE COURT: Mr. Benjamin, can I ask you a question?

MR. BENJAMIN: Of course.

THE COURT: Mr. Vataj, you testified a few moments ago. Mr. Benjamin asked you a question. You testified that the note and the guarantee was given to protect -- your answer to counsel was to protect the money in the account. You said to protect us, too, as the partners of Cache. Then the question was: In other words, your $30,000, her $188,000. Then you interjected: Our agreement, it had no individual value in it.

What did you mean when you said the agreement had no individual value?

THE WITNESS: He seems to bring up the question that Nancy's money, my money. Nancy's money, my money. This was really -- the money was put in for a partnership to eventually be of equal value at one point or another. It had nothing to do with who is putting 100, who is putting 200. This is just the excess money that she brought from the other company because of what she promised me many years back. That's all.

THE COURT: But your understanding was that it, to the extent there was any profit in the partnership or joint venture, would be split 50/50?

THE WITNESS: Yes. Yes, your Honor.
THE COURT: Thank you.
Q. And at the time that you dispersed the two payments, the second payment, you did not feel the need to add to that to give to Faton to finish the renovation, right?
A. No, sir.
Q. And why not? Why didn't you add money to that?
A. Like I said, we offered to help a colleague that was working with us. We gave him what we promised. I expected to get the money back within six months or so. Unfortunately, the world turned the way it was turning. For whatever reason, they were not able to sustain a mortgage, and I was not going to be in the lending business. That's not what I do, and that's really it.
Q. You got in the lending business with this transaction though, right?
A. I've lent other people money in the previous years that they are losing their home. My records online will show that. But they were in need, and I seen the opportunity to help a family. And not everything in life goes perfect. I understand that people have or might have this perception that I had to do it perfect. I did it perfect on what I thought was correct and perfect to the best of my knowledge. I would have done nothing different if this is my child's life savings to save her life.
Q. Yet all the money was lost? Almost all the money was lost?

A. In your words. To me, it's not lost. They are both alive. He is working. I never stopped working for this money. I have texts from my friends basically f-ing me and telling me, she'll get the money. She knows who to get it from.
Q. When you said just now, unfortunately the way the world was turning, are you talking about COVID at the time?
A. Economy. In 2018, the market was like this. Literally the plane has taken off. COVID hit, the market stood like this exactly where you are. The katasha (Ph.) -- the frost hit in a winter that wasn't expected anywhere in the world in Tennessee. It destroyed just about everything that those people did because they left the water and Tennessee had no heat.
If you look at your exhibit on the attorney that did the filing of my judgments and stuff, I kept persisting, please make sure this is done in a fast manner, and he told me Tennessee is on shutdown because of this major frost.
Q. You are talking about 2022?
A. Probably.
Q. What happened in November 2019 when they simply defaulted and did not pay a penny?
A. Unfortunately, the banks must have seen -- I don't know what happened because I'm not God but --
Q. You had an interest in the loan?
A. I had an interest in the money I lent, yes, and for my interest, I did everything I could to the best of my knowledge.

I filed what I had in my power to make sure that if they make $1, they will repay us back.
Q. That was after the fact. I'm asking about November 2019.
A. That's when they defaulted.
Q. That's after the fact. I'm asking about November 2019. They didn't pay a penny only in six months. Wasn't it doomed from the beginning, six months earlier?
A. They really didn't have to pay us until they got their loan. So I understand somebody shows a promissory note six months, and unfortunately they are showing they are going to get a loan in eight months and something goes wrong in ten months. If you are asking why didn't we put the judgment the day after they defaulted, because they had all this data saying we're selling this property. They are out there. Nancy knew about it.
Q. And none of that came about, right?
A. No, unfortunately.
Q. Right. And you testified earlier you were out to help someone's family. Were you referring to Faton when you said you were helping somebody by giving them help?
A. Negative. When you said: Are you in the business of lending to others? And I said I've helped other families.
MR. BENJAMIN: Your Honor, if I could just take a quick break. One minute.
(Brief break)

BY MR. BENJAMIN:
Q. So in that six-month period, you expected that the work would be done and they would refinance all within that period, correct?
A. A small portion of the work. The properties needed more work. That is the reason they were getting a bigger loan.
Q. But you thought that in the six months, they would pay you back from that loan, correct, from that larger loan?
A. They're -- when they came to us they were already——and Nancy knew this——they were already a couple months into getting a loan from a regular lender. This was merely a bridge loan from both of us, and her and me, really she said she needs to make some money. I said, you know, 8 percent is not a bad return for a few months. It's not going to hurt. Equity is there. Properties were going like this, and everything in the right mind said that this loan will be paid.
Q. But you knew that if they were in default or distress during that six months, they would -- it wouldn't have been able to get money from a larger loan to repay you, right?
A. Counselor, multifamily is more like what does the property do versus did the person as an individual default. If I knew that the money wouldn't be paid, I wouldn't have given it to them. You keep coming back and forth with this if, but I knew, but I knew, but I knew, but I knew. I didn't know. This was a decision made by both of us. Neither one of us are non-educated people.

Both of us are pretty well educated to know that, OK, we took a shot at a business deal, and it didn't go as planned.

MR. BENJAMIN: Nothing further for now, your Honor.

THE COURT: Mr. Bliss, do you want to do a redirect?

MR. BLISS: Just a brief one, your Honor. Thank you. If you can have a minute?

REDIRECT EXAMINATION

BY MR. BLISS:

Q. Mr. Vataj, there was quite a bit of testimony about the value of potential investment properties, and there was some confusion on that subject. So if you could look at I think it's exhibit 5?

A. The first page or the offer?

Q. The second page. If you could look at the second page, the offer to purchase?

A. Go ahead, sir.

Q. OK. I'm going to ask you about this particular deal, OK, but in a demonstrative way. So you made an offer of $1,150,000 to buy this building. Correct?

A. Yes, sir.

Q. OK. But that offer was subject to conditions that you included in the offer?

A. Yes, sir.

Q. All right. And had those conditions all been met, then you believe that property had the potential to be a good

investment?
A. Yes, sir.
Q. OK. So the $1,150,000 wasn't to buy a piece of property that would be a turnkey operation, and it was worth it to buy that property; properties that you seek out are properties that are undervalued for any number of different reasons, correct?
A. Yes, sir.
Q. And that you see it as an opportunity to buy an undervalued property, enhance its value, and then have it be a viable income-producing property?
A. That has been my model for 30 years.
Q. All right. And there was some testimony in this case about these types of investments being passive income. But being a landlord is not a passive way to make money, is it?
A. No, sir. Not today anyway.
Q. It takes work; it takes management --
A. A lot of effort.
Q. -- in order for it to be profitable?
A. Yes, sir.
Q. And as a result, for two years, which included a period of time after that loan was made, you continued to search out properties. Both of you continued to search out properties, but during that period, you didn't find a property that you saw as an opportunity to improve it and enhance its value?
A. That is correct.

Q. I'm going to ask you to look at—I'm sorry. Here it is—exhibit 2, and then I'm going to direct your attention to the operating agreement, which starts on the second page, but it's numbered at the bottom as 114.
A. Yes, sir.
Q. If you look at the second page, you see at the bottom, it's entitled: Allocation of profit/losses?
A. Yes, sir.
Q. And if you look at number 8 --
A. Yes, sir.
Q. -- it says -- or can you read that to me?
A. Each member will receive an equal share of any distribution.
Q. And with respect to number 7, can you read that to me?
A. Allocation of profit and losses, subject to the order of provision of this agreement, the net profit or losses for both accounting and tax purpose will accrue to and be borne by the members of the equal proposition -- proportions. I'm sorry.
Q. OK. When you entered into this LLC agreement, was that your understanding?
MR. BENJAMIN: Objection.
A. Yes, sir.
MR. BENJAMIN: What LLC agreement did they enter into?
MR. BLISS: When they created the LLC.
I'll rephrase, your Honor.

THE COURT: Yes, if you could rephrase.

MR. BENJAMIN: When they formed the LLC documents is what you are asking?

MR. BLISS: When they formed the LLC? An LLC exists by law not just by its documents.

THE WITNESS: Formation of the documents.

MR. BENJAMIN: That's what I'm saying. We are talking about the formation of the LLC, not any agreement that -- there's no agreement to the LLC.

THE COURT: I think if you rephrase the question, I think we can get an answer.

MR. BLISS: I'll rephrase.

BY MR. BLISS:

Q. Do those provisions of that draft operating agreement reflect what your understanding of your arrangement with Ms. Hall was in entering into the creation of Cache?

A. Yes, sir.

MR. BLISS: I have no other questions, your Honor.

MR. BENJAMIN: Brief recross?

THE COURT: Yes.

RECROSS EXAMINATION

BY MR. BENJAMIN:

Q. I asked you about that exhibit 2, the draft operating agreement, with respect to the tax matters. Do you remember the tax matter portion? We can turn to it if you want. It's

paragraph 52, I think.
A. Page 2, is that what you say?
Q. Exhibit 2.
A. What page?
Q. Page 10, paragraph 52. Do you see this portion?
A. Yes, sir.
Q. Your counsel just asked you that the equal proportion language in here is something that you understood this partnership to be, right?
A. Yes.
Q. Not because you had put any money in it, right?
A. I put money in it.
Q. You put $30,000 in.
A. Like I said, I put money. Your question was not because I put -- I put money in. It's irrelevant whether I put $1 or $50.
Q. It's irrelevant that you put $1 or $50 to entitle to you a 50 percent share?
A. That's not the -- you see, you are looking at and trying to prove a point on something that, in my opinion, really real estate is not your thing in my opinion. Nancy was going to get -- if we bought a piece of property, Nancy was going to get 50 percent of this conglomerate. I understand that your belief is that you think I did you wrong, but my record shows otherwise.

Q. It didn't matter how much money you put in, you still expected 50 percent ownership, is that true?
A. You could ask your client right now in oath if I ever told her that --
Q. Try to focus.
A. -- that if we ever needed money --
MR. BENJAMIN: Motion to strike.
A. -- to fix whatever be bought, I would put as much as she needed.
THE COURT: Mr. Vataj, just answer the question.
A. What was your question, sir?
Q. It didn't matter how much money you put in, you still expected to be a 50 percent owner?
A. This is something she asked to be drawn.
Q. It is really a yes or no. Your counsel asked --
A. Yes. For the investment end of it, yes.
Q. But you said you would not be the one that did the tax returns earlier, right?
A. I have never seen them in my life.
Q. Right. So you wouldn't expect to be bound by paragraph 52, right, the tax matters part?
A. I tell you the truth, I didn't really expect anything other than what me and her spoke --
Q. You told me that earlier.
A. -- and agreed.

Q. You didn't expect to do the tax returns, but you expected to be 50 percent partner, is that fair to say?
A. I'm not understanding really the question.
Q. I'm summarizing your testimony. Is it true that, as you testified earlier, you're not bound to the paragraph that says you would do tax returns, but you want Nancy here to be bound to something that says you were 50 percent partner?
A. I only want what we had in a discussion. We had a discussion more than 20 times in our lives that says we will be 50/50 partners. We have never discussed taxes because there was never anything to file other than the first year that she asked me and approached me. Thereafter she had never asked me. That year I did agree. She said, I need to write off something of Dash to Cache. Can I take a bigger loss because I made a gain on the other company? I said, yes. I have never seen other than that one K-1 in my life until you guys produced it.
Q. You didn't think that she could take the loss because she had most of her money in there?
A. She could take all of it. You see, I never objected to help her. You are trying to make me be the bad guy, that I did something wrong.
Q. Just answer. Do you actually think, as you had just testified, that she shouldn't have taken the large majority of the loss of the money on the tax return?
A. No, no.

Q. OK. We agree.
A. When it's the truth, absolutely we would.
MR. BENJAMIN: Thank you.
Your Honor, nothing further.
THE COURT: You can step down. Thank you, Mr. Vataj.
THE WITNESS: Do you want this report or can I leave it right here?
THE COURT: You can leave it.
THE WITNESS: Thank you, Judge.
(Witness excused)
MR. BENJAMIN: Your Honor, I'm sorry. May I recall Nancy Hall in terms of a rebuttal witness?
THE COURT: Do you have any objection, Mr. Bliss?
MR. BLISS: I don't.
THE COURT: Do you have a sense of how much time you want?
MR. BENJAMIN: I mean, 15 minutes. Don't hold me to do that but something around 15 minutes.
THE COURT: Do we want to break for lunch and then do that?
MR. BLISS: That's fine.
MR. BENJAMIN: OK. Sure. Thank you.
THE COURT: For lunch, can folks be done in 45 minutes or do you need more time?
MR. BENJAMIN: Lunch in 45 minutes, yes, sure.

THE COURT: Why don't we reconvene -- it's a little bit more than 45 minutes but 2:30 is a round number.

MR. BENJAMIN: Yes, sure.

(Luncheon recess)

(Continued on next page)

AFTERNOON SESSION

2:40 p.m.

(In open court)

THE COURT: You all can sit.

Mr. Benjamin, are you ready?

MR. BENJAMIN: Yes, your Honor. Thank you.

THE COURT: Ms. Hall, you understand you are still under oath?

THE WITNESS: Yes.

NANCY HALL, resumed.

DIRECT EXAMINATION

BY MR. BENJAMIN:

Q. Hi, Ms. Hall. You were in the courtroom today when Mr. Vataj was testifying, correct?

A. Yes.

Q. And you heard the answers to questions both from his own counsel and from me, correct?

A. Yes.

Q. We talked a lot about the concept of due diligence, Mr. Vataj and his lawyer and me on cross, and he testified that his due diligence was in effect looking at the numbers. He looked at the numbers, and he was satisfied that this loan was justified.

What did you think due diligence -- what do you think due diligence should have been here? What should he have done

and not should have done?

MR. BLISS: I'm going to object. Besides being leading, there's a characterization of the testimony in there that the Court has already heard, so I'm not sure why we're -- I'm not saying I agree with the characterization, but why are we going back there? She testified in her own case as to what she felt due diligence was to be and complained about a lack -- or not due diligence as she envisioned. And now she's being asked once again what it means to her to be due diligence.

MR. BENJAMIN: This is rebuttal, your Honor. It's a response to what was said. She's entitled to respond to what he said, what his due diligence was. That was the premise of the question.

MR. BLISS: Yes, but are we concerned with what she thinks it should have been or is she going to say that he did something different?

THE COURT: So I'll be perfectly candid. I'm struggling with the question that you asked, not on the grounds that counsel raised but because in the nature of this claim, my understanding, let's say we're taking the breach of fiduciary duty claim. My understanding is that -- at least the plaintiff's theory would have been that she was trusting of the defendant because he had superior knowledge or superior expertise in this area, and she would have relied on that. If that's the context, I'm not sure how she could comment about

what due diligence should have been done or not done.

Putting that aside, if she's not experienced in this industry, if she has never conducted due diligence on her own, I don't understand what the foundation would be to ask her what should or should not have been done.

MR. BENJAMIN: Well, in the context of what the defendant said, yeah. Well, then I'll ask an open question to respond then to what he said. A rebuttal is in the nature of responding to what was testified to.

THE COURT: And that is right. That is rebuttal testimony. But normally the witness would have the ability to rebut because she's either an expert——this isn't that case——or the witness has first-hand knowledge from experience, either through training, educational or personal, and could testify about that. If she were, for instance, a real estate developer, she would say, in my prior deals, this is the due diligence I did, and the inference would be that the due diligence done by the defendant was insufficient.

I understood from her testimony that she has no experience in this. She was a bookkeeper/administrative assistant. She essentially trusted defendant. So in those circumstances, I don't understand how she could then say, this is what I thought would have been done.

MR. BENJAMIN: I'll simply ask a general question to respond to what was testified to by the defendant then. That

should be allowable.

THE COURT: I think on this question, she was about to answer. Can you ask another question?

MR. BENJAMIN: Let me ask her an open-ended question then.

BY MR. BENJAMIN:

Q. You heard this testimony as to what he conducted as to due diligence. Do you have a response to what he said when he said he checked the numbers?

A. Yes.

MR. BLISS: I'm going to object, and it's really the same objection because what is the relevance of her, quote, unquote, response unless it's to undermine what he did? And then that has got to encompass -- that's just going to be her opinion, and without having a foundation for her opinion, we're back at the same question.

MR. BENJAMIN: It's an opinion on what was done, and the relationship between the two of them, which is the crux of this case. It is her allegations that, as you rightly said, your Honor, support our causes of action from breach of fiduciary duty to breach of faith and fair dealing to fraud. It goes to that. It goes to the very heart of our allegations and our causes of action.

MR. BLISS: Right. But she's not a witness that is qualified, without proper foundation, to testify.

THE COURT: Again, I'm happy to hear you out on this, but this is the same underlying problem, which is under the facts as I've understood them so far, she didn't have any expertise or knowledge in this area. She trusted what defendant put before her and the representations that this was iron clad, a good deal, an easy flip, right? So given her testimony that she is not experienced in this field, has not worked in real estate, has not worked in investments——I believe she testified she hadn't owned property except for the home she purchased at some time during this time period——she doesn't have the knowledge through qualifications, experience, or otherwise to testify as to what should or should not have been done with regard to due diligence.

She can testify that this happened, defendant told her he did this, or some representations along those lines, but she can't come up and say, he should have done X, Y, and Z because she wouldn't have the basis to give that testimony.

MR. BENJAMIN: The question is to what happened and what actually happened from this lawsuit and her investigation. It doesn't have anything to do with expertise. It has nothing to do with qualifications. It has to do only with what the reality on the ground was after the fact. It is not anything before. I understand the question of what should have been done, no, but she learned through this lawsuit what actually happened, and so --

THE COURT: What actually happened for what?

MR. BENJAMIN: For the background of the viability of this loan, the liens, what we brought out in exhibit number 22, which we did talk about on direct, of course. But the prior loan, the actual prior loan, this is nothing to do with expert opinions.

THE COURT: But the prior loan, that is already in evidence. So what would she add to that?

MR. BENJAMIN: Again, the response to what he was saying as to simply checking the numbers without knowing of the prior loan -- of really the prior first loan of the $1.6 million.

THE COURT: But that still goes back to her having some basis to say he was wrong. He could not have just simply run some numbers or done some math. He needed to do a lien check. He needed to go look for the tax records. That can't be this witness because that's inconsistent with what she has told us so far about her experience or lack thereof.

MR. BENJAMIN: I don't think it's an expert issue.

THE COURT: It doesn't have to be an expert issue.

MR. BENJAMIN: You're saying experience. If you say experience, that's an expert issue. If you are not going to allow the questioning, I've asked it as open ended as I can. I'll move on if you are overruling me.

THE COURT: I am because, again, she doesn't have to

come in through expert testimony, but she needs some foundation to be able to say this is what goes on in due diligence. This is what should have been done. That sounds like what you are trying to elicit from her, what should have been done, is that right?

MR. BENJAMIN: That was my original question, yes. She learned after the fact and what she learned from public record and researching this stuff but not from any expert or experiential thing.

THE COURT: If you are trying to get in the record that there was a lien or another creditor that extended the loan, that has come in already. If what you are trying to get in, he should have done X, Y, and Z because she, after the fact, did X, Y and Z, that's not really testimony she could give.

MR. BENJAMIN: The reason I asked the question is because we were talking about factual and not really sort of something based on experience.

THE COURT: Again, it might just be that you have to give her a different question, not the question you had just asked, which I can try to find for you. But if you want to ask her what she did in 2022, that's different.

MR. BENJAMIN: OK. I'll keep trying, and we'll see where we are.

BY MR. BENJAMIN:
Q. You heard the testimony of Mr. Vataj who said that he looked at the numbers and decided that this was a good investment, right?
A. Yes.
Q. And you decided to bring this lawsuit on the basis that looking at the numbers was not enough and that during this lawsuit and in 2022, you did your own, you know, fact checking and research. Is that true?
MR. BLISS: I am going to object, your Honor.
THE COURT: Let me see where this goes. I understand the objection.
MR. BLISS: OK.
Q. So when you did your research for this lawsuit -- excuse me.
Later in 2022 and eventually what you learned in this lawsuit, what did you discover with respect to the background of this property, the history of this property?
A. I discovered that the property --
MR. BLISS: Objection, your Honor. We're going into testimony that is going to all be based upon hearsay once again, which was the same problem on direct examination of this witness. It's: What did you discover? Well, anything that she's going to tell us that she researched is now going to be her -- her discovery is going to be based upon hearsay

information at a minimum.

THE COURT: So we have the lien. I think that's Plaintiff's Exhibit 22, perhaps, or the substitute deed of judgment.

MR. BLISS: Correct.

THE COURT: Questions elicited about how she found out wouldn't be hearsay because we have the document in evidence. But if we're trying to get back to the tax records, that would be hearsay because we don't have any direct evidence of the tax and the payments.

MR. BENJAMIN: I'm not.

MR. BLISS: If we are going to the deed or the lien, what is the rebuttal testimony? That is already in evidence. She testified about it. He testified about it. They were both cross-examined on it. What's she going to rebut at this point?

THE COURT: OK. I hear you on that objection, Mr. Bliss. I'm willing to give Mr. Benjamin some leeway here as long as we're not getting into hearsay.

MR. BENJAMIN: Thank you.

BY MR. BENJAMIN:

Q. So the question was: Having heard what Mr. Vataj said in testimony today, what did you discover in reality of the history of this property?

A. Well, he said he wasn't concerned with the first position lender and that to me is absurd because the bottom line --

MR. BLISS: Objection.
A. -- is that --
MR. BLISS: Objection. Now, we're going into her opinion again regarding his testimony.
THE COURT: Sustained on that one.
MR. BENJAMIN: I'm sorry?
THE COURT: It's sustained on the basis that we discussed earlier, if we're talking about why he wouldn't have been concerned about the first position lender.
THE WITNESS: It's in this document. I don't understand.
MR. BENJAMIN: I'm sorry. I'm overruled? The question is -- you are overruling?
MR. BLISS: I think it's sustaining.
THE COURT: I'm sustaining the objection for the same reasons I've given before.
BY MR. BENJAMIN:
Q. You heard Mr. Vataj say that he had gone to Mr. Ciacci after the loan had defaulted.
A. I'm sorry. Could you repeat that because I didn't hear it?
Q. Yes, sure. Let's start back.
You heard Mr. Vataj say that you were involved in the retention and the work of Mr. Ciacci, the lawyer. Do you remember that?
A. Yes.

Q. OK. Were you, in fact, involved in those conversations and that work?
A. No, I was not. I only received two letters from Mr. Ciacci over a four-year period. One, which was in 2021, I think, January if I recollect and it was entered into evidence, telling me that we needed to decide about whether to move forward with filing the confession of judgments to chase, you know, the personal guarantee. And the second letter I received was in February of 2022, telling me that basically the property -- the asset had been sold off in auction, and, you know, that the money was gone.
Q. So the only communication you had from Ciacci was when the property was in the process of -- that letter that said that the property was gone?
A. Correct. That was the only time that I heard from them, and at that point, there was not much that I could do.
Q. So the statement he made saying that you were involved along the way with Mr. Ciacci was not accurate?
A. No, not at all.
Q. With respect to the note, the default on -- he testified today that he took action sometime after the default in November of 2019 to collect the money. You heard that?
A. Yes.
Q. And that was some -- and that was in February of 2022. Do you remember that part?

A. Well, he took the action in January of 2021.
Q. OK. So were you aware at that point of what he was doing on the collections part?
A. What he told me was that basically he was going to file the confession of judgments. He did not suggest to me that we should retain a Tennessee lawyer. He did not suggest that we should contact the first position hard money lender to try to buy back the note.
Q. And that was in January 2021?
A. Correct. In January of 2021, we had a brief discussion. He sent a letter basically saying that me and Sonny had to decide. I don't even think he sent me that letter. He might have mailed it, but there was an actual call where we briefly discussed it, and basically he told us he was going to file the confession of judgment. And Sonny pretty much explained to me that they were going to——what's the word——put a lien on their bank accounts to get the money, but he did not tell me that there was an option to buy the property back at auction. He did not tell me that there was an option to contact the hard money lender and basically negotiate with them to buy the note back at a discounted rate. And actually in order to do that, you don't even have to get permission from the original borrowers because if --
MR. BLISS: Objection at this point. She's now offering opinion.

THE COURT: Sustained.

MR. BLISS: It's way beyond answering the question. I would move to strike the nonresponsive portion as well.

THE COURT: The objection is sustained.

MR. BLISS: Thank you.

Q. When the note was defaulted in November of 2019—you heard his testimony—why was there nothing done at that time?

A. He told --

MR. BLISS: Objection. Why was nothing done at that time by who?

MR. BENJAMIN: Why were no collection efforts made then as opposed to --

MR. BLISS: And this is rebuttal testimony directed at what?

MR. BENJAMIN: At his testimony as to when the collections efforts began.

THE COURT: So I do believe Mr. Vataj testified that although the payment didn't come in this November 2019, he didn't immediately file a judgment. I think those were his words.

MR. BLISS: I think we're all in agreement on that.

THE COURT: So then you can ask her --

MR. BLISS: She just testified though that it was done in the following year, correct, that the default -- I mean, the confession of the judgment was filed in January 2020.

THE COURT: January 2021.

MR. BLISS: '21. I'm sorry.

THE COURT: I think you can ask her if she knows why the partnership did not take any action in November of 2019 -- or Cache. Excuse me.

THE WITNESS: Could you ask the question again, please?

Q. Sure. Why did the partnership not take any collection action at the moment there was a default in November 2019?

A. Mr. Vataj told me that we shouldn't take action right away because we would still be collecting interest, and he also told me that he did not want to put them in default because they were friends of his in the Albanian community and it didn't look good for him to do that to another Albanian.

Q. Mr. Vataj testified that the loan made to Faton and Pendelton was for construction of a specific amount of things. Did you hear that testimony?

A. Yes, I did.

Q. He testified that it was supposed to be for apartments and roof and electrical and plumbing?

A. That's correct.

Q. OK. Was that your understanding of where your money was going at the time on this property?

A. Yes.

Q. OK. And was it your understanding that that was going to

be enough with the amount of the property that was somewhere between $3- to $4 million?

A. Yes, and he also testified to that just now. He said that basically if he put in $200,000, we would have reached an after-repair value of $3.5- to $4 million. So I don't understand why they defaulted if they did the actual construction.

Q. OK. So as to the actual construction, you heard him testify that he had gotten assurance from Faton from texts, from a phone call, and from a video FaceTime session. You heard that testimony?

A. I did.

Q. Were you involved in any of those communications?

A. Absolutely not.

Q. So what is your response to when he said that he got verification that at least the construction was in progress at that time?

A. They defaulted with the first position hard money lender. If the construction was done, they would not have defaulted.

MR. BLISS: Objection.

THE COURT: It's nonresponsive to the question.

Q. You were not -- you testified you were not involved in those communications that he --

A. That's correct.

Q. -- testified to?

A. That is correct.
Q. Did you ever discuss with him physically going there and making an inspection of the construction at the time?
A. No, not at that time.
Q. Was there ever a conversation as to --
A. There was in the very beginning, but that was before the loan was given, and then he just waived that off and overrided it by saying that he looked at the numbers and that he looked like a, you know, good loan to give.
Q. Was there any discussion with him about not giving that second payment until you actually saw the proof that construction was ongoing?
A. No. He didn't even discuss it with me when he deployed the second payment. He just went and deployed it. And I didn't question it because he was the one with the industry experience, and we had already agreed that we were going to do the loan.
Q. You heard Mr. Vataj testify that he didn't feel the need to put in money into the Cache account because it wasn't about -- because the ownership interest wasn't about money. Did you hear that part?
A. I did.
Q. What is your response to that?
A. If the ownership wasn't about money, then why did he let the property go? He testified that he tried to buy the

property back at auction for $1.7 million, and the bank refused it and that they wanted $2 million. And he also testified that the construction was done and that the $200,000 in construction --

MR. BLISS: I'm going to object. Your Honor, there was no testimony that he tried to buy it at auction. The testimony was he tried to buy it subsequent to the auction.

THE COURT: The testimony was also -- the objection that plaintiff had was sustained, so that's not in the record for the various reasons we discussed earlier, which is that it wasn't turned over in discovery essentially.

MR. BENJAMIN: Thank you.

Q. When you heard him say that money didn't matter in terms of the ownership of the LLC, did you expect him not to put money into the LLC?

A. I absolutely expected him to put money in the LLC, and I expected him, as he said in his testimony, you know, it wasn't a matter of money. He said that I knew that he would put whatever dollar amount to make the project happen. But for some reason when these people defaulted, he didn't put whatever dollar amount he needed to put in order to make it happen, because if he had done that, we would have owned Pendelton Court Apartments.

Q. Was there ever any discussion at the time with him to secure ownership interest that he talked about at the time the

loan was extended for him to put money in at that time?
A. I'm sorry. Could you repeat the question?
Q. Yes. I'm sorry.
Did you have discussion with him as to putting in money at the time that the loan was extended to equal what was in the account from you?
MR. BLISS: I'm going to object. Once again, this was already testified to on her direct and on her cross, and it wasn't brought up in his testimony today about whether there was a discussion about him putting more money in, so I'm not really sure what the rebuttal is of.
MR. BENJAMIN: It goes to his statement that money didn't matter and yet we have a consummation of an actual deal. It was a loan deal, and I'm asking what her expectation was. Did she expect him to put money in at that time?
THE COURT: It's just the one question?
MR. BENJAMIN: Yes.
MR. BLISS: Then it's been answered.
A. I'm sorry. Could you repeat the question?
Q. Yeah. Did you expect -- at the time the loan was going to be dispersed, did you expect him to put in money to match yours at the time to equal your share?
A. Yes, just like I would have expected him to do that if we were buying a property. We were supposed to have a partnership.

Q. OK. He testified also that he made an offer of purchase on a Westchester Avenue property. Do you remember that testimony?
A. I do remember.
Q. What was your response to that? What knowledge do you have of that?
A. Didn't happen. First of all, those documents were submitted into evidence by us. They were blank documents that were emailed to us. That offer never happened. That is an outright lie.
MR. BLISS: I'll object and move to strike because they were introduced into evidence by them, was testified to on direct by plaintiff, and now you're telling us that those documents were not real documents.
THE WITNESS: I'm telling you --
THE COURT: It's OK. I do remember her on direct testifying that she believed this offer was never extended. It's a straightforward issue of fact. He says that it was. I think the testimony on that is pretty clear.
THE WITNESS: Thank you.
BY MR. BENJAMIN:
Q. You heard him testify today that he was not in the business of hard money lending. When you heard that today, what was your response to that statement?
A. I'm in shock. Why would he suggest to deploy my money as a hard money lender with no experience as a hand money lender?

And on top of that, I find that hard to believe because he has built properties from the ground up, and distressed properties are obtained from hard money lenders unless you buy them all cash and you have all cash to do the construction, which most people don't. He had a bevy of experience dealing with hard money loans, so I don't believe that. Again, this is more fabrication for the Court to act like he was negligent in the process. He was very experienced in the process.

Q. He testified that the point of giving this money was to allow the borrowers to refinance and reimburse you. Did you hear that testimony?

A. I did.

Q. OK. Was it your understanding that that was going to happen?

A. How was that going to happen if they were in default of the first position lender? A conventional mortgage does not allow you to refinance if you are in default with your first position lender. So according to this document that we introduced or they introduced into evidence, it showed that they were in default since 2018.

MR. BLISS: I'm going to object to referencing any document, but, again, this is the same testimony. It's not rebuttal testimony.

THE COURT: Mr. Benjamin, is there much more?

MR. BENJAMIN: No. Can we have that answer stand,

your Honor?

THE COURT: So the question was: Was it your understanding that that was going to happen? I don't think she actually gave a responsive answer. If she wants to give another answer? In other words, her answer to that question was nonresponsive.

Q. OK. Did you think that the financing was going to go through, as he testified, based on only your $188,000 that was sent?

A. I don't understand how that was possible if they were in default.

MR. BENJAMIN: Your Honor, I have nothing further. Thank you.

THE COURT: Mr. Bliss, do you have anything?

MR. BLISS: Yes, brief, Judge.

CROSS-EXAMINATION

BY MR. BLISS:

Q. Ms. Hall, did I understand you to say that you only had two communications with Walter Ciacci?

A. That's correct.

Q. From 2018 to 2022?

A. The man sent me two letters; that's correct.

Q. OK. And so there was no communication regarding the formation of the LLC?

A. No. Sonny handled all of that.

Q. No communication about the discussion of the operating agreement?

A. No. In fact, you could see the way the operating agreement was written, it wrote that Sonny was going to do the tax returns.

Q. It's a yes or no answer.

A. But I did the tax returns, so clearly I didn't speak to Walter about it.

Q. It's a yes or no answer.

Now, you heard Mr. Vataj testify that Mr. Ciacci's offices were right next door to the offices of both you and Mr. Vataj?

A. It had a separate entrance. You had to go through a receptionist. It had a wall --

Q. You would have to go out the door and walk to the next doorway?

A. I'm sorry.

Q. You would have to go out the door and walk to the next doorway?

A. I had to go out my door, walk to the law firm. You can't just talk to an attorney because you want to.

Q. Is that the reason during these four years you never went over there to ask a question, find out what was going on, express any displeasure --

A. I had my experience line of communication with Sonny, and

Sonny handled all those calls with Walter with me on the line. It wasn't like I was able to just question Walter and get into depth about different strategies.
Q. I'm sorry, but there were phone calls with you on the line --
A. Maybe three or four phone calls.
Q. -- in addition to the two letters?
A. Yes. I'm not going to dispute that. Two or three phone calls here or there over four years, yes, those did happen. They weren't in-depth discussions for an hour or two with counsel.
Q. You've answered the question already.
A. No, because you're --
Q. You've answered the question already.
A. OK. OK.
Q. But there certainly was nothing prohibiting you from communicating with either Mr. Ciacci or Mr. Della Mura?
A. No. But --
Q. There's no but. You've answered question.
A. You can't just walk into somebody's office, Mr. Bliss, and number two --
Q. It's a yes or no question. You answered it.
MR. BENJAMIN: Your Honor, it's not a yes or no question. She's trying to explain.
THE COURT: It's cross-examination. It should be a

yes or a no. If you want to elicit an explanation, that would be for you to do, Mr. Benjamin.

MR. BENJAMIN: OK.

BY MR. BLISS:

Q. At any point in time after the loan was defaulted on, did Mr. Vataj tell you that they were still trying to salvage the deal, and they were still trying to either sell the property or get financing for the property?

A. No, he did not.

Q. Now, you testified also that when the loan was made, you expected Mr. Vataj to contribute money to the LLC -- more money to the LLC?

A. Yes.

Q. OK. And notwithstanding that expectation and that it didn't happen, you did continue to search out other possible real estate investments?

A. Yes.

Q. For the next year?

A. Yes.

Q. OK. And during that process, did you ever question him, where is your additional contributions?

A. No.

Q. You did not?

A. No. I didn't have a reason to not trust the guy. He showed me --

Q. Please, ma'am, you answered the question already. You answered --
A. He showed me a letter that he had $600,000 in the bank. I had no reason to think he didn't have the funds. The fact that he didn't transfer it to the LLC didn't really matter because he had the ability to transfer it.
Q. Then why did we just have testimony on your expectation regarding that?
A. I'm sorry. Could you repeat what you are trying to get at?
Q. What I'm questioning you about is you had an expectation that he was going to contribute more money --
A. Yes. He could have contributed more money and still got us an investment property even with the loan being in default.
Q. -- in May of 2018?
A. He could have still contributed money, and we could have obtained another property even with the loan being in default.
MR. BLISS: Move to strike, your Honor. The question is not what could have happened or hypotheticals.
A. OK, so repeat the question.
Q. You testified that expected Mr. Vataj to put more money into Cache --
A. Absolutely is.
Q. -- when the loan was made?
A. Absolutely.
Q. OK. And notwithstanding your expectation, you never

questioned him on where's the money or put more money in until --
A. I absolutely questioned him, what was going on with the money. Absolutely.
Q. Not that money. His contributing more money to the LLC?
A. I wasn't concerned about it. He showed me a letter that he had $600,000. He reassured me. He gave me his word. He --
Q. So is the answer no, you did not --
A. No, the answer is not no. I did question him. He gave me his word that I was going to get that $200,000 back no matter what, that if he had to kill somebody, he was going to do it. OK? His words.
Q. OK. And he is still pursuing collecting that money, yes?
A. He did it for two years behind my back without so much as a phone call. The only reason I found out about this money, Mr. Bliss, is because we filed this lawsuit. Let's be clear. And even then, when we filed the lawsuit, they didn't tell me until they came to the deposition, so two years.
Q. Didn't we have testimony about a letter from Walter Ciacci --
A. I never got a letter from Walter Ciacci that that money was collected on my behalf.
Q. -- from 2022 asking direction on what to do to --
A. They were trying to get me to settle to give Walter $10,000 to pay a bill that I didn't even know about and accept $600 as

repayment, and I absolutely was not going to accept that. But after that --

Q. In 2022 --

A. -- him and Walter colluded for two years collecting that $46,000 behind my back, and they never once picked up the phone and called me, Mr. Bliss. The only reason I found out about the $46,000 is because I filed this lawsuit.

Q. If you could please answer the question.

A. I'm answering the question. That's the answer.

Q. Well, no, because you knew in 2022 that they hadn't collected --

A. They hadn't collected anything. What they had done is they had put a lien on Faton's son's bank account, and they were trying to get some sort of settlement going that I would agree that they would release $10,000, we would pay Walter Ciacci, and I would get $600 a month. And I was not going to agree to that, and I told Sonny and Walter that and hung up on them, OK. That's what happened. Let's be clear.

Q. So you knew they were making efforts to collect the money?

A. Those were not legitimate efforts to me to collect the money. You know what legitimate efforts would have been? If they would have filed the *lis pendens*, if they would have contacted the first position lien holder and said, hey, we want to buy the note back at a discount, and not in 2022 when it was up for auction, Mr. Bliss. He should have done it in 2019 the

minute they defaulted.
Q. And you expressed that to them?
A. I expressed what to them?
Q. All the things they should have done in 2019 when they --
A. No. I'm expressing it to you now. If I knew that that was an option in 2019, you bet your bottom dollar I would have been down in Tennessee with a lawyer protecting my money.
Q. And how would a *lis pendens* have protected you?
A. It would have at least let the court know that we had an interest in the property --
Q. Right.
A. -- and the property would not have been sold off without coming to us. And on top of that, even if you didn't want to make the argument that you didn't want to file the *lis pendens*, we should have immediately——immediately——conducted the first position lender and said, hey, what is owed on the note? Would you give to us back at a discount --
Q. Because you --
A. -- and we didn't have to get position from Faton or from Destan to make that deal go through because once they were in default, that lender would have agreed to sell the note to us. And then we would have owned that property, and then we could have worked with them on finishing the construction. And even if --
Q. So that would --

A. -- and even if Sonny didn't want to own a property in Memphis, we could have flipped it. I lost that opportunity because of this nonsense, because of these lies.
Q. What you are saying is, as we sit here today, your 200,000-dollar loan should have been turned into an excess of a million-dollar investment back in 2019 --
A. What I'm saying today --
Q. -- in order to acquire the property to flip?
A. What I am saying today is that the 2,000,000-dollar loan could have been converted into an investment property just like what we agreed to do. The purpose of Cache's formation was to get an investment property that was duplicative of the property that she had down in Tennessee. Now, was it ideal for it to be in Tennessee? No, it was not. But the fact of the matter is that either one of us could have flew down there, oversaw the construction, and basically got the job done, and then flipped the property if we didn't want to keep it in Tennessee. And Mr. Vataj hid that option from me. He hid that option from me.
Q. Because he was aware of that?
A. He is a real estate investor. What are you talking about because he was aware of that?
Q. That's a huge leap to make a $200,000 loan and assume --
A. Did he start Cache with me to purchase properties for million dollars or $1.6 million? He claimed in his testimony he made an offer to purchase the property that Otis Gore sent

us for a million dollars. He also said in his testimony, which I know you struck, that he made an offer to purchase this property back at 1.7. So which is it? You can't have it both ways. The bottom line is he formed Cache --
Q. Ma-am --
A. He formed Cache to purchase --
Q. -- this isn't an argument. I'm trying to have you answer questions without giving a speech, and then coming up with would have, could have, should have, four years ago, five years ago.
A. That's the reason for this lawsuit, Mr. Bliss. You keep abdicating -- you keep trying to act like none of this matters. The reason we formed Cache is to purchase an investment property.
Q. Nobody is asking you a question right now, ma'am.
THE COURT: Mr. Bliss, do you have much more?
MR. BLISS: I don't, your Honor.
BY MR. BLISS:
Q. Now, you indicated in your cross that when Mr. Vataj said he was not in the business of making hard money loans --
A. That's a lie.
Q. -- that's a lie. Do you know --
A. Actually, no. I won't say that's a lie. Let me correct my statement.
Q. No. I don't want you to give a speech, ma'am. I want you

to answer my question.
A. Go ahead.
Q. When you testify -- rather when you testified that Mr. Vataj, his comment that he was not in the business of making a hard money loan wasn't the case, are you aware of any other hard money loans that he has made?
A. I'm aware of him working with hard money loans. He has a lot of experience --
Q. Ma'am, that's not my question.
A. -- and that's a convenient statement to make to get a finding of negligence.
Q. That's not my question. That's not my question.
Are you aware of any hard money loans that he has made?
A. I'm aware of hard money loans that he has obtained.
Q. So that's a no?
A. I'm aware of hard money loans that he has obtained.
Q. The question was: Are you aware of any hard money loans that he has made?
A. OK.
Q. OK what?
A. I gave you my answer. That's my final answer, Mr. Bliss.
Q. OK. Is your answer --
A. That's my answer. I gave you my answer. It's not going to change.

Q. In terms of being a borrower of a hard money loan, you equate that with being a hard money lender?
A. He knew how the process worked. Let's not play stupid here, Mr. Bliss. This man had 25 years plus experience.
Q. Ma'am, I'm going to ask you just to answer the question and stop insults and characterizations and the rest of it.
A. I'm telling you: He had 25-plus years experience in real estate, real estate transactions, his own real estate transactions. He had a bevy of real estate properties.
Q. But he didn't make his money as a hand money lender?
A. Agreed.
Q. Right, because it's hard money. It has high reward but it has high risk?
A. But he made lots of money in real estate investments.
Q. But it has high reward and high risk?
A. Well, even that, I wasn't aware of but he was, and he lied to me. He acted like this was going to be an easy transaction --
Q. There's no question pending.
A. -- it wasn't a big deal, that it was going to be a flip --
Q. There's no question. I'm going to ask you to stop.
A. -- we'll get it back in six months. No worries. In fact, those were all lies.
MR. BLISS: I'm asking you to stop talking. There's no question before you. I have no other questions.

THE COURT: Thank you. Ms. Hall, you can step down.

THE WITNESS: Thank you.

(Witness excused)

THE COURT: I presume both sides want to give a closing?

MR. BLISS: Yes.

MR. BENJAMIN: Yes.

MR. BLISS: Do you want to wait or do you want to give them?

THE COURT: OK. There are certain areas I think it might be useful for you to touch upon in the closing. If you can give me a few minutes, I'd like to give some guidance in what I'd be interested in hearing about. Maybe if we could take a 10-15 minute recess?

MR. BENJAMIN: Sure. Can I approach the Court about a motion and post-trial memorandums?

THE COURT: Sure.

MR. BENJAMIN: I can do this when we come back if you would like.

THE COURT: It doesn't matter.

MR. BENJAMIN: First, I would opt for post-trial memorandums. I think that those are necessary, but I need to make a motion under Rule 15(b), which is to amend the pleadings to conform to the evidence. The evidence is closed now. I can either do this later or do it now, but we -- our case has these

three causes of action in them. And under Rule 15(b), I want to make that oral motion for two things, for two things, to add a cause of action for negligence that the defendant breached a duty of care to his partner, and she suffered damages from that, and as well a cause of action for declaratory judgment for the -- first to determine the right to the——I think it's——$47,000 that's sitting in the bank account -- in the lawyer's bank account to be turned over to Ms. Hall.

So under that oral motion, and I don't know if we'll need papers on it, but I'd like to make a post-trial under Rule 15 for negligence and declaratory judgment.

THE COURT: And, Mr. Bliss, I will give you ample time to respond, but just two things came to mind as you are making these motions. One is you currently have a claim for breach of fiduciary duty, so I don't know how that would work if you are not claiming -- is that in the alternative to a negligence action? Can you bring that if you have already a claim for breach of fiduciary duty?

MR. BLISS: Well, there's statute of limitations issues depending on what events they are relying upon to make that claim.

THE COURT: Yes. That's another point. I definitely need briefing on this.

MR. BLISS: And then if I can interrupt slightly?

THE COURT: Of course.

MR. BLISS: If we're doing post-trial memos and we're doing this motion, is there really a point to closings because we're going to be arguing new things? I get that the Court may have things you want us to lay out, but can't do we do that in our post-trial memos?

THE COURT: Yes. I don't need a regurgitation of the facts, and if you are going to do that in post-trial memos, then I definitely don't need a closing statement.

What I was going to point you to were things that ultimately are going to be legal in nature, so I didn't expect you to be fully able to answer them in your closing statement. So it might make sense for me to give you the issues on my mind at the moment, and you can address this in a post-trial memo.

However, if you are going to move to add these claims, including the declaratory judgment, that briefing should go first because then I can give you a ruling at the end once we know what the claims are if you are moving to amend.

MR. BENJAMIN: Yes. That sounds fine.

THE COURT: Mr. Bliss?

MR. BLISS: That is fine with me, Judge. So we'll have a briefing schedule on the motion, and then we'll have a date for post-trial memos?

THE COURT: I can give you a date right now for the Rule 15 motion that plaintiff wants to make. I'd rule on that and then give you -- I don't want to delay this too long

because obviously the testimony is fresh now, so I would rather just give you simultaneous schedules and just have it staggered.

MR. BLISS: That's fine.

THE COURT: So I can do that as well. And if you give me ten or 15 minutes, I can flag through the issues that I'm interested in. Did you have a question?

MR. BENJAMIN: Really quick. Just to clarify what you said about the interplay between our breach of fiduciary duty and negligence. Is it the Court's --

THE COURT: That was me talking off the top of my head because you mentioned negligence, and I immediately thought: But wait we have a breach of fiduciary duty claim, wouldn't that be encompassed?

MR. BENJAMIN: It's the Court's knee jerk reaction to say it could be duplicative. As I go to motions, I just wanted to know.

THE COURT: I'm concerned it could be duplicative. I might be wrong because I only heard about this right now. But let me look to the areas that I would like to flag for you, and I'll put together a schedule.

MR. BENJAMIN: Thank you.

THE COURT: Was there something else?

MR. BLISS: My only other thing is do you need the parties to stay?

THE COURT: No. Thank you for your time.

(Recess)

THE COURT: So these are some thoughts I had based on reviewing the case law and after having heard the testimony. So this is in no particular order, and this is with the caveat that once I get post-trial briefing, there might be additional questions. This is where right now I'd like some assistance in terms of when you start working on those briefs.

So for the fraudulent inducement/fraudulent misrepresentation claim, if you fully credit plaintiff's testimony that she was told and understood the loan to be iron clad, a good deal, an easy flip, a no-risk investment essentially is what she testified to, for this fraudulent inducement claim, is that sufficient to sustain a claim?

MR. BLISS: I can answer that now.

THE COURT: Well, no. Would plaintiff need to show that Mr. Vataj understood those statements to be false? Did he knowingly make these statements? For this claim, it would also be helpful to get some case law briefing. Do you need to show that defendant's due diligence was inadequate or that he did not conduct any due diligence at all?

So in other words, for this fraudulent inducement claim, if you credit the testimony that there was a joint venture created, did he somehow have some independent obligation to do more to investigate the loan? We talked about

getting the tax records, getting the lien records, finding out if there were any lenders with higher priority. Did he have to do more than what he did? Does anyone have any questions about that?

MR. BLISS: No.

MR. BENJAMIN: No. Thank you.

THE COURT: OK. So then for the breach of fiduciary duty claim, my understanding of how this could work is there's two possible theories here. There's one theory which would be: There were two partners entered into this joint venture, this LLC, which the case law makes clear that one partner owes the other a duty. Then there's another way this claim could go, which is there was no venture joint or LLC, and he would have owed her a duty if he had some superior knowledge that she was relying on. So as you can see, they are almost in tension with each other, right? Unless there's some theory of this case where there was the joint venture Cache was formed for purposes of finding distressed investment properties, and the loan was separate and apart from that. It was a different understanding.

So I guess I would like to get folks' briefing on what the facts in the case law are around the two ways to state this claim and what each side thinks the evidence would show based on the law. In particular, it would be helpful if plaintiff wants to either gather the facts or make an argument about what

plaintiff understood was defendant's knowledge or experience with hand money lending in particular since that is the area in which the loan was made.

MR. BENJAMIN: I'm sorry. Could you repeat that, your Honor?

THE COURT: Yes. What plaintiff understood was defendant's knowledge, experience, expertise with hard money lending specifically. I know there was a lot of testimony about real estate development or investment, real estate ownership.

The other question was what evidence would show that defendant had superior knowledge -- it's the same question, but what evidence would show that he had superior knowledge in this area of hard money lending. This is more of a legal question. But we were looking at the case law, and what we're trying to understand is what obligation he would have had to conduct any independent due diligence with regards to the loan. Or is this also a circumstance where he could have -- he simply could not have misrepresented information that he knew or omitted material information? In other words, did he have an affirmative obligation to go and conduct due diligence?

There's a claim in the complaint for unjust enrichment. An element of unjust enrichment --

MR. BENJAMIN: Sorry, your Honor. My pen ran out.

THE COURT: No worries.

MR. BENJAMIN: OK.

THE COURT: So for unjust enrichment, this is my question. Because an element of that claim was that the defendant was enriched, and the reason I'm asking is because I could have misremembered but I'm not sure I heard any testimony on that, so I'm not sure if you are continuing to pursue that claim.

MR. BENJAMIN: I don't think we are, no.

MR. BLISS: I would like to know that before we do briefs. And I'm not putting you on the spot.

MR. BENJAMIN: No, no. And it's not my memo first and then a reply, right? It's not a response?

THE COURT: For the post-trial briefing?

MR. BENJAMIN: Right. It's simultaneous?

THE COURT: You can file them simultaneously, but it would honestly be helpful to have the other side respond if you wanted to. That's always helpful.

MR. BENJAMIN: Yes.

THE COURT: But at the end of the day, for the unjust enrichment, again, unless you want to point me to the testimony, I don't think there's been any evidence to sustain the three elements of that claim.

MR. BENJAMIN: I'll withdraw the claim.

THE COURT: OK.

MR. BENJAMIN: Plaintiff will withdraw the claim.

THE COURT: I'll rule on that as part of the final opinion.

MR. BENJAMIN: We have to brief it for counsel.

MR. BLISS: Thank you.

THE COURT: But it sounds like I'm not going to get any briefing on unjust enrichment?

MR. BENJAMIN: No.

THE COURT: For negligence, obviously you should flush out whatever needs to be shown for the Rule 15 motion, and then the two things. Mr. Bliss mentioned a statute of limitations problem. I don't know if there is one or isn't. And then maybe this is duplicative, but, again, you should fully brief your Rule 15 motion.

My last question, this really goes towards the breach fiduciary duty claim. I just want to flag for both sides there might be -- and, again, I don't have the full transcript, so you should go through the transcript. But my recollection was that plaintiff testified that there was never an agreement on ownership percentages. They never discussed what the ownership of each person would be. Defendant testified that it was 50/50. In light of that conflicting testimony, one of the arguments or questions the parties should address: Was there even a formation of a joint venture which requires agreement to share in profits and losses? When you are basing a breach of fiduciary duty claim on an oral agreement, you need a meeting

of the minds on a sharing of profits and losses.

MR. BENJAMIN: Just to clarify, was there even an agreement at all with respect to profits and losses, is that what you said?

THE COURT: Well, the --

MR. BENJAMIN: The ownership --

THE COURT: The agreement would have been the Cache LLC. It wasn't in writing. I think everyone agrees that that operating agreement was never signed, so you would have to have an oral agreement to enter into this joint venture. For an oral agreement, you do need a meeting of the minds on the percentage of how the profits and losses would be shared, and there does appear to be conflicting testimony on that, which I think has different ramifications depending on which side of "v" you are on which is why I'm flagging it.

It sounds like the Rule 15 motion should come first. How much time do you want for that?

MR. BENJAMIN: I would say June 12, your Honor.

THE COURT: And Mr. Bliss?

MR. BLISS: Two weeks?

MR. BENJAMIN: It's not a very extensive one.

MR. BLISS: By the 22nd, Judge.

MR. BENJAMIN: Although -- I'm sorry. You highlight something. I think I'm going to need the transcripts for that motion.

THE COURT: For the Rule 15?

MR. BENJAMIN: I think so.

THE COURT: Yes.

MR. BENJAMIN: OK. So can I ask the Court, do you have an overall timeline for everything? In other words, a drop-dead date for memos of law at the end so we can go backwards maybe.

THE COURT: So I'd like to get you a decision, a final decision on everything, before August 21.

MR. BENJAMIN: OK. You can't really tell how long you'd want this fully submitted at this point, right?

THE COURT: I think at least I need everything sometime in mid-July, and then I would have about a month to work on it.

MR. BENJAMIN: OK. But did we determine that it's not going to be responsive? We're going to submit simultaneously and --

THE COURT: For the Rule 15, it needs to be a call and answer. You have an opposition and reply if you would like. For the post-trial briefing, if you each want to submit your formative brief, and then each have a response.

MR. BLISS: To each other.

MR. BENJAMIN: Right. So full submission of briefs by July 24, your Honor, does that work?

THE COURT: As in everything will be in by July 24?

MR. BLISS: She said mid July, I believe.

MR. BENJAMIN: Right, because we're going to finish by August 21.

MR. BLISS: I think you really want to give -- assuming we get the transcripts relatively quick, you may want to give yourself a little more time to make the motion. I'll give a week of when to respond, and then we talk about when to file briefs and then responses to the briefs.

MR. BENJAMIN: Right. OK. I would need the transcript. I think we can get a three-day transcript. I would say June 26 for my motion. I'm just picking a Friday.

THE COURT: June 26 for the Rule 15 motion?

MR. BENJAMIN: Right.

MR. BLISS: I'm only chuckling. If I say give me a week, that puts me at the Fourth of July. So could I get to the end after that week? I'm going to say --

MR. BENJAMIN: In other words, the end of --

MR. BLISS: Whatever the end of that week is. I don't even know.

MR. BENJAMIN: July 3 is a Friday.

MR. BLISS: Oh, it is.

MR. BENJAMIN: July 3 is a Friday.

MR. BLISS: Then let's do July 3. It's a little pressure on me, but that's OK.

MR. BENJAMIN: I don't anticipate it being that

extensive, but we need the transcripts.

THE COURT: For the post-trial motion?

MR. BLISS: And then you have a right to reply.

MR. BENJAMIN: OK. The reply you want to decide on the motion before -- it doesn't matter when you decide on the motion -- yeah, I guess you need to decide on the motion before our memos.

MR. BLISS: I would think --

THE COURT: I'm not looking to crunch you all up, and the summer is what the summer is.

MR. BENJAMIN: Right.

THE COURT: If you want more time, that's fine. I'm just then not going to be able to give you a decision until -- it depends, but it wouldn't be in August.

MR. BLISS: Can we work with this schedule, and if somebody needs more time, we can reach out to the Court and push it all back?

THE COURT: Yes. The other thing is you can confirm with yourselves and give me a proposal. That works too. Maybe that might be simpler.

MR. BLISS: I'm up for that.

THE COURT: Sure. I need to hear from you on the post-trial briefing schedule. You should just file a letter on the docket, and I can memo endorse it. But you need to give me a Rule 15 briefing schedule, and then the schedule on the

post-trial breaching, which will be simultaneous for the initial brief and then simultaneous responses.

Any other questions?

MR. BENJAMIN: No. Thank you.

MR. BLISS: Thank you.

THE COURT: Thank you, everyone.

(Adjourned)

o0o

INDEX OF EXAMINATION

Examination of: Page

SONNY VATAJ

Direct By Mr. Bliss . . . . . . . . . . . . . 170

Cross By Mr. Benjamin . . . . . . . . . . . . 193

Redirect By Mr. Bliss . . . . . . . . . . . . 276

Recross By Mr. Benjamin . . . . . . . . . . . 279

NANCY HALL

Direct By Mr. Benjamin . . . . . . . . . . . . 285

Cross By Mr. Bliss . . . . . . . . . . . . . . 305