UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NANCY HALL,

Plaintiff,

-v-

SONNY VATAJ,

Defendant.

No. 24-CV-2817 (VF)

**OPINION & ORDER**

**VALERIE FIGUEREDO, United States Magistrate Judge.**

Plaintiff Nancy Hall ("Plaintiff") commenced this action on April 14, 2024, bringing claims against Sonny Vataj ("Defendant") arising from an investment in an apartment complex in Memphis, Tennessee. ECF No. 1. Following a bench trial on June 2 and June 3, 2026, Plaintiff moved for leave to amend her complaint. ECF No. 51. For the reasons discussed herein, Plaintiff's motion for leave to amend the complaint is **GRANTED in part** and **DENIED in part**, judgment is entered in favor of Defendant on Plaintiff's claims in Counts I-III of the complaint, and the unjust enrichment claim in Count IV is dismissed with prejudice.

## FACTUAL FINDINGS

Between 2013 and 2022, Plaintiff, who resides in New Jersey (Court Ex. 1 at ¶ 1), operated her own business, Dash Car Service, which provided medical transportation for dialysis patients. ECF No. 56 at 5[1]; see also Court Ex. 1 at ¶ 2. Plaintiff was the sole owner of Dash. Court Ex. 1 at ¶ 2. In that role, Plaintiff solicited business, handled billing, and oversaw payroll, among other administrative tasks. ECF No. 56 at 5. Plaintiff received her GED and completed three years of credits at Fordham University. ECF No. 56 at 4-5. Plaintiff's background is as a

[1] The page numbers referenced herein for citations to the electronic docket ("ECF") are to the original pagination in those documents, unless otherwise noted.

bookkeeper and administrative assistant. Id. at 5. Plaintiff also has a real-estate license and completed "maybe one" real-estate transaction of a rental property. Id. at 5-6.

Defendant, who resides in New York (Court Ex. 1 at ¶ 1), is a licensed real-estate broker and owner and president of Tony Realty Corporation, which does business under the name Exit Realty Group. ECF No. 56 at 9, 170; see also Court Ex. 1 at ¶ 2. Defendant's real-estate brokerage business operates out of 985 Allerton Avenue in the Bronx. ECF No. 56 at 171; see also Court Ex. 1 at ¶ 2. Defendant is "prominent" and very "well known" in the community, and Defendant knew that Plaintiff trusted him. ECF No. 56 at 9, 200-02.

Plaintiff met Defendant around 2013 at a community meeting that he and she attended. Id. at 7-8, 171; see also Court Ex. 1 at ¶ 3. Plaintiff was applying for a business license in Morris Park, and the community was opposed to a car service business in the middle of a residential-retail district. ECF No. 56 at 7-8, 171-72. Plaintiff asked Defendant for help, and he helped Plaintiff with picking a location for Plaintiff's business that would be approved by the community. Id. at 8, 172-73. Plaintiff hired Defendant to help her, and Plaintiff compensated Defendant for his help in assisting Plaintiff obtain "the licenses for Dash." Id. at 8, 98, 172-73.

Their business relationship continued, and Defendant helped Plaintiff find a residence to live in that was also in the area. ECF No. 56 at 173. Plaintiff paid Defendant a commission of $10,000 or $15,000 as a broker. Id. at 98. After that, Plaintiff approached Defendant again for help. Id. at 173. At various times, Defendant assisted with various issues that arose with Plaintiff's business. Id. at 174. Defendant and Plaintiff were friends. ECF No. 56 at 173; see also Court Ex. 1 at ¶ 3.

In 2018, Plaintiff spoke to Defendant about taking over office space in a strip mall he owned, at 983 Allerton Avenue, after a tenant had moved out of the space. ECF No. 56 at 9, 175-

76. Defendant again helped Plaintiff, and as a result, Defendant became an employee of Dash and went on the company's payroll. Id. at 98, 175, 209-210. Because he did not need the money, he put it in savings. Id. at 175. Dash paid Defendant $80,000 in a 401(k). ECF No. 56 at 98. Dash also paid Defendant $30,000. Id. at 98, 194. Dash moved into the office space in Defendant's building on Allerton Avenue. Id. at 9, 175-76. Other tenants in the same building were Defendant's Exit Realty and the law firm of Della Murra and Ciacci. Id. at 176.

Around June 2018, after Plaintiff had moved into Defendant's office space, Plaintiff approached Defendant about an investment opportunity. ECF No. 56 at 10-12, 176-77. Plaintiff knew that Defendant "was extremely successful, not only as a broker, but he also owned a multitude of investment properties." Id. at 10. Plaintiff's business was "doing very well" and she had saved up some money. Id. Plaintiff wanted a vehicle that would permit her to claim tax write-offs for her business, Dash. Id. at 176-77. Plaintiff "wanted to get into some mixed use properties, similar to the types of properties Defendant already owned" because she wanted to create passive income for herself. Id. at 11. Plaintiff approached Defendant with a business venture where she suggested that they "buy a property or two." Id. at 177. She told Defendant that she would "put some money up to invest in that type of property." Id. at 11. Defendant agreed to the proposal. Id. at 11, 177.

Plaintiff and Defendant formed a limited liability company ("LLC") named Cache Realty Group LLC ("Cache") in or around June 2018. ECF No. 56 at 17-18, 177; see also Court Ex. 1 at ¶ 4. Plaintiff and Defendant were the two "members" of Cache. ECF No. 56 at 17-18; see also Pl.'s Ex. 2 at 1 (draft operating agreement). Plaintiff and Defendant agreed that Cache would be used to engage in a business venture aimed at investing in real estate (preferably mixed-use properties). ECF No. 56 at 11, 51.

Walter Ciacci, who was a partner at the law firm that was one of Defendant's tenants at the Allerton Avenue location, formed the LLC, and prepared a draft operating agreement for Cache. ECF No. 56 at 16, 176; see also Pl.'s Ex. 1. The Statement of Organization for Cache lists two members: Plaintiff and Defendant. Pl.'s Ex. 1 at 6.

Plaintiff and Defendant never signed the operating agreement. ECF No. 56 at 21, 206; Pl.'s Ex. 2. Ownership of the LLC would be split 50-50. Id. at 178, 195-97, 271-72. Defendant and Plaintiff were "partners." Id. at 196-97. The draft operating agreement also indicated that "[e]ach Member will receive an equal share of any Distribution" and that "Net Profits or Losses" will "accrue to and be borne by the Members in equal proportions." Pl.'s Ex. 2 at 2.

A bank account was opened in the name of the LLC; both Plaintiff and Defendant were signatories on the Cache account. ECF No. 56 at 181; see also Court Ex. 1 at ¶ 4. On June 8, 2018, Plaintiff transferred $100,000 into Cache's bank account. ECF No. 56 at 23-24; see also Pl.'s Ex. 3. On June 13, 2018, Plaintiff transferred another $100,000 into Cache's bank account. ECF No. 56 at 23-24; see also Pl.'s Ex. 3. The money that Plaintiff put into Cache came from the Dash business account. ECF No. 56 at 95-96. Defendant took the $30,000 paid to him by Dash and deposited the money into Cache's account on June 20, 2018. ECF No. 56 at 24-25, 129, 180-81; see also Pl.'s Ex. 3.

For purposes of filing tax returns for Cache, Plaintiff discussed with Defendant that the ownership split would be 80/20 on the tax return. ECF No. 56 at 22, 98. Defendant understood that Plaintiff wanted to "write off something of Dash to Cache" and take a "bigger loss" because she had "made a gain" in Dash. Id. at 282. Defendant agreed to the 80/20 split for the tax returns. Id. at 132. Although the draft operating agreement indicated that Defendant would "prepare or cause to be prepared" the tax returns for Cache (Pl.'s Ex. 2 at 10), Plaintiff's bookkeeper

prepared the tax returns for Cache, Plaintiff signed the tax returns, and Defendant did not review them. ECF No. 56 at 81, 208.

Plaintiff filed a tax return for Cache for tax year 2018 with various expense items, and Cache claimed a loss on its tax return for 2018. ECF No. 56 at 95-96; Def.'s Ex. 1 (2018 tax return for Cache). For example, Cache claimed an expense of $14,000 for wages, $3,654 in printing costs, $24,256 in "research and feasibility studies," and $1,368 in "advertising," which was for business cards. ECF No. 56 at 90-93; Def.'s Ex. 1 at 1, 17. Plaintiff also traveled to look at potential investment properties and expensed her meals and the cost of travel. ECF No. 56 at 90. Defendant never had a business card for Cache and did not know that Cache had business cards. Id. at 192. The salary noted on Cache's 2018 tax return was paid to Plaintiff's sister. Id. at 104. Plaintiff hired her sister as an employee of Cache; Defendant was not aware that this had been done and Plaintiff had not discussed with Defendant the idea of hiring an employee. Id. at 82, 179.

Defendant did not maintain the books and records of Cache, he was not involved in preparing the tax returns for Cache, and Defendant did not review the bank statements for Cache. Id. at 179-81. Defendant never claimed any expenses on behalf of Cache. Id. at 180. Plaintiff at times would withdraw money from Cache because it was her money, and if she needed it "for cash flow [for] Dash" she would "pull[ ] some of it out and put it back." ECF No. 56 at 133-36; see also Def.'s Exs. 4, 5.

For the 2019 tax year, Plaintiff again filed a tax return for Cache, prepared by her bookkeeper, and again claimed expenses on the tax return. ECF No. 56 at 103; Def.'s Ex. 2. Plaintiff again allocated 80% of the loss incurred by Cache to herself. ECF No. 56 at 104-05.

Plaintiff understood that Defendant would be "in charge of vetting any investment properties" and putting proposals together for her, because she had no experience working with distressed investment properties or even working with any type of properties. Id. at 12-13. Defendant also understood that his role was to find properties for Cache to invest in. Id. at 196. Defendant stressed to Plaintiff that they needed to make sure it was a property that made sense. Id. at 12-13. Defendant's philosophy was to look for a property that was "undervalued" so that he could enhance its value and then have the property become a viable income-producing property. Id. at 277. Plaintiff "presume[d] [Defendant] would be doing some sort of due diligence," such as "what the price of the property was versus what sort of work was needed on the project," and if it was a distressed property, "maybe put forth some sort of construction budget." Id. at 15.

Following the creation of Cache, Defendant searched for investment opportunities but did not identify any property consistent with their plan. ECF No. 56 at 25-26, 180. Defendant sent Plaintiff a few "listings via email," including a listing involving an investment property in Hopewell Junction, and Defendant's agents also sent Plaintiff a couple of listings for her to review. ECF No. 56 at 25-26; see also Pl.'s Exs. 4, 25 (e-mails with multiple property listings).

One of Defendant's agents sent Plaintiff information about an investment property on Westchester Avenue. ECF No. 56 at 28-29. Plaintiff and Defendant discussed the investment opportunity. Id. at 29-30. Cache submitted an offer to purchase the property for $1.15 million. Id. at 30, 213; see also Pl.'s Ex. 5. The offer had certain conditions, and Defendant believed that if the conditions were met, then the property had the potential to be a good investment for Cache. ECF No. 56 at 276-77. Cache's offer was not accepted by the seller. Id. at 214-16. Had the offer been accepted, Defendant would have obtained funding to purchase the property and would have conducted due diligence. Id. at 31, 216. For example, Defendant would have confirmed that the

property had tenants in place, and he also would have confirmed how much the tenants were paying in rent. Id. at 216-17.

Plaintiff was also looking at property listings, including in Baltimore where her daughter had a house, New Jersey, and the Bronx. Id. at 15-16, 73, 254-56; see also Pl.'s Ex. 25. Plaintiff and Defendant were looking at properties valued at $1.15 million or more and Plaintiff understood that to purchase such a property she would have to put more money into Cache, Defendant would have to put more money into Cache, and they might also need financing. ECF No. 56 at 31, 214-15. Defendant expected that he would put more money into Cache once they identified a property to buy. Id. at 214-15.

In Spring 2019, Defendant was approached by one of his agents, Faton Zogejani, about a loan opportunity. ECF No. 56 at 181-82. Faton asked Defendant if he knew anyone who could lend him money. Id. at 182. Defendant initially brushed Faton off because Defendant is not "in the business of lending." Id. at 182-83, 223.

Defendant eventually told Plaintiff about the opportunity to make a loan related to a real-property project in Tennessee, owned by an LLC known as Pendleton Court Apartments ("Pendleton Court"). ECF No. 56 at 32-33, 182-83. The LLC was owned by Faton, and Faton's uncle, Destan Seferaj, who was a developer. Id. at 33, 38. Although Faton was one of Defendant's real-estate agents, Defendant and Faton were not friends. Id. at 198, 219-20. Although Plaintiff was also a real-estate agent in Defendant's office, where Faton was employed as an agent, Plaintiff "wasn't really familiar with Faton." Id. at 37, 219.

The project in Tennessee had three buildings with an anchor tenant of FedEx and around 72 or 78 apartment units. ECF No. 56 at 32, 184. Faton told Defendant that the units were being renovated and they needed extra money to renovate 36 units, so that Pendleton Court, which was

in the process of obtaining refinancing on an existing loan from a hard money lender, could obtain a long-term loan from a "regular lender." Id. at 220, 275. Faton told Defendant that Pendleton was in the process of getting new financing for the project, but that as a condition of obtaining that new financing, they needed to complete certain repairs on the property. Id. at 275. Pendleton Court's then-existing loan was a short-term loan for about $1.6 million from Mercury Capital, which Plaintiff later discovered through her own research of public records. Id. at 42-44. Faton did not mention that Pendleton Court was in default of that loan; he told Defendant that they were "struggling" and "needed to renovate" so that they "could pay off this loan." Id. at 220.

Defendant and Plaintiff spoke about the loan, and Defendant told Plaintiff what Faton had told him. ECF No. 56 at 182-83. Plaintiff and Defendant understood that the "bridge loan" to Pendleton Court would be used for construction, to fix the 36 units, so that Pendleton could obtain a long-term loan and eventually complete other repairs in the buildings. Id. at 33-34, 275. Defendant described the loan to Pendleton Court as a "hard money loan" which is why they "would be getting a high interest rate." Id. at 34, 41-42. At that time, Plaintiff did not understand what the term "hard money loan" meant. Id. at 42, 76, 124. Plaintiff was aware that the Borrower was attempting to refinance, and she assumed "there was some sort of mortgage" on the property." Id. at 42. Defendant mentioned "in passing[ ]" that foreclosure is "something that could happen in the future." Id. at 149. Plaintiff had been eager to make some money on her investment in Cache. Id. at 182.

Defendant believed the loan to Pendleton Court was a good investment because it was a multi-family property, and the value of such properties was high at the time. ECF No. 56 at 219-224, 228. Even with the existing loan on the property, Defendant believed that there was more

than $1.5 million in equity on the property. Id. at 223. At the time Defendant recommended the investment, he did not know that Pendleton Court was in default of the $1.6 million loan. Id. at 219-24, 237. Defendant expected that the loan would be repaid in six months. Id. at 272. Defendant did not conduct a tax-history search prior to the investment to see if any taxes were owed, and he did not think it was important to look at that information. Id. at 227-28. Defendant also did not get any loan documents from Pendleton Court concerning the then-existing loan on the property. Id. at 231-32. Defendant did not specify to Plaintiff what due diligence he did to ensure the loan was a good investment. Id. at 35, 161-62. Defendant believed the loan was going to be successful. Id. at 237.

Plaintiff testified that Defendant told her it was "ironclad," a "good deal," and an "easy choice" because the money would earn interest until they found an investment property. ECF No. 56 at 36-39. Plaintiff also testified that Defendant told her he was "familiar" with "these people" and that there was "nothing to really worry about." Id. at 39.

Defendant and Plaintiff agreed to loan Faton and Destan, who owned Pendleton Court, the $200,000. ECF No. 56 at 182-83, 256, 259. Plaintiff and Defendant agreed upon the terms of the loan to Pendleton Court. Id. at 130-31.

On or about May 9, 2019, Cache made a loan to Pendleton Court (the "Borrower"). Pl.'s Ex. 8 (Promissory note); see also Court Ex. 1 at ¶ 7. Pursuant to the terms of the promissory note, the loan was guaranteed by Destan and Faton (the "Guarantors"), and the principal amount was $200,000. Pl.'s Ex. 8 at 1; see also Pl.'s Ex. 7 (Personal Guarantee); see also Court Ex. 1 at ¶ 7. The promissory note was due and payable in six months, in November 2019, and the borrowers were to pay an interest rate of 8%. Pl. Ex. 8; see also Court Ex. 1 at ¶ 7. The loan was secured by a confession of judgment and personal guaranty. Pl. Exs. 7, 15; see also Court Ex. 1

at ¶ 7. The loan would be disbursed in two installments because Defendant wanted to make sure that the borrowers were doing the work they had said would be done with the loan money. ECF No. 56 at 186-88, 262-63. Defendant and Plaintiff agreed to hire Ciacci to prepare the loan documents, and Plaintiff was aware that the Borrowers had signed a personal guarantee on the loan. ECF No. 56 at 185, 256, 259. Defendant did not present the personal guarantee and promissory note to Plaintiff to convince her to go forward with the loan; he obtained those documents to protect himself and Plaintiff. Id. at 259-61. Plaintiff was induced to agree to the loan by the personal guarantee and confession of judgment. Id. at 141, 156-57; see also Pl.'s Exs. 7, 15.

Cache disbursed $100,000 to Pendleton Court on May 13, 2019 via check (ECF No. 56 at 38; Pl.'s Ex. 9), and then disbursed $88,500 on July 3, 2019, via a wire transfer executed by Defendant (ECF No. 56 at 40; Pl.'s Ex. 10). Although the loan was for $200,000, because of fees at disbursement, the amount disbursed was only $188,500, and Cache made $21,500 in fees at the time of the initial disbursement. ECF No. 56 at 183-85. Before the second installment of the loan was disbursed (the $88,500), Defendant had conversations with Faton, and Faton sent text messages with photographs of the work that had been performed on the units. ECF No. 56 at 187, 261-62. Defendant and Faton also had FaceTime calls where Defendant could see the work that had been performed after the first disbursement of the loan to Pendleton Court. Id. at 262-63. Defendant showed the photographs to Plaintiff, but Plaintiff did not participate in the FaceTime calls. Id. The photographs that Defendant saw showed that Faton and Deston had completed roofing work, electrical work, plumbing work, and they had done other work on windows and doors in the units. Id. at 264, 267-68. Defendant did not conduct a physical inspection of the work that had been performed in Tennessee. Id. at 299-300. Defendant and Plaintiff "had

conversations" and agreed to disburse the second installment of the loan to the Borrowers. Id. at 262.

In November 2019, when payment of the loan was due, the Borrower did not make the required payment. ECF No. 56 at 55-56, 274. Defendant at that time did not attempt to seek a judgment against the Borrower. Id. at 295-96. Plaintiff felt reassured in November 2019, after the default on the loan, by the confession of judgment. Id. at 58-60.

Around December 2021, Plaintiff was going to close her business, and wanted her money returned, so she started pressuring Defendant. ECF No. 56 at 46, 66-67. Defendant attempted to enforce the promissory note. Id. at 188-90. Plaintiff was aware of the steps Defendant was taking to collect on the loan, because they had numerous conversations about it, and they also spoke to Ciacci about their options.[2] Id.

Sometime in 2022, Plaintiff hired an attorney in Tennessee who informed Plaintiff that the Tennessee property had been sold in a foreclosure auction. ECF No. 56 at 70-72; Pl.'s Ex. 22. A Substitute Trustee's Deed was filed with the Shelby County Register in Tennessee. Pl.'s Ex. 22 at 6. The deed indicated that the property owned by Pendleton Court had been sold to Mercury Capital for $1,050,000 in a foreclosure auction on February 4, 2022. Id. at 7. Shortly thereafter, Plaintiff learned from Defendant that they had lost the property. ECF No. 56 at 73-75.

---

[2] At trial, Defendant testified that when he was notified that the Tennessee property had been foreclosed, he attempted to buy it and made an offer to the bank for $1.6 million. ECF No. 56 at 238-42. Defendant testified that he had "papers" to prove he had made an offer that was rejected. Id. at 241. In a colloquy with counsel, it became clear that any documents in Defendant's possession concerning an offer to purchase the Tennessee property had not been produced in discovery by Defendant's prior counsel. Id. at 241-42. Plaintiff objected to the introduction of such testimony or documents because Defendant had not disclosed the offer in discovery. Id. at 243-51. Because the objection was sustained (id. at 247-48), the Court has not considered any testimony concerning Defendant's attempt to purchase the Tennessee property after its foreclosure.

Cache commenced proceedings against the Borrower and Guarantors. ECF No. 56 at 191-92. Cache obtained a restraining notice on bank accounts. Pl.'s Ex. 18. Cache obtained a judgment against the Borrower and the Guarantors, jointly and severally, in the Supreme Court of New York, Bronx County in the amount of $238,157.88, on May 7, 2021. Pl's Ex. 16; see also Pl.'s Ex. 19; Court Ex. 1 at ¶ 7. Defendant hired an attorney in Tennessee, and the attorney on February 7, 2022, filed notice in Tennessee state court of the New York judgments obtained by Cache. ECF No. 56 at 75, 191; Pl.'s Ex. 27. Plaintiff was aware of the steps being taken to collect on the loan. ECF No. 56 at 63, 192. In February 2022, Ciacci sent Plaintiff and Defendant a letter, explaining the steps he had taken to collect on the promissory note. Id. at 63-65; Pl.'s Ex. 19. The letter indicated that Cache had obtained a judgment in New York and that Defendant had retained counsel in Tennessee to obtain a formal lien on the Tennessee property. Pl.'s Ex. 19 at 2. The letter also noted that Cache had issued a restraining notice to two accounts at Chase Bank. Id. at 3. Ciacci sought Defendant's and Plaintiff's permission to demand that Faton pay Cache $10,000 upfront, which was held in a bank account of Faton's relative, plus $600 monthly payments beginning on April 1, 2022, all of which would go towards satisfaction of the amount owed by Pendleton Court on the promissory note. ECF No. 56 at 63-64; Pl.'s Ex. 19 at 2-3.

To date, $46,189.25 has been recovered on the loan by Cache to Pendleton Court. ECF No. 56 at 143, 189; see also Court Ex. 1 at ¶ 8. The money is being held in escrow by the firm representing Cache, Della Murra & Ciacci LLP. ECF No. 56 at 147, 189; Court Ex. 1 at ¶ 8. As of June 1, 2026, the amount owed by Pendleton Court and the Guarantors on the promissory note "exceeds $344,000," including interest. Court Ex. 1 at ¶ 7.

Defendant did not benefit in any way from the loan made by Cache to Pendleton Court. ECF No. 56 at 192. Defendant has not received any reimbursement or monies from Cache. ECF No. 56 at 152, 192-93.

At some point in 2022, Plaintiff changed the address of Cache and Cache's bank account to her home address. ECF No. 56 at 107-109, 126-27; see also Court Ex. 1 at ¶ 9. Around March 2022, Plaintiff also closed the bank account for Cache and took whatever money remained in the account. ECF No. 56 at 87, 131-32; see also Court Ex. 1 at ¶ 9.

**PROCEDURAL HISTORY**

Plaintiff commenced this action on April 14, 2024, alleging five causes of action: fraudulent inducement, concealment, and false pretenses based on alleged misrepresentations made by Defendant in Count I; breach of fiduciary duty for failing to return Plaintiff's invested funds in Count II; breach of the implied covenant of good faith and fair dealing for Defendant's failure to return Plaintiff's funds in Count III; unjust enrichment in Count IV; and an accounting in Count V.[3] ECF No. 1.

[3] An accounting is not an independent cause of action—it is a remedy. See Gurvey v. Cowan, Liebowitz & Latman, P.C., 462 F. App'x 26, 29 n.6 (2d Cir. 2012) (summary order) ("[A]n accounting is a remedy, not a separate claim."); Est. of Albin v. Mertz, LLC, No. 05-CV-3440 (KMW) (KNF), 2006 WL 8461442, at *10 (S.D.N.Y. Mar. 15, 2006) ("[P]laintiffs' claim for an accounting is not an independent cause of action but, rather, a remedy and therefore should be dismissed."). Because Plaintiff has not proven any of her claims, the remedy of an accounting is not warranted. See Alessi Equip., Inc. v. Am. Piledriving Equip., Inc., No. 18-CV-3976 (VB), 2019 WL 719252, at *4 (S.D.N.Y. Feb. 20, 2019) ("Under New York law, a plaintiff seeking an accounting, which is an equitable remedy, must allege both a fiduciary relationship between the plaintiff and defendant and a breach of that fiduciary duty by the defendant."); Druck Corp. v. Macro Fund (U.S.) Ltd., No. 02-CV-6164 (RO), 2007 WL 258177, at *2 (S.D.N.Y. Jan. 29, 2007), aff'd sub nom. by, Druck Corp. v. Macro Fund Ltd., 290 F. App'x 441 (2d Cir. 2008) ("Because the breach of fiduciary duty claim is dismissed, plaintiff has no right to an accounting, which, on that theory is a remedy."); Mexican Hass Avocado Importers Ass'n v. Preston/Tully Grp. Inc., 838 F. Supp. 2d 89, 98 (E.D.N.Y. 2012) (dismissing accounting claim because "only the existence and breach of a fiduciary duty entitle [plaintiff] to an accounting").

The Court held a bench trial on June 2 and June 3, 2026, where Plaintiff and Defendant testified as witnesses. No other witnesses testified. At the close of the bench trial on June 3, 2026, Plaintiff orally moved for leave to amend the complaint under Federal Rule of Civil Procedure 15(b). ECF No. 56 at 317-19. Plaintiff filed a written motion on June 25, 2026. ECF No. 51. Defendant filed an opposition on July 10, 2026. ECF No. 58. On June 30, 2026, after the bench trial, Plaintiff filed a request to substitute her counsel with new counsel. ECF No. 52. Plaintiff's current counsel objected due to a "substantial charging lien" that Plaintiff's counsel had on any recovery in this matter. ECF No. 54.

## CONCLUSIONS OF LAW

A. Fraudulent Inducement, Concealment and False Pretenses

To establish a claim for fraudulent inducement or fraudulent misrepresentation, a plaintiff must prove the following elements: "(1) a misrepresentation or an omission of material fact which was false and known to be false by the defendant, (2) the misrepresentation was made for the purpose of inducing the plaintiff to rely upon it, (3) justifiable reliance of the plaintiff on the misrepresentation or material omission, and (4) injury." CANBE Props., LLC v. Curatola, 227 A.D.3d 654, 656 (2d Dept. 2024) (elements of fraudulent inducement); P.T. Bank Cent. Asia, N.Y. Branch v. ABN Amro Bank N.V., 301 A.D.2d 373, 376 (1st Dep't 2003) (elements of fraudulent misrepresentation). A fraudulent-concealment claim has the same elements as a fraudulent-misrepresentation claim and the additional requirement that the plaintiff prove that the defendant had a duty to disclose the material fact and failed to do so. P.T. Bank Cent. Asia, N.Y. Branch, 301 A.D.2d at 376. A false-pretense claim has the same elements as a fraudulent-inducement claim. See, e.g., People v. Brigham, 261 A.D.2d 43, 50 (3d Dep't 1999) (noting that "[t]he term 'false pretenses' has been defined by the Court of Appeals as 'false statements about some *prior or existing facts*' . . . and, thus, contemplates a misrepresentation or an untrue

statement of fact or facts.") (emphasis in original); Vinci Brands LLC v. Coach Servs., Inc., No. 23-CV-5138 (LGS), 2025 WL 2777831, at *8 (S.D.N.Y. Sept. 29, 2025) (analyzing false pretense claim using the same elements for fraudulent inducement claim). "Each element of a fraud claim must be proved by clear and convincing evidence." Colavito v. N.Y. Organ Donor Network, Inc., 438 F.3d 214, 222 (2d Cir.), certified question accepted and answered, 8 N.Y.3d 43 (2006); Uddo v. DeLuca, 425 F. Supp. 3d 138, 153-54 (E.D.N.Y. 2019), aff'd by, 837 F. App'x 39 (2d Cir. 2020) (fraudulent inducement claim "must be proven by clear and convincing evidence"); Manley v. AmBase Corp., 126 F. Supp. 2d 743, 755 (S.D.N.Y. 2001) (fraudulent concealment claim "must be proved by clear and convincing evidence").

1. *Plaintiff failed to prove by clear and convincing evidence that Defendant knowingly made a misrepresentation of material fact.*

At trial, Plaintiff testified that she knew that the loan to Pendleton Court was a "hard money loan," as well as a "bridge loan" so that Pendleton Court could obtain a long-term loan and complete the repairs needed on the buildings. ECF No. 56 at 33-34, 41-42. Plaintiff also testified that Defendant told her that the loan was "ironclad," a "good deal," an "easy choice," and "nothing to really worry about," because the money would earn interest until they found the type of investment opportunity for which Cache was formed. ECF No. 56 at 36-39.

Statements of subjective opinion are generally not actionable in a claim based on fraud. See N. Fork Partners Inv. Holdings, LLC v. Bracken, No. 20-CV-2444 (LJL), 2023 WL 3871903, at *6 (S.D.N.Y. June 7, 2023); see also Moore v. Thomson Reuters (GRC) Inc., No. 17-CV-0211 (LGS), 2017 WL 4083582, at *6 (S.D.N.Y. Sept. 14, 2017) ("Defendant's alleged misrepresentations that relocation would be a 'great opportunity' and in Plaintiff's 'best interest' are non-actionable statements of subjective opinion."). Statements of opinion "may nevertheless be actionable as fraud if the plaintiff can [ ]prove that the holder of the opinion did not

subjectively believe the opinion at the time it was made and made the statement with intent to deceive." Bracken, 2023 WL 3871903, at *6 (alterations in original). "A fraud claim based on an expression of opinion is actionable in an appropriate case not because the opinion is objectively wrong" but because "the speaker either did not in fact hold the opinion stated or because the speaker subjectively was aware that there was no reasonable basis for it." Id.

Defendant's statements that the loan was "ironclad," a "good deal," and an "easy choice" and that Plaintiff had "nothing to really worry about" are all expressions of Defendant's subjective opinion concerning the investment. See, e.g., Moore, 2017 WL 4083582, at *6 (reasoning that statement that it was "advisable," a "great opportunity," and "a positive step" for plaintiff to accept transfer were all non-actionable statements of subjective opinion); Starke v. Krupica, No. 22-CV-4464 (DLC), 2023 WL 7326495, at *3 (S.D.N.Y. Nov. 7, 2023) (finding defendant's statement that the investment was "safe and great" was a statement of opinion that did not support a fraud claim); Ernest Lawrence Grp. v. Mktg. Americas, Inc., No. 03-CV-1510 (PKC), 2005 WL 2811781, at *5 (S.D.N.Y. Oct. 27, 2005) (reasoning that statement that individual was "credible" and a "good partner" were not actionable but rather personal opinions); Lapin v. Verner, 238 A.D.3d 1128, 1128-30 (2d Dep't 2025) (dismissing fraud claim because the representations by defendant, who "was a real estate mogul," that the investment "was 'conservative' and would generate an annual 5% return with distributions within 18 to 24 months" were "no more than vague expressions of hope and future expectation or mere opinion and puffery, and are nonactionable") (citations omitted); DH Cattle Holdings Co. v. Smith, 195 A.D.2d 202, 208 (1st Dep't 1994) (dismissing fraud claim where "[t]he only misrepresentation alleged is the statement by defendant's former agents that it was a 'safe investment'" but "such statements are generally considered [ ] not actionable statements of fact, but mere opinion and

puffery"); Tonzi v. Nichols, No. 59082, 2009 WL 2922910, at *5 (Sup. Ct. Sep. 3, 2009), aff'd by, 77 A.D.3d 1450 (4th Dep't 2010) (reasoning that for fraud and negligent misrepresentation claim, "[d]efendant's alleged representations that the investment was safe, secure, and without risk are merely opinion" were "not actionable statements of fact").

To succeed on her fraud claims given that the only alleged misrepresentation Plaintiff points to are subjective statements by Defendant of his opinion about the loan, Plaintiff must also show that Defendant did not hold those opinions or was aware that the opinions had no reasonable basis. Plaintiff has not shown that here. To the contrary, Defendant credibly testified that he believed the loan would be successful, that he expected it to be repaid in six months, and that he did not know that the Borrower was in default at the time Cache made the loan. ECF No. 56 at 219-224, 237, 272. Defendant also testified that he obtained the personal guarantee and promissory note "to protect himself and Plaintiff." ECF No. 56 at 259-61. At the time he recommended the investment, Defendant believed the loan was a good investment because the buildings were a multi-family property, and the value of such a property was high. Id. at 219-24, 228. This testimony was credible.

The evidence at trial thus establishes that Defendant recommended the investment to Plaintiff because he personally believed it would be successful. There is no evidence in the record to suggest that Defendant did not believe his statements of opinion or was aware that there was no reasonable basis to hold those opinions. See, e.g., Bracken, 2023 WL 3871903, at *6 (dismissing fraud claim as a matter of law where defendant stated that "Patriot presents a 'great opportunity' for [plaintiff]" as opinion and puffery where plaintiff provided no evidence that defendant believed the statement was false and "the fact that [defendant] may have had a motive to get [plaintiff] to invest does not mean that he subjectively did not believe Patriot was a great

investment when he made the statement"); Starke, 2023 WL 7326495, at *4 (finding plaintiff failed to state a claim for fraudulent misrepresentation because "plaintiff has failed to identify any factual statement made by the defendant at a time when there is evidence that the defendant knew the statement to be false" and that "[defendant]'s expression of optimism that the investment would prove to be sound or profitable is insufficient to support a fraudulent misrepresentation claim").[4]

*2. Plaintiff failed to prove that Defendant concealed a material fact.*

Plaintiff's fraudulent concealment claim "require[s] a misrepresentation or concealment of material fact." Entretelas Americanas S.A. v. Soler, No. 19-CV-03658 (LAK) (RWL), 2020 WL 9815186, at *7 (S.D.N.Y. Feb. 3, 2020), aff'd by, 840 F. App'x 601 (2d Cir. 2020), as amended (Jan. 7, 2021). Here, Plaintiff has not shown by clear and convincing evidence that Defendant had knowledge of any fact that he concealed from Plaintiff.

Defendant credibly testified that Faton did not tell him that Pendleton Court was in default; Faton mentioned only that Pendleton Court was "struggling" and that Pendleton Court "needed to renovate" the apartments so that they "could pay off" the hard money loan. ECF No. 56 at 220. Defendant conveyed this information to Plaintiff, and Plaintiff understood that the loan they would be extending to Pendleton Court was a bridge loan so that Pendleton Court could refinance and obtain a long-term loan to complete the needed repairs on the buildings. Id. at 33-34, 42, 183, 275. Additionally, Defendant testified that he did not know that the borrowers

---

[4] Additionally, because the alleged misrepresentations by Defendant are statements of his subjective opinion, Plaintiff also cannot prove that she reasonably relied on Defendant's opinion. See, e.g., Fierro v. Gallucci, No. 06-CV-5189 (JFB) (WDW), 2010 WL 1223122, at *13 (E.D.N.Y. Mar. 24, 2010), aff'd by, 423 F. App'x 17 (2d Cir. 2011) ("[V]aguely expressed opinions cannot provide grounds for reasonable reliance.") (collecting cases); [any other SDNY case that says subjective opinion instead of "vague" opinion?].

were in default. Id. at 219-224, 237. And because Defendant did not conduct a tax-history search or obtain any documents from Pendleton Court concerning any preexisting loan, id. at 234-36, Defendant was aware of only the information Faton provided him, which, as discussed, he fully conveyed to Plaintiff.

There thus is no evidence in the record that Defendant had material information regarding the loan or the Borrower that he concealed from Plaintiff. See Cavallo v. Am. Skandia Life Assur. Corp., No. 94-CV-2908 (CSH), 1997 WL 251538, at *13 (S.D.N.Y. May 13, 1997) (fraudulent inducement claim failed as a matter of law where plaintiff failed to provide evidence that defendant was aware of a material fact that defendant did not disclose); Town of Islip v. Datre, 245 F. Supp. 3d 397, 430 (E.D.N.Y. 2017) (dismissing fraud claim where plaintiff does not "allege that [defendants] engaged in an act of concealment because concealment requires knowledge of the material information"); Woo v. Times Enter., Inc., No. 98-CV-9171 (SAS), 2000 WL 297114, at *5 (S.D.N.Y. Mar. 22, 2000) (defendant failed to state a claim for fraud as a matter of law where defendant provided no evidence that plaintiff was aware his statement was false); Colavito, 438 F.3d at 222 (dismissing fraud claim on summary judgment where "[plaintiff] has adduced no evidence to support his assertion that the [defendants] knew" of the material fact).

In short, Plaintiff has failed to establish that Defendant made a misrepresentation or omission of material fact, as is necessary for her claims of fraudulent inducement, fraudulent concealment, and false pretenses.

B. Breach of the Implied Covenant of Good Faith and Fair Dealing

*1. Plaintiff and Defendant entered into a joint venture agreement.*

To establish a claim for breach of the covenant of good faith and fair dealing, there must be "a contractual obligation between the parties." Duration Mun. Fund, L.P. v. J.P. Morgan Sec.

Inc., 77 A.D.3d 474, 474-75 (1st Dept 2010). Here, the evidence at trial established by a preponderance of the evidence that Plaintiff and Defendant entered a contractual obligation in the form of the joint venture, Cache.

A joint venture requires evidence of: "(1) the existence of a specific agreement between two or more persons to carry on an enterprise for profit; (2) evidence in the agreement of the parties' intent to be joint venturers; (3) a contribution of property, financing, skill, knowledge, or effort by each party to the joint venture; (4) some degree of joint control over the venture by each party; and (5) the existence of a provision for the sharing of both profits and losses." In re Cohen, 422 B.R. 350, 377 (E.D.N.Y. 2010) (citing Dinaco, Inc. v. Time Warner, Inc., 346 F.3d 64, 67-68 (2d Cir. 2003)). "Parties can evince their intent to be bound in a joint venture through a written or oral agreement." Napoli v. 243 Glen Cove Ave. Grimaldi, Inc., 397 F. Supp. 3d 249, 269 (E.D.N.Y. 2019); see also Laun v. Stewart, 255 N.Y.S.3d 847, 853-54 (4th Dep't 2026) reargument denied sub nom. by, Laun on behalf of 5 & 20 Marine, LLC v. Stewart, 257 N.Y.S.3d 910 (4th Dep't 2026) (finding plaintiff pled "facts from which a joint venture can be inferred" where there was no written agreement but "Plaintiff alleges that he and the [ ] defendants formed the LLC to make improvements to and operate their business at the marina" and the parties "contributed capital from the proceeds of their business flipping houses into the LLC and contributed labor to make improvements to the marina").

Plaintiff and Defendant's agreement to enter a joint venture, Cache, to invest in real estate was memorialized in writing, although the agreement was never signed. The draft operating agreement stated that the purpose of the joint venture was "to purchase and develop real estate," that "each Member will receive an equal share of any Distribution," and that "Net Profits or Losses" will "accrue to and be borne by the Members in equal proportions." Pl.'s Ex. 2 at 2.

Although the draft agreement was unsigned, the terms memorialized in that written agreement were the same terms orally agreed to by Plaintiff and Defendant. Both Plaintiff and Defendant testified that they formed a joint venture to invest in real property. Plaintiff testified that Cache was created "to get into some sort of mixed-use properties, similar to the types of properties that [Defendant] already owned" and to give her passive income. ECF No. 56 at 11. Plaintiff approached Defendant about forming the joint venture to invest in real estate and Defendant agreed. ECF No. 56 at 10-12, 176-77. Likewise, Defendant testified that Plaintiff approached him with a business venture where "we buy a property or two." Id. at 177. Defendant agreed to form Cache with Plaintiff to invest in real estate. Id. at 11, 177.

Next, Plaintiff and Defendant each contributed money to Cache. Plaintiff contributed $200,000, and Defendant contributed $30,000. ECF No. 56 at 23-25, 129. Plaintiff testified that Defendant did not contribute any money to Cache because the $30,000 from Defendant was Plaintiff's money that Plaintiff gave Defendant to "motivate him" and as a "good will" gesture. ECF No. 56 at 24, 100. This testimony, however, was not credible. It strains credulity to believe that Plaintiff—who had the idea to create the joint venture with Defendant (id. at 10-12, 176-77)—gave Defendant $30,000 simply to "motivate him." If she believed Defendant was not motivated to participate in the joint venture, then Plaintiff would not have approached him with the idea. Instead, it seems more likely that the $30,000 payment to Defendant was, as Defendant testified, monies owed to him by Dash, Plaintiff's business, for services he rendered to Dash, and which Defendant then invested in Cache. ECF No. 56 at 8, 98, 172-73.

Additionally, Plaintiff and Defendant shared control of Cache. "A joint venture will not exist where one party has all, or virtually all, of the management of the business, and the other lacks independent decision-making authority or co-management or control." Hodnett v. Medalist

Partners Opportunity Master Fund II-A, L.P., No. 21-CV-00038 (JLR), 2025 WL 2607548, at *16 (S.D.N.Y. Sept. 9, 2025) (internal quotation marks, alterations, and citations omitted). However, each joint venturer need not exercise "the *same* degree of management control." Id. (noting that the relevant inquiry is "whether a member of the venture had *any* measure of control over decision-making") (emphasis in original).

Both Plaintiff and Defendant were signatories on the bank account for Cache. ECF No. 56 at 181; see also Court Ex. 1 at ¶ 4. Both parties contributed services to the joint venture by looking for investment properties. See, e.g., ECF No. 56 at 25-26 (Plaintiff testifying that she sent listings to Defendant, and Defendant and Defendant's agents also sent Plaintiff potential listings), id. at 90 (Plaintiff testifying that she traveled to look at properties), id. at 180 (Defendant testifying that he made efforts to locate possible business opportunities for Cache). Additionally, Plaintiff had the ability to move money in and out of Cache's bank account, and prepared the tax returns for Cache. ECF No. 56 at 81-83, 90-93, 133-36, 208; see also Def.'s Exs. 1, 4, 5. And when Defendant suggested the loan to Pendleton Court, both Plaintiff and Defendant had to agree to disburse the money from Cache's account. ECF No. 56 at 130-31, 182-83, 256, 259. These facts collectively establish that Plaintiff and Defendant each had some degree of control over Cache. See, e.g., Slinin v. Shnaider, No. 15-CV-9674 (RJS), 2018 WL 11447252, at *2 (S.D.N.Y. July 18, 2018) (finding control over joint venture established where there was evidence defendant "[found] buyers, shepherd[ed] them through the sales process, and execut[ed] related banking transactions" and "participated in major partnership decisions"); Richbell Info. Servs., Inc. v. Jupiter Partners, L.P., 309 A.D.2d 288, 298 (1st Dep't 2003) (finding a joint venture was sufficiently alleged even without a signed agreement where each party was given some control over the stock).

Finally, the evidence establishes that Plaintiff and Defendant agreed to split any profits equally. Defendant testified that he and Plaintiff were partners and the profits and losses of Cache would be split 50-50. ECF No. 56 at 178, 195-97, 271-72. Consistent with Defendant's understanding that profits and losses would be split 50-50, Plaintiff testified that she expected Cache "to be a partnership." Id. at 15-16. Plaintiff's testimony about her expectation that the relationship was a partnership itself suggests equal distributions among the two members, and is consistent with the terms of the draft operating agreement. Moreover, the draft agreement indicated that "each Member will receive an equal share of any Distribution" and that "Net Profits or Losses" will "accrue to and be borne by the Members in equal proportions." Pl.'s Ex. 2 at 2.

Plaintiff testified that when Cache was formed "[n]othing was finalized" as to how money and ownership would be divided. ECF No. 56 at 21-22, 128-29, 132. But that testimony was not credible. It is implausible that Plaintiff would have handed over $200,000 without having an understanding as to how profits and losses from the partnership would be split. Likewise, it does not seem plausible that Defendant would have agreed to a partnership and contributed $30,000 towards that partnership, without understanding how profits or ownership would be allocated. Additionally, Plaintiff testified that she expected that Defendant would either match her money or contribute more money to Cache. Id. at 31. And Defendant confirmed that he expected to deposit more money in Cache's account once an investment property was identified. Id. at 216. In other words, although Plaintiff's investment exceeded Defendant's financial contribution when Cache was formed, the parties understood that Defendant would at some point invest more money into the joint venture.

In sum, the record establishes that Plaintiff and Defendant entered a joint venture. Napoli, 397 F. Supp. 3d at 269 (finding the parties entered into a joint venture agreement even without a written agreement where "the credible testimony regarding the profit-sharing arrangement, the division of responsibilities, and the conduct of the parties . . . demonstrates an intent to enter a joint venture").[5]

2. *Plaintiff failed to establish a breach of the implied covenant of good faith and fair dealing.*

Under New York law, a duty of good faith and fair dealing is implied in every contract, to the effect that neither party "shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 407 (2d Cir. 2006) (citation omitted). The implied covenant does not include any term inconsistent with the terms of the contractual relationship, or "create duties which are not fairly inferable from the express terms of that contract." Interallianz Bank AG v. Nycal Corp., No. 93-CV-5024 (RPP), 1994 WL 177745, at *8 (S.D.N.Y. May 6, 1994); see also Scottsdale Ins.

[5] The oral joint venture agreement here would not be barred by the Statute of Frauds, because there was no testimony that the parties agreed (or even considered) that the joint venture had a durational term in excess of one year, and the joint venture was created for a stated purpose that could have been achieved within one year. See, e.g., Ramgoolie v. Ramgoolie, No. 16-CV-3345 (VEC) (SN), 2017 WL 9565534, at *7 (S.D.N.Y. May 31, 2017) ("New York case law suggests that, generally, the Statute of Frauds is inapplicable to oral agreements to form a joint venture, unless the joint venture itself has a specified durational term that exceeds one year.") (collecting cases); In re Cohen, 422 B.R. at 377 n.10 ("The Statute of Frauds is generally not applicable to an oral joint venture agreement, even an oral joint venture agreement to purchase and sell real property to third parties, when that joint venture is capable of being performed within one year."); Abed v. Azar, No. 08-CV-4404 (NRB), 2010 WL 103867, at *3 (S.D.N.Y. Jan. 5, 2010) (explaining that if "the joint venture is not for a stated term but for a stated purpose, the Statute of Frauds will not act as a bar to enforcement if it is possible that the purpose could be achieved in one year"); cf. Rivkin v. Coleman, 914 F. Supp. 76, 79 (S.D.N.Y. 1996) (finding oral joint venture agreement barred by the statute of frauds where plaintiff testified to an agreement that contemplated a "long range plan for an annual and ongoing program" that "was to continue for eternity" and that the parties were to be "partners forever on the [ ] venture") (internal quotation marks and citations omitted).

Co. v. McGrath, 549 F. Supp. 3d 334, 353 n.6 (S.D.N.Y. July 19, 2021) ("The duty of good faith and fair dealing is a doctrine that reads into a contract a term that is not expressed but is necessary to give the agreement meaning and to prevent it from being illusory."). Nor can it "be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights." Nasdaq, Inc. v. Exch. Traded Managers Grp., LLC, 431 F. Supp. 3d 176, 252 (S.D.N.Y. 2019) (quoting Peter R. Friedman, Ltd. v. Tishman Speyer Hudson Ltd. P'ship, 107 A.D.3d 569, 570 (1st Dep't 2013)).

Instead, the implied covenant includes promises that a "reasonable person in the position of the promisee would be justified in understanding were included" in the contract and, when the contract involves the exercise of discretion, a promise "not to act arbitrarily or irrationally in exercising that discretion." Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995) (citation omitted); see also 511 W. 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153 (2002) (explaining that the covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract"). "For an action to be 'arbitrary' it must be without sound basis in reason and generally taken without regard to the facts." Bibicheff v. Chase Bank USA, N.A., No. 17-CV-4679 (DRH) (AYS), 2018 WL 4636817, at *4 (E.D.N.Y. Sept. 26, 2018) (internal quotation marks, alteration, and citation omitted).

"[S]ince there is a presumption that all parties act in good faith, the burden of proving a breach of the covenant of good faith and fair dealing is on the person asserting the absence of good faith." Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 98 (2d Cir. 2007) (quoting 23 Williston on Contracts § 63:22 (4th ed. 2006)). A claim must be proven by a preponderance of the evidence. Cap. Sec. Sys. W.L.L. v. L-3 Commc'ns Sec. & Detection Sys.,

Inc., No. 16-CV-3687 (PKC), 2018 WL 4666072, at *7 (S.D.N.Y. Sept. 28, 2018); Design Partners, Inc. v. Five Star Elec. Corp., No. 12-CV-2949 (PKC), 2018 WL 3636700, at *17 (E.D.N.Y. Feb. 24, 2018).

The parties created Cache to invest in real property. ECF No. 56 at 11, 51, 176-77. As an initial matter, the parties' agreement is completely silent as to Defendant's obligation to conduct due diligence with regards to any type of investment. But even if their agreement presumed an obligation that Defendant would conduct due diligence prior to the purchase of any real estate property, it cannot be inferred that such an implied obligation existed where Cache did not use the money for the purpose initially intended by the parties. "Nor can the implied covenant impose new duties outside the scope of the contract." Benex LC v. First Data Merch. Servs. Corp., No. 14-CV-6393 (JS) (AKT), 2016 WL 1069657, at *3 (E.D.N.Y. Mar. 16, 2016).

Here, the parties went beyond the scope of their joint venture—to purchase "mixed used properties similar to the types of properties Defendant already owned"—and instead extended a hard money loan. ECF No. 56 at 11. Imposing an obligation to conduct due diligence under these circumstances would improperly create a new duty outside the scope of the parties' original agreement. See Broder v. Cablevision Sys. Corp., 418 F.3d 187, 198-99 (2d Cir. 2005) (finding implied covenant "cannot transform an obligation to refrain from changing the customer's rates except in accordance with applicable law into an affirmative obligation to change his rates" because the covenant "can only impose an obligation consistent with other mutually agreed upon terms in the contract") (internal quotation marks and citation omitted).

Nor can it be said that Defendant acted so arbitrarily or irrationally in exercising his discretion when he recommended that Cache extend a loan to Pendleton Court. To be sure, Defendant did not investigate the financial condition of the borrower prior to recommending the

loan, but at most such conduct was imprudent or inept business judgment, and "a party bringing a claim for breach of the implied covenant 'must show substantially more than evidence that the defendant's actions were negligent or inept.'"[6] Bus. Exposure Reduction Grp. Assocs., LLC v. Pershing Square Cap. Mgmt., L.P., 549 F. Supp. 3d 318, 334 (S.D.N.Y. 2021) (quoting Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y, 769 F.3d 807, 817 (2d Cir. 2014)).

Defendant testified that he believed the loan was a good investment, because it was a multi-family property and "the value was there." ECF No. 56 at 219-224, 228. He further testified that even with the existing loan on the Tennessee property, he believed that there was more than $1.5 million in equity on the property. Id. at 223. With the benefit of hindsight, Defendant's decision not to investigate the status of the already existing loan was unwise, but it is not the sort of arbitrary and irrational decision that would result in a breach of the implied covenant of good faith and fair dealing. See, e.g., Bus. Exposure Reduction Grp. Assocs., LLC , 549 F. Supp. 3d at 334 (dismissing claim for breach of implied covenant where "[e]ven assuming that [defendant] acted ill-advisedly in failing to close out its [ ] position when [plaintiff] allegedly recommended that it do so," plaintiff had only shown defendant made a "mistaken business decision"); Lykins v. IMPCO Techs., Inc., No. 15-CV-2102 (PGG), 2018 WL 3231542, at *10 (S.D.N.Y. Mar. 6, 2018) ("While Plaintiffs have offered evidence that [defendant] mismanaged the [ ] business, they have provided no evidence of bad faith[;] [t]here is simply no evidence that [defendant's] allegedly poor and incompetent management decisions were undertaken with the purpose of depriving Plaintiffs"); Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC, 706 F. Supp. 3d 409, 436 (S.D.N.Y. 2023), aff'd by, No. 24-CV-159, 2025 WL 1374732 (2d Cir.

[6] For the reasons discussed infra at Section E.2, Plaintiff also fails to establish that Defendant's actions were negligent.

May 13, 2025) (dismissing breach of implied covenant claim after trial where plaintiff pointed to no bad faith by defendant and rejecting plaintiff's argument that defendant "could have, and should have, done more to complete the [project]" because "this is not the test for bad faith"); Medacist Sols. Grp., LLC v. CareFusion Sols., LLC, No. 19-CV-1309 (JMF), 2021 WL 293568, at *14 (S.D.N.Y. Jan. 28, 2021) (granting summary judgment on breach of implied covenant claim where "there is no evidence in the record that any delays by Medacist in notifying CareFusion of RxA Solution installations were in bad faith"); Behren v. Warren Gorham & Lamont, Inc., 808 N.Y.S.2d 157, 158 (1st Dep't 2005) (affirming dismissal of claim for breach of implied covenant where the "alleged mismanagement" of assets by defendant "was due to ineptitude, not an intention to prevent plaintiffs from realizing incentive compensation"); cf. Fishoff v. Coty Inc., 634 F.3d 647, 653 (2d Cir. 2011) (defendant's actions were arbitrary and irrational and breached the implied covenant of good faith and fair dealing when the defendant cut its share price by 50% to devalue plaintiff's stock options, in addition to conducting an unjustified post hoc valuation that applied only to the plaintiff's options).

Finally, there is no evidence that Defendant acted for his own gain. Sec. Pac. Nat. Bank v. Evans, No. 22899/92, 2008 WL 270558, at *3 (Sup. Ct. Jan. 14, 2008), aff'd as modified, 62 A.D.3d 512 (1st Dep't 2009) (dismissing breach of the implied covenant claim where party failed to show that counterparty acted malevolently, "for its own gain as part of a purposeful scheme designed to deprive her of the benefits of the fruit of her bargain under the Settlement Agreement") (internal quotation marks and alterations omitted); Ray Legal Consulting Grp. v. DiJoseph, 37 F. Supp. 3d 704, 726 (S.D.N.Y. 2014) (dismissing breach of implied covenant claim where plaintiff alleged neither "malevolent conduct nor a purposeful scheme designed to deprive Plaintiff of receiving the escrowed funds"); Bank of Baroda v. Harsh Imps., Inc., No. 22-

CV-2257 (GHW), 2023 WL 2601613, at *8 (S.D.N.Y. Mar. 22, 2023) (dismissing plaintiff's breach of implied covenant claim as a matter of law where party's "conduct here was not malevolent and did not deprive Defendants of the benefits of the Agreements"). In that regard, Plaintiff adduced no evidence that Defendant received any personal benefit from the loan to Pendleton Court. When asked if Defendant received a "nickel" from the agreement, Plaintiff testified that she did not know. ECF No. 56 at 146-47. And after the Borrower's default on the loan, Defendant made efforts to have the money returned, ultimately securing a judgment in Tennessee state court. ECF No. 56 at 75, 191; Pl.'s Ex. 27. In short, the evidence at trial does not demonstrate that Defendant's conduct was malevolent.

In sum, Plaintiff has failed to prove that Defendant breached of the implied covenant of good faith and fair dealing.

C. Breach of Fiduciary Duty

To establish a claim for breach of fiduciary duty, a plaintiff must prove the existence of "a fiduciary relationship between the parties" and breach of that fiduciary duty. Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC, No. 17-CV-307(PKC), 2021 WL 4460547, at *11 (S.D.N.Y. Sept. 29, 2021), amended, 2021 WL 4710787 (S.D.N.Y. Oct. 7, 2021). "A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Harrington v. Ortolani, 247 A.D.3d 733, 737 (2d Dep't 2026). A claim for breach of a fiduciary duty must be established by a preponderance of the evidence. Marini v. Adamo, 995 F. Supp. 2d 155, 178 (E.D.N.Y. 2014), aff'd by, 644 F. App'x 33 (2d Cir. 2016).

As members of a joint venture, Plaintiff and Defendant owed each other fiduciary duties. See Argilus, LLC v. PNC Fin. Servs. Grp., Inc., 419 F. App'x 115, 119 (2d Cir. 2011) (summary

order) ("Under New York law, participants in a joint venture owe one another the same fiduciary duties that inhere between members of a partnership.").[7] "Although there is no set formulation of the fiduciary duties of partners," E-Glob. Alls., LLC v. Anderson, No. 10-CV-2844 (KMK) (PED), 2011 WL 8879268, at *8 (S.D.N.Y. May 11, 2011), adopted by, 2012 WL 3656042 (S.D.N.Y. Aug. 25, 2012), a partner breaches their fiduciary duty by failing to disclose all material facts or engaging in self-dealing. See, e.g., In re L&N Twins Place LLC, No. 20-CV-1858 (KMK), 2020 WL 7211235, at *4 (S.D.N.Y. Dec. 4, 2020) ("New York law relatedly imposes on managers of an LLC the duty to make full disclosure of all material facts.") (internal quotation marks and citation omitted); Yorizzo v. Maplecorp, LLC, No. 70216/2017, 2023 WL 5811593, at *14 (Sup. Ct. Aug. 25, 2023) ("Parties to a joint venture agreement owe a fiduciary duty to the other, which is breached by concealing business dealings and failing to disclose pertinent information to the other."); Madison Hudson Assocs., LLC v. Neumann, No. 604263/01, 2005 WL 1941229, at *12 (Sup. Ct. June 29, 2005) (explaining that "co-venturers may not engage in self-dealing, and are otherwise under an affirmative duty to communicate business opportunities to one another") (internal citation omitted); Brittany Dying & Printing Corp. v. Griseto, No. 96-CV-9218 (WK), 2000 WL 1717554, at *4 (S.D.N.Y. Nov. 16, 2000) (finding defendant's misappropriation of funds from the account of joint venturers was a breach of fiduciary duty).

There is no evidence in the record that Defendant failed to disclose any information to Plaintiff or engaged in any self-dealing. To the contrary, the record is devoid of any evidence

[7] "It is well settled that a joint venture is in a sense a partnership for a limited purpose, and it has long been recognized that the legal consequences of a joint venture are equivalent to those of a partnership, and, as a result, it is proper to look to the Partnership Law to resolve disputes involving joint ventures." Eskenazi v. Schapiro, 27 A.D.3d 312, 314-15 (1st Dep't 2006) (internal quotation marks, alterations, and citation omitted).

that Defendant misrepresented any fact or failed to disclose any information to Plaintiff in connection with the loan to Pendleton Court. See Est. of Ginor v. Landsberg, 960 F. Supp. 661, 671-72 (S.D.N.Y. 1996), aff'd sub nom. by, Ginor v. Landsberg, 159 F.3d 1346 (2d Cir. 1998) (granting summary judgment on breach of fiduciary duty claim where there was no evidence that defendants failed to disclose material information). There is also no evidence that Defendant personally benefited in any way from the loan to Pendleton Court.

Finally, to the extent Plaintiff's testimony at trial would suggest that she relied on Defendant's superior knowledge, such reliance would not save Plaintiff's fiduciary duty claim, where there is no evidence that Defendant exercised de facto control and dominance over Plaintiff. See Trahan v. Lazar, 457 F. Supp. 3d 323, 347 (S.D.N.Y. 2020) (noting the Second Circuit's guidance that "at the heart of the fiduciary relationship lies reliance, and de facto control and dominance"). Where courts have found the existence of a fiduciary duty based on one party placing their confidence in another due to that person's superior knowledge, the party with the superior knowledge also exercised dominion and control. Rhoda v. Rhoda, No. 14-CV-6740 (CM), 2017 WL 11530950, at *20 (S.D.N.Y. June 22, 2017) (finding defendant, who was plaintiff's mother, had a fiduciary duty to plaintiff where she exercised "extensive (if not exclusive) control over their finances"); Benfeld v. Fleming Props., LLC, 89 A.D.3d 654, 655 (2d Dep't 2011) (finding issue of fact as to whether defendant exercised the requisite dominion and control to establish a fiduciary duty).

Here, the record is devoid of any suggestion that Defendant exercised the necessary "control and dominance" over Plaintiff. See, e.g., Schulman v. Delaire, No. 10-CV-3639 (HB), 2011 WL 672002, at *4 (S.D.N.Y. Feb. 22, 2011) ("Although Plaintiffs turned to [defendant] for information and an introduction to Madoff, they have failed to show the kind of reliance and de

facto control and dominance, which are required to establish a fiduciary relationship.") (internal citation omitted); Jobanputra v. Kim, No. 21-CV-7071 (ER), 2022 WL 4538201, at *8 (S.D.N.Y. Sept. 28, 2022) (finding no fiduciary duty where defendant "held no such discretion over how the parties used his equity; dual consent was required"); Lynch v. Nat'l Prescription Adm'rs, Inc., No. 03-CV-1303 (GBD), 2019 WL 761194, at *8 (S.D.N.Y. Jan. 31, 2019), aff'd sub nom. by, Lynch as Tr. of Health & Welfare Fund of Patrolmen's Benevolent Ass'n of N.Y. & Retiree Health & Welfare Fund of Patrolmen's Benevolent Ass'n of N.Y. v. Nat'l Prescription Adm'rs, Inc., 795 F. App'x 68 (2d Cir. 2020) (finding no fiduciary duty established where the evidence was that defendant invited plaintiff to "participate in discussions of what drugs should be included in the formulary, rather than making decisions on the Funds' behalf" but no evidence that defendant "exercised the level of de facto control or dominance"); Petrello v. White, 344 F. App'x 651, 653-54 (2d Cir. 2009) (one party did not owe a fiduciary duty to the other because the record contained no evidence "that would permit a reasonable fact-finder to conclude that [the party] exercised 'de facto control' or 'dominance' over [the other], both '[e]ssential elements' of a fiduciary duty claim"). Instead, Plaintiff testified that she was aware of the terms of the loan to Pendleton Court, and that she approved disbursement of the loan to Pendleton Court. ECF No. 56 at 124, 130-31. For these reasons, Plaintiff's breach of fiduciary duty claim also fails.

D. Unjust Enrichment

During trial, Plaintiff confirmed that she was not pursuing her claim for unjust enrichment. ECF No. 56 at 324-25. The claim is thus dismissed with prejudice. See, e.g., Kohner v. Wechsler, 477 F.2d 666, 667 (2d Cir. 1973) (affirming dismissal of claims where "[n]o proof was adduced at trial as to this claim"); K. Mortg. Corp. v. Liberty Lending Corp., No. 97-CV-

8519 (AKH), 1999 WL 61812, at *2 n.1 (S.D.N.Y. Feb. 10, 1999) (determining that dismissal of claims "at this late stage of the proceedings, just before trial, is with prejudice").

E. Plaintiff's Motion for Leave to Amend the Complaint.

At the close of trial, on June 3, 2026, Plaintiff orally moved for leave to amend her complaint. ECF No. 56 at 317-19. In her motion for leave to amend, Plaintiff requested amendment to "conform to the evidence in this matter," add new claims for negligence and negligent misrepresentation, and add a request for a declaratory judgment deeming Plaintiff entitled to any proceeds collected from the judgment against Pendleton Court. ECF No. 51. Defendant opposed the motion on July 10, 2026. ECF No. 58. For the reasons discussed herein, leave to amend the complaint is denied as to Plaintiff's request to add claims for negligence and negligent misrepresentation. The motion is granted as to Plaintiff's request for a declaratory judgment.

*1. Legal Standard*

Federal Rule of Civil Procedure 15(b) permits a district court to amend pleadings after trial to conform to the evidence produced at trial. Under Rule 15(b)(1), "[i]f, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended" and the court "should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits." Fed. R. Civ. P. 15(b)(1). Under Rule 15(b)(2), "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings," and "[a] party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue." Fed. R. Civ. P. 15(b)(2).

A Rule 15(b) motion should be granted only "if the party against whom the amendment is offered will not be prejudiced by the amendment." Hillburn v. Maher, 795 F.2d 252, 264 (2d Cir. 1986). "Generally, introducing new claims for liability on the last day of trial will prejudice the defendant." Gussack Realty Co. v. Xerox Corp., 224 F.3d 85, 94 (2d Cir. 2000).

Courts considering post-trial Rule 15(b) motions apply a two-prong test. "First, if the parties presented the evidence and tried the issues by express or implied consent, the court must grant the motion to amend the pleadings. Second, if the parties did not consent to trying the issues, the court has the discretion to grant the motion to amend the pleadings and may do so if the amendment will not prejudice the opposing party and if the interests of justice require the amendment." NextG Networks of N.Y., Inc. v. City of New York, No. 03-CV-9672 (RMB) (JCF), 2006 WL 8456389, at *3 (S.D.N.Y. Dec. 5, 2006) (internal quotation marks, alterations, and citations omitted); see also L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc., 558 F. Supp. 2d 378, 387 (E.D.N.Y. 2008), aff'd, 710 F.3d 57 (2d Cir. 2013). "The decision as to whether to allow such an amendment is left to the discretion of the district court judge." L.I. Head Start Child Dev. Servs., Inc., 558 F. Supp. at 387.

*2. Discussion*

Leave to amend under Rule 15(b) can be denied where amendment would be futile. See, e.g., Campbell v. City of New York, No. 99-CV-5129 (LTS) (THK), 2003 WL 660847, at *4 (S.D.N.Y. Feb. 27, 2003), aff'd by, 93 F. App'x 315 (2d Cir. 2004) (denying Rule 15(b) motion to amend after jury trial as futile); Sparta Com. Servs., Inc. v. DZ Bank, 680 F. App'x 17, 19 (2d Cir. 2017) (summary order) (noting that "[a] motion to amend pursuant to Rule 15(b)(2) may properly be denied [ ] when amendment would be futile") (summary order). Here, even assuming that Defendant impliedly consented to the introduction of evidence relevant to Plaintiff's unpled

claims of negligence and negligent misrepresentation, and even assuming that adding those claims after the close of trial would not prejudice Defendant, any amendment is futile. For that reason, leave to amend to add claims for negligence and negligent misrepresentation is denied.

Beginning with Plaintiff's negligent misrepresentation claim, plaintiff must prove "'that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.'" Blank v. TriPoint Glob. Equities, LLC, 338 F. Supp. 3d 194, 217-18 (S.D.N.Y. 2018) (quoting Anschutz Corp. v. Merrill Lynch & Co., Inc., 690 F.3d 98, 114 (2d Cir. 2012)). Separate and distinct from the lack of a duty arising from a special relationship, this claim fails because, as discussed, Defendant did not make a false representation to Plaintiff. See supra Section A. The cases cited by Plaintiff (ECF No. 51-4 at 14-15) only underscore how Defendant's actions do not constitute a negligent misrepresentation and do not counsel a different result. See Ongor v. Highmore Grp. Advisors, LLC, 2024 WL 772502, at *2 (Sup. Ct. Feb. 25, 2024) (finding plaintiff had sufficiently alleged a claim for negligence and negligent misrepresentation against defendant investment advisor in gold purchase where defendant told plaintiff it "conducted due diligence at every level" and confirmed the gold existed even though defendant had not conducted due diligence); Bravura Priv. Wealth PTY Ltd. v. Cadmus Asset Mgmt., Ltd, 2018 WL 500456, at *1 (Sup. Ct. Jan. 22, 2018) (finding plaintiff had adequately alleged a claim for negligent misrepresentation where defendants had "represented to plaintiffs that defendants were working with licensed, high yield traders in the United States and had met the traders and their licensed trade principals several times" and "had

completed due diligence on the traders and determined that they were licensed, regulated and in good financial standing" where defendants had not).

Turning to Plaintiff's negligence claim, Defendant argues that Plaintiff's negligence claim is barred by the statute of limitations.[8] ECF No. 58 at 6-7. "The statute of limitations for a negligence action in New York is three years," Ventarola v. Narvaez, No. 18-CV-3231 (PMH) (BCM), 2021 WL 1536540, at *7 (S.D.N.Y. Feb. 16, 2021), adopted by, 2021 WL 839454 (S.D.N.Y. Mar. 5, 2021), and runs from when the injury occurred. See Coleman & Co. Sec. v. Giaquinto Fam. Tr., 236 F. Supp. 2d 288, 299 (S.D.N.Y. 2002) ("A negligence claim accrues on the date of injury, that is, when the cause of action is complete and a plaintiff may plead all the required elements of his or its claim.") (internal citation omitted).

Here, Plaintiff's claim for negligence is based on Defendant's conduct in failing to conduct due diligence in connection with the loan to Pendleton Court before recommending the investment to Plaintiff. See ECF No. 51-4 at 10-12. Any injury stemming from the loan would have occurred when Cache disbursed the money to the Borrower, which was completed by July 3, 2019, when the final wire transfer was executed (ECF No. 56 at 40; Pl.'s Ex. 10). See Fisher v. N.Y. Chase Manhattan Bank, No. 16-CV-6030 (VSB), 2018 WL 1274560, at *3 (S.D.N.Y. Mar. 8, 2018), aff'd sub nom. Fisher v. JPMorgan Chase Bank, N.A., 740 F. App'x 745 (2d Cir. 2018) (negligence claim based on failure to conduct due diligence before extending loan accrued upon injury which "occurred upon the issuance of the Loan"); Kelly v. Park Place Home Mortg. Corp., No. 05-CV-5720 (ADS) (ETB), 2006 WL 8435452, at *6 (E.D.N.Y. Dec. 23, 2006) (reasoning

[8] A claim for negligent misrepresentation has a six year statute of limitations. Meyer v. Seidel, 89 F.4th 117, 129 (2d Cir. 2023) ("As to a claim of negligent misrepresentation, New York law makes no express provision for a limitations period. Such a claim, when it rests on a theory akin to fraud, is subject to the catch-all limitations period provided in N.Y. C.P.L.R. § 213(1), which is six years.").

that statute of limitations on negligence claim stemming from loan began to run at closing of loan). Even if the statute of limitations did not begin to run until the Borrower defaulted on the loan, the injury would have occurred in November 2019, when Pendleton Court missed the deadline for repayment (ECF No. 56 at 55-56, 274). See Ruso v. Morrison, 695 F. Supp. 2d 33, 45 (S.D.N.Y. 2010) ("[Plaintiff] was not injured by [defendant]'s negligence in failing to adequately investigate or authenticate the 'guarantee' until there was a default on the original agreement. At that point, the 'guarantee' became effective and its inadequacy caused [plaintiff] to be injured."). In either case, Plaintiff's proposed negligence claim had to be filed, at the latest, before November 2022 to be timely.[9] And Plaintiff did not commence this action until April 14, 2024. ECF No. 1.

But even if Plaintiff's negligence claim is not time-barred, it is futile. To establish a claim for negligence, Plaintiff must prove "(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'" Caronia v. Philip Morris USA, Inc., 715 F.3d 417, 428 (2d Cir. 2013). "Ordinarily there is no duty to exercise due diligence[.]" Banque Franco-Hellenique de Com. Int'l et Mar., S.A. v. Christophides, 106 F.3d 22, 27 (2d Cir. 1997); see also Hamilton v. Beretta U.S.A. Corp., 264 F.3d 21, 28 (2d Cir. 2001) (noting that "a plaintiff cannot recover on a negligence claim absent

[9] Plaintiff's injury occurred when she had a right to a return of the funds—not when her subsequent actions to recover those funds failed—and for this reason, the injury would have occurred long before the confession of judgment was entered in New York (Pl.'s Ex. 16) or when Pendleton Court Apartments was sold (Pl.'s Ex. 22). See, e.g., In re Tapmasters Chelsea, LLC, 621 B.R. 580, 587 (Bankr. S.D.N.Y. 2020) ("Any 'injury' in this case occurred only when [plaintiff] had the right to a return of the funds."); Allen v. Devine, No. CV 09-0668 (ETB), 2012 WL 832298, at *4 (E.D.N.Y. Mar. 12, 2012) ("The injury to [plaintiff] occurred when the money he invested . . . was allegedly wrongfully misappropriated by defendants. None of the actions alleged . . . in the Third-Party Complaint could have worsened [plaintiff's] injuries since the money was already gone.").

some duty of care owed by defendant to the plaintiff"). To establish the existence of a duty of care, a plaintiff must demonstrate the existence of a special relationship between the parties, "as in the case of professionals, common carriers, and bailees, which 'may be subject to tort liability for failure to exercise reasonable care.'" See, e.g., Purchase Partners, LLC v. Carver Fed. Sav. Bank, No. 09-CV-9687 (JMF), 2012 WL 6641633, at *14 (S.D.N.Y. 2012) (citing Sommer v. Fed. Signal Corp., 79 N.Y.2d 540, 551 (1992)). And as discussed, see supra Section C, joint venturers have a duty to disclose all material facts and to refrain from engaging in self-dealing.

Even if not time barred, Plaintiff's negligence claim fails because there is no evidence that Defendant owed Plaintiff a duty independent of his contractual obligations under the joint venture agreement and fiduciary obligations stemming therefrom. See Mallikarjun v. Travelers Home & Marine Ins., No. 25-CV-4045 (GHW), 2026 WL 535226, at *6 (S.D.N.Y. Feb. 25, 2026) (dismissing negligence claim where plaintiff "fails to plead any facts to suggest that [defendant] owed him an independent duty of care beyond its contractual obligations"); Bd. of Managers of Riverview at Coll. Point Condo. III v. Schorr Bros. Dev. Corp., 182 A.D.2d 664, 666 (2d Dep't 1992) (dismissing negligence claim where "plaintiffs have failed to establish that a legal duty of care was owed to them independent of the contractual duty allegedly arising from the agreement"). Further, as already discussed, Defendant did not breach any fiduciary duty stemming from the joint venture agreement because Defendant did not engage in self-dealing and he disclosed to Plaintiff all material facts about the loan.

Plaintiff points to Defendant's testimony that he had a duty "not to let [Plaintiff] down or squander her investment" in Cache. ECF No. 51-4 at 7; see also ECF No. 56 at 201. But these are Defendant's beliefs about his personal obligations to Plaintiff, given that they were partners. His statements, however, do not establish a legal duty recognized under New York law, which is

necessary to support a negligence claim. See, e.g., Daily v. Tops Markets, LLC, 134 A.D.3d 1332, 1333 (3d Dep't 2015) ("[A] moral duty does not equate with a legal duty[.]"); Hanna v. St. Lawrence Cnty., 34 A.D.3d 1146, 1150 (3d Dep't 2006) ("[A]ny moral or familial obligation . . . did not constitute an actionable legal duty[.]"). And tellingly, Plaintiff cites to no case where an independent duty was found in the context of joint venturers or partners based on one partner's personal beliefs about his obligations to the other partner.

In sum, Plaintiff's proposed claims for negligence and negligent misrepresentation are futile and thus her motion to amend the complaint is denied for this reason.

Plaintiff also seeks to amend her complaint to add a declaratory judgment to determine who is entitled to any funds recovered from the Borrower, including the $46,189.25 held in escrow by Cache's law firm. ECF No. 51-4 at 16-17; ECF No. 56 at 114, 143, 189; see also Court Ex. 1 at ¶ 8. The evidence adduced at trial established how the profits and losses of the joint venture would be allocated, and Defendant would suffer no prejudice from amendment to add the request for a declaratory judgment.

As discussed, Plaintiff and Defendant agreed to split any profits and losses equally. ECF No. 56 at 178, 195-97, 271-72; see also Pl.'s Ex. 2 at 2. This evidence was adduced to support Plaintiff's claims in the complaint, which required evidence as to how profits and losses would be allocated among the members of the joint venture in order to establish the existence of a joint venture. See supra at Section B.1. Defendant was thus aware prior to trial that evidence as to how profits and losses would be allocated would be introduced at trial. And, indeed, Defendant provided testimony at trial on that issue. ECF No. 56 at 178, 195-96, 271-72, 282. There thus is no prejudice to Defendant from permitting Plaintiff to amend her complaint now to add a request for declaratory judgment concerning who is entitled to any recovered funds.

Moreover, given the evidence that Plaintiff and Defendant agreed to allocate any losses and profits equally, any recovered funds must also be split between Plaintiff and Defendant equally. See USHA Holdings, LLC v. Franchise India Holdings, Ltd., No. 12-CV-3492 (KAM) (CLP), 2015 WL 13741743, at *16 (E.D.N.Y. Sept. 11, 2015), adopted by, 2015 WL 5719647 (E.D.N.Y. Sept. 29, 2015) (granting declaratory judgment on default where plaintiff provided evidence establishing that the parties were joint venturers in a license agreement and based on the language of the contract); Reza v. Mannan, No. 09-CV-233 (SIL), 2022 WL 16860294, at *9 (E.D.N.Y. Sept. 26, 2022) (finding that three partners agreed to share profits and losses equally and partner who brought suit was entitled to one-third of the total damages for partner who breached). Accordingly, any funds recovered from the Borrower or Guarantor stemming from collection the promissory note must be split between Defendant and Plaintiff equally.

## CONCLUSION

For the foregoing reasons, judgment is entered in Defendant's favor on Counts I-III in the complaint. Plaintiff's motion to amend is **GRANTED** as to her request for a declaratory judgment. Any recovered funds from the Borrower or Guarantors, including the amount being held in escrow by Della Mura & Ciacci LLP, must be split between Plaintiff and Defendant equally. Plaintiff's motion to amend is **DENIED** as to her request to add new claims for negligence and negligent misrepresentation. The Clerk of Court is directed to enter judgment in favor of Defendant and close the case.

**SO ORDERED.**

DATED: New York, New York
September 15, 2026

VALERIE FIGUEREDO
United States Magistrate Judge